USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/31/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
AMY HAUS, et al.,

                   :

            Plaintiffs,              REPORT & RECOMMENDATION

                   :

      -against-               03 Civ. 4915 (RWS)(MHD)

                   :

CITY OF NEW YORK, et al.,

                   :

           Defendants.

------------------------------x

TO THE HONORABLE ROBERT W. SWEET, U.S.D.J.:

     Seventeen plaintiffs commenced this class-action lawsuit under 42 U.S.C. § 1983 to seek relief for what they contend were numerous violations of their constitutional rights by the City of New York and by at least twenty-two officials and employees of the New York City Police Department during a massive anti-war protest on February 15, 2003 in mid-Manhattan. They ask for declaratory, injunctive and monetary relief based on asserted violations of their First, Fourth and Fourteenth Amendments as well the commission of state common-law torts and violations of the New York State Constitution.

     At the conclusion of discovery, defendants and the fifteen

remaining plaintiffs[1] have each moved for partial summary judgment. For the reasons that follow, we recommend that defendants' motion be granted in part and denied in part and that plaintiffs' motion be denied. Plaintiffs have also moved for class certification, an application that we recommend be denied.

## I. The Nature of Plaintiffs' Claims

This case is an outgrowth of the City's efforts to manage crowd control at a huge protest rally called to express public opposition to the impending plans of the Bush administration to commence a war against the government of Iraq. In anticipation of the scheduled event, City officials declined to permit a protest march, citing concerns for public safety and security, and instead authorized a stationary demonstration, to take place on First Avenue at 51st Street, in the vicinity of the United Nations, and extending northward on that avenue. Ultimately, crowds that may have numbered in the hundreds of thousands assembled or attempted to assemble at that venue, but significant numbers of people were

---

[1] Plaintiffs Scott Fitzgerald and Alain DeHalleux did not appear for their depositions and are apparently no longer pursuing their claims in this case. Plaintiffs' counsel has agreed to voluntarily dismiss their claims with prejudice. (Decl. of Dara L. Weiss, Esq., Aug. 2, 2007, ("Weiss Decl.") at ¶¶ 20-22; Defs.' Mem. of Law at 1 n.3).

unable to reach First Avenue either because of the mass of participants already there or, allegedly, because of actions taken by the police that, whether intended or not, limited access to the site of the rally.

This lawsuit was commenced by a group of plaintiffs who alleged that their rights -- and those of numerous others -- had been violated in a variety of ways because of either policies or practices adopted by the Police Department to control the throngs who were seeking to appear at the site of the planned rally or actions taken that day by individual police personnel. Most of the plaintiffs complain that they were denied their First Amendment rights of expression and association (or assembly) by virtue of the police physically preventing them from reaching First Avenue. The particular tactics of which they principally complain include the erection of metal barricades, the blockage of side streets leading to First Avenue and the use of various forms of allegedly excessive physical force, including in some instances the unreasonable use of horses to obstruct their path. (2d Am. Compl. at ¶¶ 53-55). Most also complain that they were arrested without probable cause, in violation of their Fourth Amendment rights, for the sole purpose of clearing the streets, and that after long delays under uncomfortable conditions they were given summonses signed by police

3

personnel who had no knowledge of their encounter with the arresting officers and had no factual basis to sign the summonses. (<u>Id.</u> at ¶¶ 56(c)).

Apart from these allegations and claims, most of the plaintiffs assert that, in violation of the Fourth and Fourteenth Amendments, they were subjected to excessive and unnecessary force in the process of being arrested and detained, or that they were manhandled and otherwise assaulted by police officers or police horses even when they were not arrested, presumably in violation of due-process requirements. (<u>Id.</u> at ¶¶ 56(a)). A few of these plaintiffs allege that they suffered significant physical injuries or psychological trauma from these contacts with the police, and some also complain of pain inflicted on them by virtue of their being tightly rear-cuffed for extended periods of time. (<u>Id.</u> at ¶¶ 57-61, 64, 68-69).

Most of the arrested plaintiffs also assert that, after being arrested, they were detained for extended -- and, by implication, unnecessarily long -- periods of time under inappropriately harsh conditions. These conditions included prolonged exposure to the cold, denial of access to a toilet, denial of food and water, and refusals to unlock or loosen painfully tight handcuffs. (<u>Id.</u> at ¶¶

4

58-67, 69-71, 73).

Based on these allegations, plaintiffs assert constitutional-tort claims, and a host of state-law claims as well, all of which are alleged in consolidated fashion under the heading of four causes of action. The first invokes section 1983 as an umbrella for the federal claims, including denial of plaintiffs' rights of expression and association, false arrest, malicious prosecution, unreasonable detention and excessive force. (Id. at ¶¶ 74-75). The second asserts a Monell claim that the City is liable, based on all of the federal claims asserted against the individual defendants. (Id. at ¶¶ at 76-78). The third cause of action encompasses a host of common-law torts, including assault and battery; trespass; false imprisonment; negligence; intentional infliction of emotional distress; negligent hiring, training, supervision and retention; and conspiracy, as well as claims arising under the New York State Constitution. (Id. at ¶¶ at 79-81). The last cause of action invokes respondeat superior to hold the City liable for the state-law torts of police personnel. (Id. at ¶¶ 82-83).

In the complaint plaintiffs seek certification of a class consisting of all "persons whose rights of free expression, protest, assembly and association were denied on February 15, 2003

and in the future are likely to be denied, in violation of the First and Fourteenth Amendments . . . as a result of the policies and practices of the defendants which denied them access to the site of the protest and/or meaningful and unencumbered participation at the site of the protest against the war in Iraq." (Id. at ¶ 39). The pleading proposes three sub-classes, consisting of (1) all those "who were victims of the unreasonable and excessive use of force" allegedly employed by defendants in violation of the First, Fourth and Fourteenth Amendments, (2) all those arrested without probable cause or other legal justification in "mid Manhattan for merely attempting to engage in a lawfully protected, peaceful anti-war demonstration and who in many but not all instances were then criminally charged based upon sworn statements by NYPD officers . . . who had no knowledge of the circumstances of the arrests," and (3) all those "subjected to unreasonable and excessive detentions and conditions of detention . . .", including extended unduly tight handcuffing, refusal to provide food and water, failure to provide toilet facilities, and exposure to extreme cold. (Id. at ¶¶ 39(a)-(c)).[2]

_____

[2] As will be seen, plaintiffs have somewhat revamped their class-certification request in their pending motion, and now seek certification of four separate classes. (See Pls.' Class Mem. of Law at 1; pp. 248, infra.).

II.  The Current Summary-Judgment Motions

A. Defendants' Summary-Judgment Motion

Defendants seek summary judgment on most, though not all, of plaintiffs' claims. They advance a plethora of arguments to achieve this result.[3]

Defendants first address the conditions-of-detention claims. They argue that the proof fails to sustain a claim of municipal liability for the challenged conditions, that the evidence fails to demonstrate that plaintiffs' rights were violated by virtue of those conditions, that plaintiffs cannot demonstrate that any of the named individual defendants was responsible for the deprivation of their rights as a result of those conditions, and, finally, that the individual defendants are entitled to qualified immunity for any such hypothesized violations. (Defs.' Mem. of Law at 4-46; Defs.' Reply Mem. of Law at 5-12).

Defendants then turn to the First Amendment claims. They first argue that plaintiffs cannot demonstrate municipal liability for

---

[3] We cite the three briefs on defendants' summary-judgment motion as follows: "Defs.' Mem. of Law at __", "Pls.' Mem. in Opp'n at __," and "Defs.' Reply Mem. of Law at __".

any such violations. (Defs.' Mem. of Law at 48-52; Defs.' Reply Mem. of Law at 16-23). Next they assert that plaintiffs cannot establish that the crowd-control methods employed by the New York City Police Department violated their First Amendment rights. (Defs.' Mem. of Law at 52-58; Defs.' Reply Mem. of Law at 23-31). They then contend that the evidence regarding individual police actions taken against some of the plaintiffs cannot be shown to have transgressed those plaintiffs' First Amendment rights. (Defs.' Mem. of Law at 58-63). Finally, they argue that plaintiffs cannot demonstrate that any of the individual defendants violated their First Amendment rights and that in any event those defendants who participated in the challenged police actions are entitled to qualified immunity. (Defs.' Mem. of Law at 63-65).

Defendants next target the excessive-force claims. They assert that plaintiffs cannot show a basis for municipal liability, that the excessive-force claims of some of the plaintiffs fail as a matter of law, that plaintiffs do not plead and cannot demonstrate the liability of any of the individual defendants, and that the defendants who did interact with the plaintiffs are entitled to qualified immunity. (Defs.' Mem. of Law at 66-83).

As a fourth category of challenges to plaintiffs' case,

defendants focus on the false-arrest claims. Again, they first argue against municipal liability. (Defs.' Mem. of Law at 83-89). They then assert that some of the arrests were buttressed by probable cause as a matter of law and that some cannot be challenged because the arrests led to adjournments in contemplation of dismissal. (Defs.' Mem. of Law at 89-112). They then argue that plaintiffs fail to plead, or to offer sufficient evidence to prove, these claims against some of the individual defendants and that the individual defendants actually involved in the incidents are entitled to qualified immunity. (Defs.' Mem. of Law at 112-22).

Defendants next attack the malicious-prosecution claims. They argue that plaintiffs cannot prove these claims because the individually sued defendants did not initiate the criminal proceedings. (Defs.' Mem. of Law at 124). Defendants further argue that some of the plaintiffs cannot prevail because the criminal proceedings against them did not end in their favor, that liability is precluded on all of plaintiffs' malicious-prosecution claims because the triggering arrests were supported by probable cause, and that the claims fail because the individual defendants were not animated by malice. (Defs.' Mem. of Law at 125-26). Finally, they assert that these defendants are entitled to qualified immunity. (Defs.' Mem. of Law at 127).

Defendants then turn to plaintiffs' state-law claims. They assert that some of these claims fail as a matter of law because plaintiffs did not exhaust required administrative remedies, that certain plaintiffs' claims should be dismissed because they fail to plead cognizable claims, and that liability on the state-law claims is precluded because defendants are protected "by good faith snd governmental immunities". (Defs.' Mem. of Law at 127-37; Defs.' Reply Mem. of Law at 84-89). Finally, defendants argue that, as a matter of law, plaintiffs are not entitled to either injunctive or declaratory relief. (Defs.' Mem. of Law at 137-45).

B. Plaintiffs' Summary-Judgment Motion

Plaintiffs oppose most of defendants' motion, and they also move for partial summary judgment, although their motion is somewhat more circumscribed than defendants' application.[4] They seek summary judgment on liability against the City and the individual defendants on their First Amendment and equivalent state-law claims premised on the implementation of the policing plan for the demonstration. (See Pls.' R.56 Mem. of Law at 10-46). They seek similar relief against certain individual defendants for

---

[4] We cite the three briefs addressing plaintiffs' Rule 56 motion as follows: "Pls.' R.56 Mem. of Law at __", "Defs.' R.56 Mem. in Opp'n at __", and "Pls.' R.56 Reply Mem. of Law at __".

the use of excessive force. (Pls.' R.56 Mem. of Law at 47-53).
Finally, they ask for summary judgment for some of the plaintiffs
on their false-arrest claims. (Pls.' R.56 Mem. of Law at 53-59).

C. <u>The Class-Certification Motion</u>

Plaintiffs have moved for class certification, which they seek
under both Civil Rules 23(b)(2) and (3).[5] They are asking for
certification of four classes, representing, respectively, (1)
individuals whose First Amendment rights were violated on February
15, 2003 or are likely to be violated in the future, (2) persons
subjected to excessive force on that date or likely to be so
victimized in the future, (3) members of the public who were
arrested in connection with the same demonstration without probable
cause or other legal justification, or are likely to face such
arrests in the future, and (4) persons who were arrested on that
date and "subjected to unlawful conditions of confinement," or who
are likely to be so treated in the future. (Pls.' Class Mem. of Law
at 1).

---

[5] The pertinent briefing of the class-certification motion is
cited as follows: "Pls.' Class Mem. of Law at __", "Defs.' Class
Mem. in Opp'n at __", and "Pls.' Class Reply Mem. of Law at __".

ANALYSIS

I. The Summary-Judgment Motions

Before assessing the parties' respective summary-judgment motions, we briefly summarize the standards applicable to such Rule 56 applications. We then turn to an evaluation of the parties' arguments, organizing our discussion on a claim-by-claim basis, starting with defendants' motion.

A. Summary Judgment Standards

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting

12

Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)). It is
axiomatic that the responsibility of the court in deciding a
summary-judgment motion "is not to resolve disputed issues of fact
but to assess whether there are any factual issues to be tried,
while resolving ambiguities and drawing reasonable inferences
against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d
9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley
v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden
of informing the court of the basis for its motion and identifying
those portions of the "pleadings, the discovery and disclosure
materials on file, and any affidavits" that demonstrate the absence
of a genuine issue of material fact. Fed. R. Civ. Pro. 56(c); see,
e.g., Celotex, 477 U.S. at 323; Koch v. Town of Brattleboro, 287
F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the
burden of proof on a specific issue, the movant may satisfy its
initial burden by demonstrating the absence of evidence in support
of an essential element of the non-moving party's claim. See, e.g.,
Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co.,
315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth
Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails
to meet its initial burden, however, the motion will fail even if

13

the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003). If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact on any such challenged element of its claim. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party may not rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. Pro. 56(e); see, also, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 59-60 (2d Cir. 2004), nor may he rely on his pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann,

14

21 F.3d 522, 526 (2d Cir. 1994).

If both sides move for summary judgment, the court must separately assess the adequacy of each motion. Thus, if neither movant satisfies his Rule 56 burden, the court must deny both motions. E.g., Marvel Entm't, Inc. v. Kellytoy (USA), Inc., 769 F. Supp.2d 520, 524 (S.D.N.Y. 2011) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)).

B. Defendants' Motion: The First Amendment Claims

At the heart of plaintiffs' First Amendment claims is a challenge to perceived inadequacies or improprieties in the Police Department's plan for crowd control, and its implementation of that plan, during the February 15 demonstration. In substance, plaintiffs contend that they and others were deprived of the ability to participate in the demonstration through the utilization of rectangular pens along the First Avenue site of the demonstration, the blocking off of many side streets -- particularly in the Fifties -- leading to First Avenue (notably blocks east of Second or Third Avenues), and the Department's failure to inform the public (or even, apparently, some police personnel manning the barriers) as to the details of how would-be

15

demonstrators could access First Avenue. Plaintiffs also appear to contend that some officers engaged in conduct of a punitive or obstructive nature designed to punish putative demonstrators for their intention to participate in the event or to prevent them from doing so. They also argue in their summary-judgment motion papers that the First Amendment rights of some of the plaintiffs were violated by the use of unlawful arrests and the exercise of excessive force. This argument seems to rest on the notion that the arrests and use of excessive force -- even if not designed either to prevent people from reaching the site of the demonstration or to punish them for seeking to participate in the protest -- had the effect of preventing the affected plaintiffs from attending the demonstration. Based on these various theories, plaintiffs press claims against the City as well as against the individual defendants.

In opposition, defendants first press the argument that liability may not be imposed on the City because the Department's crowd-control plans and the actions taken by police personnel (including supervisors and patrol officers) to implement these plans were not pursuant to a municipal policy, custom or practice. Otherwise stated, defendants contend that the plans were designed and implemented by officials who were not municipal decision-makers

within the meaning of case law that has defined the full reach of the Supreme Court's decision in <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658 (1978), and that the Department did not approve or acquiesce in any police conduct that was designed to, or did, violate the plaintiffs' First Amendment rights. They then argue that liability may not be imposed on any individual defendant for alleged First Amendment violations because the evidence would not permit a trier of fact to find that any of the plaintiffs' First Amendment rights had been violated. Next they argue that some of the plaintiffs' claims fail because they do not demonstrate that any of the named defendants bore personal responsibility for the alleged misconduct. Finally, defendants invoke a qualified-immunity defense on behalf of all of the individual defendants who may have been involved in conduct cited by plaintiffs.

1. <u>The Pertinent Record</u>

We start by summarizing some of the pertinent evidence regarding the evolution of police planning for the demonstration. In this regard, we note that many of the basic facts may be found in testimony at a 2004 preliminary-injunction hearing in the case

of <u>Stauber v. City of New York</u>, 03 Civ. 9162 (S.D.N.Y.),[6] and in the findings made by Judge Sweet in the wake of that hearing, <u>see Stauber v. City of New York</u>, 2004 WL 1593870, at *1-6 (S.D.N.Y. July 19, 2004), as well as in findings made by Judge Jones in connection with a preliminary-injunction motion filed ten days before the February 15, 2003 event. <u>See United for Peace & Justice v. City of New York</u> ("<u>UPJ</u>"), 243 F. Supp.2d 19, 20-21 (S.D.N.Y. 2003), <u>aff'd per curiam</u>, 323 F.3d 175 (2d Cir. 2003). Additional detail is provided by the deposition testimony of senior Police Department officials involved in the preparation and implementation of the Department's plans. (<u>E.g.</u>, Defs.' Exs. X, Z, CC, DD; <u>see also Stauber</u> Tr. at 332 (admitting into evidence designated portions of the deposition of Capt. Christopher Acerbo[7] )).

The demonstration was sponsored by an organization known as United for Peace and Justice ("UPJ"), a coalition of national

---

[6] The transcript of this hearing is attached as Exhibit Y to defendants' memorandum of law, and is cited as "<u>Stauber</u> Tr. at ___".

[7] Excerpts of Captain Acerbo's deposition are attached as Exhibit 50 to the Affirmation of Vera M. Scanlon, Esq., in support of plaintiffs' motion for class certification ("Scanlon Aff."). Captain Acerbo's full deposition is attached as Exhibit 2 to the Declaration of Jonathan C. Moore, Esq., in support of Pls.' Opp'n Mem. of Law. Unless otherwise noted, citations to "Pls.' Ex. ___" are citations to materials submitted as exhibits to the Scanlon Aff.

organizations that opposed the impending invasion of Iraq by the United States and other governments. UPJ, 243 F.Supp.2d at 20. UPJ applied on January 24, 2003 for a permit from the Police Department for a February 15, 2003 protest march that it anticipated would involve at least 50,000 to 100,000 demonstrators. Id.; see also Defs.' Ex. PP. Under the group's proposal, the march could have started at Dag Hammerskjold Plaza on First Avenue, just north of the United Nations, with any overflow crowds to gather on Second Avenue, and would have proceeded south past the United States Mission and the United Nations, then west on 42nd Street to Seventh Avenue, from where the marchers would have headed north to the Sheep Meadow in Central Park for a rally. UPJ, 243 F. Supp.2d at 20.

After some negotiation, the Police Department denied the requested permit on February 4, 2003, citing security and crowd-control problems in policing a march of that size or even larger (the UPJ having indicated that the crowd might well be significantly larger than 100,000), and it offered instead a stationary demonstration on First Avenue starting at the Dag Hammerskjold Plaza (which occupies that avenue from 47th to 49th Streets) and stretching as far north on First Avenue as needed to accommodate the number of demonstrators who appeared. Id. at 20-21.

19

Although UPJ challenged the denial of a march permit in this court by way of a preliminary-injunction motion, the District Court and the Second Circuit upheld the decision of the Police Department and found that the stationary demonstration, which would be held on and in front of a stage at 51st Street, within sight of the United Nations, was an adequate alternative for First Amendment purposes. See id. at 23-31; UPJ, 323 F.3d at 176-78.

The Second Circuit's decision was issued on February 12, 2003, only three days before the demonstration. In the few days leading up to the planned event, the Police Department prepared a set of plans for crowd control for what was anticipated to be potentially a very large turnout, an assumption that was more than amply fulfilled by the appearance of what UPJ itself, as well as others, estimated was a crowd in the hundreds of thousands. (Defs.' Ex. X at 29-30; M. Esposito Dep. at 11-12,[8] Gannon Dep. at 191;[9] see also

---

[8] Department Chief Joseph Esposito was deposed for this case on December 27th and 28th, 2005. The transcripts of the two days of his deposition are cited as, respectively, "Defs.' Ex. X at __" and "Defs.' Ex. Z at __." He was also deposed in the Stauber case on April 23, 2004, and this deposition is cited as "Defs.' Ex. UU at __." The parties also cite to the deposition of Michael Esposito, who was the Chief of Patrol Borough Manhattan South on February 15, 2003. His deposition is attached as Exhibit CC to defendants' motion for summary judgment, and is cited as "M. Esposito Dep. at __."

[9] As with most of the depositions cited herein, the deposition of Lieutenant Dennis Gannon (Defs.' Ex. DD) is

20

Stauber Tr. at 313, 324). To ensure some level of access by the police and their vehicles to First Avenue and to avoid a potentially dangerous crush of demonstrators in a limited space, the Department decided to use metal barriers to create a series of rectangular pens along First Avenue north of the stage, which was at 51st Street. (Stauber Tr. at 160, 484-85; see also Defs.' Ex. X at 118-22, M. Esposito Dep. at 88-97). As planned, the pens were to start at 51st Street on First Avenue and would be set up in a series stretching north along the Avenue as far as necessary to provide access for all who wanted to participate in the demonstration. (Stauber Tr. at 256-58; Defs.' Ex. X at 28-32; Gannon Dep. at 158-59). To control the flow of people, the Department planned to close off side streets leading to First Avenue in those areas where the pens were full, and to direct demonstrators who were present on the more westerly avenues, particularly Second Avenue, to proceed north on those avenues before turning east to enter First Avenue. (Stauber Tr. at 256-58; Defs.' Ex. X at 32-34; M. Esposito Dep. at 122-24; Gannon Dep. at 163-65). The participants would then be permitted to filter south through the series of pens until they filled the southern-most available pens. (Stauber Tr. at 258; Gannon Dep. at 163-65). It was

included in its entirety as a single exhibit to either defendants' or plaintiffs' papers. Where this is the case, the deposition will be cited without further explanation.

estimated that each pen could contain up to 3,000 people, although some estimates suggest that the number might approach 4,000 or even 5,000. (Defs.' Ex. X at 27-28, M. Esposito Dep. at 15-16); Stauber, 2004 WL 1593870, at *9. The Police Department at one point estimated that the pens on First Avenue, if filled up to 75th Street, could accommodate up to 100,000 people. (Scanlon Aff. at ¶ 128).

The Police Department provided an oral summary of these plans to UPJ a few days before the demonstration, but neither provided a written summary of their plans to UPJ nor posted the details on the Police Department website. Stauber, 2004 WL 1593870, at *7; Stauber Tr. at 256, 258. UPJ also failed to post the details of the plan on its own website. Stauber Tr. at 298-301. It appears that the Police Department did not provide written instructions to the large numbers of officers and other police personnel who were assigned to police the demonstration, and that the written information provided to the supervisory police personnel did not contain specifics on how the demonstrators were to access the demonstration site. Stauber Tr. at 256; Defs.' Ex. X at 104-11.

In the event, it appears that at least 80,000 to 100,000 people, and perhaps as many as 500,000, showed up to take part in

22

the demonstration. (Gannon Dep. at 139-41, 190-91; Defs.' Ex. QQ at 1).[10] Large numbers ended up, as planned, on First Avenue, filling the pens for a considerable distance up the Avenue, perhaps as far north as 82nd Street. (Defs.' Ex. W, NN at 1, QQ at 1).[11] Each pen apparently extended almost from sidewalk to sidewalk, thus covering almost all of the roadway of First Avenue and most of the distance between the north and south ends of each block. (E.g., Stauber Tr. at 481-82; Cavanna Dep. at 128; Douglas Mar. Dep. at 78; Defs.' Ex. X at 27).

Many other people apparently remained on Second and Third Avenues in the Fifties after being confronted with barriers on adjacent side streets, precluding direct access to First Avenue.

_____

[10] The NYPD's official after-action report states that 100,000 people had attended (Defs.' Ex. QQ at 1), but this estimate apparently includes only those demonstrators who reached First Avenue. (Gannon Dep. at 139-41). One of the plaintiffs, Donna Lamb, reported that 700,000 people had participated in the demonstration, presumably including those who did not reach First Avenue. (Defs.' Ex. NN, at 1).

[11] One of the plaintiffs, Delaine Douglas, testified that she accessed First Avenue at 72nd Street and entered a pen between 71st and 72nd Streets. (Ms. Douglas's deposition took place over two days, March 27, 2005, and April 6, 2005. Since the transcript of each day begins with page 1, the transcript is cited as "Douglas Mar. Dep. at __" and "Douglas Apr. Dep. at __".) She and the other demonstrators with her in that pen were subsequently allowed to move south one block at a time, and she ended up in a pen between 60th and 59th Streets. (Douglas Mar. Dep. at 74-75, 78-80, 92-93; Douglas Apr. Dep. at 25).

Some of these people apparently were not aware that First Avenue was filled, as per the Department's plans, at the side-street levels where they were seeking to proceed directly to First Avenue. It also appears that some did not know that to access First Avenue they needed to proceed north some distance and then east to First Avenue. (Stauber Tr. at 50-51, 53, 64-65, 163-164; Bryant Dep. at 21-22; Dodde Dep. at 49-51, 55-56). There is also evidence that some police officers on the scene were not fully aware of that fact or had not been clearly instructed to let the crowds on Second Avenue know how to get to First Avenue. (Stauber Tr. at 214, 262-263; see also Blair Dep. at 26; Dodde Dep. at 49-51, 54-56; Defs.' Ex. X at 33-41, 150-51). Other evidence, however, suggests that the pens on First Avenue filled up so quickly that, even early in the day, it became impossible to accurately communicate how far north the crowd would have to travel to reach First Avenue, since by the time the crowd reached the side street that they had been previously informed was open, that street would inevitably be closed. (M. Esposito Dep. at 123-24, 132-33; see Gannon Dep. at 204-05, Cavanna Dep. at 121-22, 125-26).

Other complications, possibly unanticipated by the Department, were encountered by some demonstrators. Thus some individuals -- including one plaintiff -- who reached First Avenue entered pens

24

along with other members of the public, and, while waiting for the
demonstration program to begin or finish, found a need to exit the
pens, either to go for refreshments or to leave because of illness
or for other reasons, and were either denied a means of exiting the
pen or were told by a nearby police officer that if they left they
would not be permitted to return. (See Stauber Tr. at 51-52, 119-
122, 125-126, 212-213, 368-370; Douglas Mar. Dep. at 71-72).[12]

Other plaintiffs recount instances in which they encountered
a crush of people on Second or Third Avenues and reported that
police officers on the scene denied them either the ability to head
to First Avenue or any information as to how to get there. (Stauber
Tr. at 64-65, 163-164, 210-211; Blair Dep. at 26; Dodde Dep. at 49-
51, 55-56). Still others mentioned individual instances in which
police officers ordered them to disperse but offered no means to do
so since they were trapped in crowds who were also unable to move
because of a crush of people. (Stevens Dep. at 18-22; see also
Connor Dep. at 62-65). Several plaintiffs also recounted that,
while they were trapped in large and immobilized crowds, the police
attempted to push the crowds onto already filled sidewalks, either

---

[12] The only plaintiff who reported such a problem was Delaine
Douglas. At least one plaintiff reached First Avenue and
participated in the rally, encountering a problem only after
leaving the site of the demonstration. (See, e.g., Cavanna Dep.
at 127-28, 152-53).

by physically pressing the front rows of people in the roadway or
by aggressive maneuvering of police horses. (<u>Stauber</u> Tr. at 79-80,
164-65, 263; Dodde Dep. at 56-61; Connor Dep. at 58-87). Finally,
one plaintiff testified that, while trapped in such a crowd, she
fell or was pushed to the ground and was then seriously injured
when a mounted police officer's horse stepped on her leg (Haus Dep.
at 55-59, 72-86, 88-91), two others testified that they too had
been trapped in a crowd and then bumped into or stepped on by a
horse, and suffered some relatively minor injury in the process.
(Connor Dep. at 78-79; Silva Dep. at 80-81), and a fourth plaintiff
testified that he had been bumped by a horse but suffered no
injury. (Stevens Dep. at 23-25).

### 2. <u>Defendants' Monell Theory</u>

As noted, plaintiffs seek to hold the City liable for the
alleged violation of their First Amendment rights. Before assessing
defendants' arguments on this point, we summarize the applicable
standards for municipal liability.

### a. <u>Monell Criteria</u>

Municipal liability under section 1983 may be imposed only on

26

the basis of a showing that the City bore some responsibility for the alleged violation of the plaintiff's constitutional rights. See, e.g., City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under section 1983 only where the municipality *itself* causes the constitutional violation at issue.") (emphasis in original). To establish such liability, the plaintiff must demonstrate that his constitutional rights have been infringed by a municipal agent "whose acts may be fairly said to be those of the municipality" and that his injury was caused by a "municipal 'policy' or 'custom.'" Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403-04 (1997) (quoting, inter alia, Monell, 436 U.S. at 694). A single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered policy and thus subject a municipality to liability. Brown, 520 U.S. at 405-06. Alternatively, a policy may be established by showing that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which the supervising policy-maker must have been aware. See, e.g., Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011); City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Monell, 436 U.S. at 690-91.

The Supreme Court has further held that, in appropriate

27

circumstances, a municipality's failure to provide adequate training or supervision of its agents, if it amounts to deliberate indifference, may constitute such a policy or custom and thereby trigger liability under section 1983. See, e.g., Brown, 520 U.S. at 407-08 (citing City of Canton, 489 U.S. at 387-91); see also Sorlucco v. N.Y. City Police Dep't, 971 F.2d 864, 873 (2d Cir. 1992). But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 131 S.Ct. at 1359 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822-23 (1985)). In order to incur liability, the inaction by the municipality "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (quoting City of Canton, 489 U.S. at 388) (brackets in original)). This "deliberate indifference" standard is satisfied only in narrowly circumscribed circumstances, that is, when the City's policy-makers are on notice of the strong likelihood that failure to act -- most commonly, failure to adequately train municipal officials -- will lead to constitutional violations. See, e.g., Connick, 131 S.Ct. at 1359-60 (quoting, inter alia, Brown, 520 U.S. at 407, 410). This generally requires proof of "[a] pattern of similar constitutional violations by untrained employees." Id. at 1360 (citing Brown, 520 U.S. at 409). Similarly, a failure to supervise will trigger Monell

28

liability only if the municipality was aware of a pattern of
violations by hitherto-unsupervised employees or had another
compelling reason to know that a failure to provide closer
supervision was likely to lead to violations by those employees.
E.g., Reynolds v. Giuliani, 506 F.3d 183, 192-93 (2d Cir. 2007)
(discussing Walker v. City of New York, 974 F.2d 293, 297-98 (2d
Cir. 1992)).


        b. The Final-Decision-Maker Defense


        Defendants seem to suggest that the City cannot be held
responsible for any First Amendment violations because the plan for
crowd control and its implementation were in the hands of senior
police personnel other than the Police Commissioner. (Defs.' Mem.
of Law at 49-50). We reject this argument, since the evidence in
this case could permit a trier of fact to conclude that some
complained-of conduct by the police was directed by, approved of,
or acquiesced in by the ultimate policy-maker in the Police
Department and that other aspects could be viewed as reflecting
deliberate indifference by the Department's decision-makers.


        There is no dispute that in formulating a plan for managing
this demonstration, the Department anticipated the presence of a

29

vast number of people, an event for which it had to quickly make detailed and broad-scale preparations and commit a very large contingent of police personnel. Moreover, the sensitivity of the event and how the Department would handle it obviously was underscored when UPJ asked for a parade permit for up to 100,000 people and the Department rejected that request for security and safety reasons, offering instead the alternative of a large-scale stationary demonstration. Finally, the importance of the issue and its public-safety ramifications were further emphasized by the emergency litigation that occupied both the District Court and the Second Circuit in the days after the Department's decision to refuse a march permit.

Under these circumstances, defendants' suggestions that the Police Commissioner, who is concededly the most senior decision-maker within the Department, bore no responsibility for the crowd-control plan that the Department developed as an alternative to the march that it vetoed is, to put it mildly, less than plausible. Indeed, the evidence indicates that the plan was initially prepared by Lt. Dennis Gannon and his staff and reviewed and approved both by the Chief of the Department, Joseph Esposito, and by the Commissioner, Raymond Kelly. (See, e.g., Gannon Dep. at 216-24; Kelly Dep. 66-67; Defs.' Ex. X at 112-17; Stauber Tr. at 460-61).

30

Moreover, even if one were to allow for the possibility that the Commissioner simply delegated all responsibility to his subordinates, that possibility does not amount to evidence so compelling as to preclude a reasonable trier of fact from finding to the contrary.

Second, Chief Joseph Esposito -- who is among the highest-ranking officials in the Police Department -- testified that he reviewed and approved the plan in question and was on-site at the demonstration throughout the day to implement it. (Defs.' Ex. X at 41, 112-17, 150-51). Whether decisions made by Esposito could subject the City to liability for the alleged deprivation of plaintiffs' rights is unclear. See Praprotnik, 485 U.S. at 123-25 (discussing guidelines for identifying which municipal officials have final policy-making authority for purposes of subjecting a municipality to section 1983 liability); Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (concluding that an elected county sheriff had final policy-making authority in the context of section 1983 liability, but that a New York Police Department sergeant did not); Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000). In any event, the record does not conclusively demonstrate that still higher-ranking Police Department officials, including the Commissioner, bore no responsibility for the tactics used by

the police. Moreover, if the Commissioner simply deferred to his chiefs, he -- and thus the City -- could still be fairly taxed with responsibility for that hand-off in view of the nature of the challenges at stake in dealing with such a massive public turnout. See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127-29 (2d Cir. 2004) (finding that a police chief's failure to supervise at a demonstration could trigger municipal liability under Monell); Allen v. City of New York, 2007 WL 24796, at *19 (S.D.N.Y. Jan. 3, 2007) (express delegation of policy-making authority by decision-maker subjects City to liability) (citing Pembaur v. City of Cincinnati, 475 U.S. 480, 483 (1986)). As the Supreme Court noted in Praprotnik: "If . . . a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." 485 U.S. at 126.

In sum, insofar as plaintiffs' First Amendment claims are based on the plan for policing the demonstration that was prepared by the Police Department, we cannot recommend summary judgment for the City on those First Amendment claims based solely on the Commissioner's purported lack of involvement in preparing the

plan.[13]

      c. The Potential Responsibility of the City Based on
         a Pattern of Behavior or Lack of Training or Supervision

Insofar as plaintiffs may be seeking to hold the City liable

on their First Amendment claims on alternative Monell grounds, they

fail to proffer an adequate basis to present at trial. As noted,

absent a policy explicitly approved by a municipal decision-maker,

a municipality may be held liable if the plaintiff demonstrates

that a pattern of prior misconduct that may be linked to the

violation alleged in his case indicates that the City had an

informal policy or custom of promoting or permitting violations, or

that the City failed to act (either by appropriate training or

greater supervision) to prevent predictable violations of the

rights of members of the public. Connick, 131 S.Ct. at 1359-60. The

record is devoid of such proof.

Plaintiffs proffer no evidence that in the period preceding

the February 15 demonstration, the City experienced widespread

---

[13] Insofar as plaintiffs seek to impose First Amendment
municipal liability through the Commissioner's involvement, their
claims must be read as limited to the design of the plan, not to
specific actions taken by police personnel that were not dictated
by the plan and that involved on-the-ground decisions as to the
closing of specific streets or tactics used to clear blocked
thoroughfares or whether to make specific arrests.

First Amendment violations by the police when faced with large-scale demonstrations. Indeed, the February 15 demonstration was apparently unprecedented in its size, and given both the uncertainty regarding the size of the demonstration and the short time frame in which planning could take place, presented a unique challenge for policing, as Judge Jones recognized in denying UPJ's request for an injunction granting them a march permit. UPJ, 243 F. Supp.2d at 26-27; see also M. Esposito Dep. at 205-06. Moreover, although plaintiffs attempt to make a case for the notion that the Police Department has persisted in violating the First Amendment rights of protesters in succeeding events (see Pls.' Mem. in Opp'n at 39), they fail to proffer meaningful evidence establishing that First Amendment violations by the police have been a pattern of City life in the context of political events,[14] much less that before February 15, 2003 the Police Department knew of the propensity of its personnel to violate the First Amendment rights

---

[14] Plaintiffs principally invoke the fact that lawsuits have been filed, and some are still pending, that raise issues about police conduct at later protests, notably in connection with the 2004 Republican National Convention (see Pls.' Mem. in Opp'n at 39), but the pendency of these suits, which principally involve Fourth Amendment claims, see, e.g., MacNamara v. City of New York, __ F.R.D. __, 2011 WL 1991144, at *12-26 (S.D.N.Y. May 19, 2011), cannot be used as proof of a pattern of animus by the Police Department to First Amendment activity, much less as suggesting that whatever occurred in 2004 or later can shed meaningful light on whether such a policy or custom existed in 2003.

of the public and chose not to act to prevent a recurrence of such a pattern.

As for possible City inaction betokening a sub rosa policy to violate the First Amendment rights of the public, plaintiffs do not offer proof sufficient to take such a theory to trial on their First Amendment claims. They proffer no meaningful evidence of a systematic failure by the Department to supervise its personnel in the face of an awareness that, absent more aggressive supervision, the police on the street would pursue such a political agenda. Plaintiffs equally offer no evidence that the Department's training was in any specific respect inadequate to provide police officers with an understanding of their responsibility to respect the public's right to exercise First Amendment rights, much less that Police Department supervisors were aware of the danger and knew that, absent more rigorous training, the police under their command would pursue First Amendment vendettas or otherwise violate the public's right to engage in protected activities.

### 3. The Merits of the First-Amendment Challenge to the Plan

Defendants next argue that the plan for policing the February 15, 2003 demonstration (and its implementation) cannot be found to

have transgressed the First Amendment rights of the plaintiffs. On this basis they seek summary judgment for the City as well as the individual defendants. Alternatively, they invoke a qualified-immunity defense for the individual defendants.

a. The Plan Itself

We start with the premise that the free expression of personal views, particularly in the political arena, stands at the apex of constitutional guarantees. See, e.g., Boos v. Barry, 485 U.S. 312, 318 (1988); Cohen v. California, 403 U.S. 15, 24 (1970); cf. United States v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938). Nonetheless, the exercise of this guarantee in public fora may be circumscribed by local authorities asserting their police powers to safeguard public health and safety. Reasonable time, place and manner restrictions on public speech are permissible if they are content-neutral, that is, "justified without reference to the content of the regulated speech", and if they are "narrowly tailored to serve a significant governmental interest and . . . leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Committee for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

36

Defendants bear the burden of establishing that their restrictions were narrowly tailored. Deegan v. City of Ithaca, 444 F.3d 135, 241 (2d Cir. 2006). Narrow tailoring of a restriction means that the limitation is "not substantially broader than necessary to achieve the government's interest." Ward, 491 U.S. at 800. It need not, however, be "'the least restrictive or least intrusive means' of regulating speech." UPJ, 323 F.3d at 177 (quoting Ward, 491 U.S. at 798); accord, e.g., Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 12 (1st Cir. 2004). The government has meaningful discretion in choosing among alternative protocols, and the validity of its choice does not depend on "'a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." Ward, 491 U.S. at 800 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)). Of particular note, the courts have recognized that the City is not required to do all that it is physically capable of doing to promote First Amendment expression. Rather, it is given the discretion to balance often-conflicting strands of public interest, including the need to ensure access to the streets by emergency vehicles, the ability of the police to deal with public disorders or crises, ensuring access by members of the public not participating in the event to their own homes, and more generally

the preservation of public safety and order. See, e.g., Million Youth March, Inc. v. Safir, 155 F.3d 124, 125-27 (2d Cir. 1998); Coalition to March on the RNC & Stop the War v. City of St. Paul, 557 F. Supp.2d 1014, 1024-27 (D. Minn. 2008). As the Supreme Court has noted: "The requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 798-800 (quoting Albertini, 472 U.S. at 689).

The application of these general nostrums to restrictions on marches and stationary demonstrations is reflected in a growing body of case law. These decisions -- many in the context of the quadrennial national political-party nominating conventions -- make plain that, when confronted with proposed large-scale demonstrations, the City may preclude marches if they involve anticipated crowds so large that the police reasonably fear that they will seriously disrupt traffic or present other insuperable logistical difficulties inimical to public health or safety. E.g., UPJ, 323 F.3d at 177. They further make plain that the authorities may restrict stationary demonstrations in terms of the geographic area in which they may take place, e.g., Million Youth March, Inc., 155 F.3d at 126-27; Bl(a)ck Tea Society, 378 F.3d at 10-11, 14-15,

that they may require that the demonstrators be limited in terms of where on the streets they may stand so as to ensure access for police and other emergency vehicles, see, e.g., Stauber, 2004 WL 1593870 at *21, *25-29, *33; see also ACLU of Colorado v. City & County of Denver, 569 F. Supp.2d 1142, 1162 (D. Colo. 2008), and that they may require that crowds in excess of the safe capacity of the designated demonstration area be channeled to other locations. See, e.g., UPJ, 323 F.3d at 176-78; Million Youth March, Inc., 155 F.3d at 125-27; Stauber, 2004 WL 1593870 at *25. See also Bl(a)ck Tea Society, 378 F.3d at 12-15; Coalition to March on the RNC, 557 F. Supp.2d at 127-31; National Council of Arab Ams. v. City of New York, 331 F. Supp.2d 258, 272 (S.D.N.Y. 2004).

The evidence in this case reflects that the City's plan for the February 15 demonstration met these criteria. The plan was unquestionably content neutral, that is, it was not triggered by hostility to, or concern with, the political message of the demonstrators. Indeed, the Second Circuit so held in affirming the decision of Judge Jones to deny the preliminary-injunction motion of UPJ, UPJ, 323 F.3d at 176-77, and the current record is consistent with that finding.[15] Hence the pertinent test is the

---

[15] Plaintiffs mount a challenge to this conclusion principally in their own summary-judgment motion, an argument that we reject for reasons discussed in more detail at pp. 236-

"reasonable time, place and manner" standard rather than the more stringent "prior restraint" criterion espoused by plaintiffs. Cf. Hill v. Colorado, 530 U.S. 703, 733-34 (2000) (citing, inter alia, Schenck v. Pro-Choice Network, 519 U.S. 357, 374 n.6 (1997), and Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 674 n.2 (1994)); Bl(a)ck Tea Society, 378 F.3d at 12 ("The Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints[.]") (citing cases).

    As for the substance of the plan, it was consistent with First Amendment "time, place and manner" constitutional standards. UPJ, 323 F.3d 177. It allowed for large -- indeed, potentially unlimited -- numbers of people to gather. (Gannon Dep. at 158-65; Defs.' Ex. X at 28-34; M. Esposito Dep. at 122-33). It provided a location for the rally that was within sight of the United Nations and the United States Mission, both ostensible targets of the demonstrators' intended message, see UPJ, 243 F. Supp.2d at 21-22,

---

47, infra. It suffices for present purposes to note that, apart from whatever preclusive or persuasive effect may or may not be found in the UPJ decisions, the record evidence in this case is barren of any meaningful indication that the Police Department as an institution, or its basic crowd-control plan, was animated by hostility to the demonstration or its proponents. This of course does not exclude the possibility that individual officers may have evinced such hostility, and as we explain below, on one or more claims plaintiffs have a triable issue on their contention that individual defendants were so motivated.

despite the security concerns inherent in allowing a large gathering of people in that area. (See Gannon Tr. at 92-93, 112-16, 131-32). It used large pens, occupying almost all of the roadbed on First Avenue between side streets, as a means of allowing large numbers of people to attend on First Avenue while preventing an undue crush of people in any given geographic area on First Avenue and as a way of ensuring that police and emergency vehicles had access to all areas adjacent to the demonstration. (E.g., Stauber Tr. at 481:16-482:8; Cavanna Dep. at 128; Douglas Mar. Dep. at 78:4-14; Otero Dep. at 36-37; Defs.' Ex. X at 27-34; M. Esposito Dep. at 88-97). It closed off side streets on a rolling basis as an additional measure to ensure that the crowds in any one part of First Avenue not grow so large as to endanger public safety. (Defs.' Ex. X at 32-41, 118-22; M. Esposito Dep. at 88-97; Gannon Dep. at 163-64). It provided for people desirous of accessing the site of the demonstration to do so through other side streets progressively further north, as blocks along First Avenue north of the front of the demonstration filled up. (Defs.' Ex. X at 27-34, 150-51; Gannon Dep. at 163-64). Moreover, the record reflects that perhaps a hundred thousand people successfully participated in the rally in accordance with this plan, that is, by journeying in one way or another to First Avenue north of 51st Street. (E.g., Defs.' Ex. QQ at 1, M. Esposito Dep. at 106-07; Gannon Dep. at 139-41).

41

All of these aspects of the plan appear to have been well within the constitutional discretion of the Police Department, and insofar as plaintiffs may be heard to complain about them, we find nothing in the record that would justify a trier of fact in finding that these aspects of the plan violated the demonstrators' First Amendment rights. In this regard we note that the plan was reasonable in its general approach and details, and plaintiffs proffer no meaningful evidence that it was designed or intended to deny anyone the right to express his or her views by participating in the planned demonstration or that, in these basic elements, it constituted an unreasonable set of time, place and manner restrictions on the exercise of First Amendment rights.

In resisting this conclusion, plaintiffs appear to rely in major part on the fact that large numbers of people found themselves unable to reach First Avenue, either in the Fifties or further north.[16] That in itself does not provide a basis to challenge the City's plan. As noted, that plan provided for a potentially unlimited number of people to go to First Avenue,

---

[16] Indeed, at one point in plaintiffs' own summary-judgment motion they seem to contend that all people who appeared at the demonstration -- no matter how numerous -- were entitled under the First Amendment to crowd onto First Avenue sufficiently close to the stage at 51st Street to hear all the speakers. (Pls.' R.56 Mem. of Law at 24-25). This assertion is legally insupportable and, as a matter of common sense, is absurd.

albeit by way of a northern entry. Moreover, although more people would presumably have been able to access First Avenue in the Fifties and Sixties if the police had not used pens and had left all side streets open, the City is not obliged to ensure that everyone who wishes to appear at a First Avenue venue is enabled to do so, irrespective of consequences. Even if the police could have physically handled such an overflow and resultant crush of people on First Avenue, they were not obliged to do so and potentially put at risk public health or safety.

Moreover, the record reflects that the turnout of people on February 15 was so large that it was almost unavoidable that substantial numbers of would-be demonstrators would be unable to access First Avenue in the Fifties. To the extent that many of those people sought access to First Avenue directly in the Fifties, it was virtually inevitable that they would find themselves in very crowded conditions on the adjoining avenues and streets. Again, this is not tantamount to a denial of the First Amendment rights of these individuals.

Alternatively, plaintiffs rely on what they refer to as expert testimony by an individual named Lou Reiter, who reports having extensive experience in police practices, including crowd control.

43

(Pls.' Mem. in Opp'n at 6 & n.9; see also Reiter Dep. at 1-62). In substance, Mr. Reiter offers his opinions on the adequacy of the Police Department's planning for the demonstration, which he finds deficient -- especially in not better preparing the details for assuring access by demonstrators to First Avenue -- and, in some respects, inconsistent with what he views as better practices by other police departments. (Reiter Dep. at 64-67, 77-78, 80-82, 85-93, 98-109, 111-15). Insofar as his testimony is intended to address the First Amendment issues,[17] we assume for present purposes at least some minimal competence or expertise on his part, but conclude that his personal critique of the plan, while perhaps relevant to a claim of negligence -- if one were otherwise viable -- does not meaningfully speak to the First Amendment question, and in any event his opinions on the adequacy of the plan are largely couched in terms of his view of the ultimate legal merits of the First Amendment claims (see id. at 87, 98-100, 112-15), which is not a proper subject for an expert witness. See, e.g., United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991); In re Initial Public Offering Secs. Litig., 174 F. Supp.2d 61, 64 (S.D.N.Y. 2001) ("[E]very circuit has explicitly held that experts

---

[17] He also discusses the evidence pertaining to certain other aspects of the case, notably involving the use of horses, which is pertinent to the excessive-force claims. (Reiter Dep. at 64, 98-101).

may not invade the court's province by testifying on issues of law.") (collecting cases). Moreover, his largely conclusory assertion of his personal opinions does not fulfill the role of an expert in that it does not assist a trier of fact in dealing with a technical or otherwise specialized area. Cf. Fed. R. Evid. 702. In short, his testimony does not alter the arc of our analysis of plaintiffs' challenge to the plan itself under the pertinent First Amendment standards.

Based on these findings, we conclude that plaintiffs' First Amendment claims against both the City and the individual defendants, insofar as predicated on the substance of the plan for crowd control, cannot survive summary judgment, and we recommend that defendants be granted summary judgment on these claims. There remain for consideration plaintiffs' First Amendment claims insofar as they are premised on the actual implementation of the plan.

> b. First-Amendment Challenges to the Plan's Implementation:
> The Alleged Failure to Inform the Public of Access Routes

A number of the plaintiffs complain that they were unable to access the First Avenue rally for reasons other than arrest, principally because they attempted to walk eastward to First Avenue and encountered blocked side streets and a crush of people (e.g.,

45

Connor Dep. at 58-65, Haus Dep. at 44-50, Stevens Dep. at 18-22),
and some because they were left in the dark by police officers, who
did not inform them that they could get to First Avenue by heading
north some distance and then east to the rally site. (See, e.g.,
Bryant Dep. at 22). One plaintiff also complains that he was
blocked by the police from proceeding northward along Second, Third
or Lexington Avenues in order to access the demonstration site, as
had been planned by the Police Department. (Dodde Dep. at 42-56).
Deeming this set of allegations to amount to a claim against both
the City (and, presumably, some of the supervisory individual
defendants) for failure to supervise,[18] we find issues of fact that
preclude summary judgment on one portion of this set of claims.

Insofar as plaintiffs appear to complain about blocked side
streets, their claim fails since this was part of a plan to funnel
people to the north before they turned east to enter First Avenue,
at which point they would be free to filter south towards the
demonstration stage, at least as far as space could be found in the
pens set up along the Avenue. As we have noted, this aspect of the
plan was intended to avoid a dangerous crush of people on First
Avenue in the Fifties, a danger that likely would have been

---

[18] Plaintiffs do not identify as defendants any of the
officers who allegedly failed or refused to tell them how to
access First Avenue.

realized if unchecked numbers had headed instead directly to that Avenue in the lower Fifties, and it is well within the broad discretion of the City in designing a plan for crowd control in anticipation of such a large congregation of demonstrators. UPJ, 323 F.3d at 177; see also, e.g., Million Youth March, Inc., 155 F.3d at 126-27 (allowing police to limit number of people at designated demonstration site and "divert any excess crowds to nearby sites" "[i]n the event that more people attend than can be safely accommodated within the [designated] area"); Coalition to March on the RNC, 557 F. Supp.2d at 1022-31. In fact, some plaintiffs testified that they were able to reach First Avenue and participate in the demonstration. (Cavanna Dep. at 127-28; Douglas Mar. Dep. at 74-80). Their testimony and the appearance of vast numbers of other people on First Avenue reflect that the plan had some success.

As for the experience of a number of plaintiffs who encountered a crush of people on Second and Third Avenues, often leading to an inability to move forward in the direction that they wanted to go, the record reflects that this crush was largely attributable to the huge turnout of people, all seeking to head for the same location on First Avenue. (See, e.g., Defs. Ex. X at 155-56; M. Esposito Dep. at 122-28, 131-33, 141-43). There is no

evidence that the defendants caused the vast numbers of people to turn out or to concentrate in any one geographic area. Although plaintiffs may be heard to complain that the barricades used by the police on side streets and on Second and Third Avenues contributed to the immobility of the crowds -- an assertion that is supported in a few instances by plaintiffs' testimony (see, e.g., Connor Dep. at 58-65, 74-76, Dodde Dep. at 49-56, Dellal Dep. at 51-55) -- the evidence reflects that most of the barriers to which plaintiffs refer appear to have been set up either to keep people from heading directly to First Avenue in the Fifties or to press them onto the sidewalks in order to keep the roadway open to some traffic or at least to police and other emergency vehicles. (See, e.g., Cavanna Dep. at 120-28, Connor Dep. at 58-65, Dodde Dep. at 56-64; M. Esposito Dep. at 88-97, 122-28). Whether or not in individual instances barricade placements were ill-chosen, such discrete judgment errors do not remotely come within the scope of a viable First Amendment claim in view of the considerable latitude that the police have, and indeed must have, in policing such large-scale public events. And in any event plaintiffs offer no evidence of decisions by defendant police supervisory personnel or other individual defendants that were either intended to preclude First Amendment activity by plaintiffs or were so irrational as to exceed allowable police discretion in crowd-control tactics when

48

confronting such a large-scale, high-density event. In short, this aspect of plaintiffs' experience cannot be found to demonstrate that defendants were responsible for unreasonable time, place and manner restrictions.

Insofar as plaintiffs cite instances in which they were unable to reach First Avenue, they may be heard to complain that more people could have accessed that thoroughfare to attend the event activities if the police had not blocked any side streets and had not confined people on First Avenue to pens. While that might well be true, there were valid reasons for these measures -- ensuring against a potentially dangerous crush of people on First Avenue near the 51st Street stage and preserving a lane on First Avenue sidewalks for the police and emergency workers to have access as needed. These limitations are fully consistent with precedent governing crowd-control measures for public demonstrations. See, e.g., UPJ, 323 F.3d at 177; Million Youth March, Inc., 155 F.3d at 126; Coalition to March on the RNC, 556 F. Supp.2d at 1027 (citing cases); see also Stauber, 20024 WL 1593870 at *24-29 (finding likelihood of success on plaintiffs' First Amendment claims as to limited information regarding access to demonstration and ingress/egress from pens, but not as to use of pens in general). Moreover, given the expected and realized size of the turnout on

February 15, there is no question that the basic format designed by
the Department reflected a reasonable approach to the problem of
allowing a mass demonstration without posing serious dangers to
public health and safety and the ability of other New Yorkers to
access public thoroughfares, particularly given the limited time
frame in which the plan was designed.[19] UPJ, 323 F.3d at 176-77; Cf.
Bl(a)ck Tea Society, 378 F.3d at 12-15. Indeed, the evidence
reflects that ultimately the participants in the demonstration
filled all of the pens north from 52nd Street to the Seventies and
perhaps the Eighties. (E.g., Scanlon Aff. at ¶¶ 228-30; Lamb Dep.
at 61-62; Defs.' Ex. QQ at 1 (stating that UPJ "conducted a planned
demonstration on 1st Avenue from E. 49th Street to E. 82nd
Street").

Insofar as plaintiffs also seem to challenge the refusal of
the police to allow people already assembled in the pens to exit
them or to return, we note that the record makes plain that such

---

[19] At various points in plaintiffs' briefing, they appear to
take issue with the decisions of Judge Jones and the Second
Circuit to uphold the Police Department's rejection of a march
and ask us to reconsider parts of those decisions. (See, e.g.,
Pls.' R.56 Mem. of Law at 19-21). Putting to one side whether
these decisions have any preclusive effect, we note that
plaintiffs offer no evidence to suggest that the denial of the
march permit itself constituted an unreasonable time, place and
manner restriction, particularly given the broad discretion
accorded local authorities in matters of this kind.

refusals were not part of the plan. Indeed, the testimony of at least one of the plaintiffs, Ms. Douglas, refutes that implicit contention. As she testified, she accessed First Avenue at 72nd Street, where she and many others entered a pen between that street and 71st Street, and thereafter she and the other demonstrators were permitted successively to exit that pen and enter the next pen, and then again to move further south, pen by pen, until they had reached and entered the pen between 60th and 59th Streets. (Douglas Mar. Dep. at 74-75, 78-80, 92-93; Douglas Apr. Dep. at 25). To the extent that Ms. Douglas then encountered police officers who did not permit demonstrators to exit from the 59th Street pen (Douglas Apr. Dep. at 36-39), that action was unquestionably an error by those officers and did not reflect the overall implementation of the plan. In fact, the officer who later arrested Douglas stated that he had allowed another demonstrator to exit the 59th Street pen to use the restroom in a nearby Food Emporium and return to the pen afterwards. (Otero Dep. at 56).

Plaintiffs' complaint about the failure of the police to provide needed information as to how to access the demonstration presents a more viable potential claim. We start by noting that at least implicit in the Police Department's plan was an intention to provide information to the policing officers and, through them, to

51

the public as to how to access the designated protest area. Were
this not the case, the plan itself might well fail to pass
constitutional muster; time, place and manner restrictions are to
be judged by a standard of reasonableness, though mediated by a
presumption of broad police discretion, and a plan for crowd
control that was premised in major part on successive closing off
of streets leading to the designated demonstration area and re-
direction of the assembly towards the remaining open streets could
fairly be viewed by a trier of fact as unreasonable if it failed to
provide for some means to communicate to the public necessary
details concerning access to the site of the event. E.g., Stauber,
2004 WL 1593870, at *27.  Moreover, if such an omission actually
caused putative demonstrators to be denied access to the
demonstration despite the availability of space at the protest
site, those individuals might well have a viable First Amendment
claim against those who were responsible for the omission. See id.
at *27-28.

In this case, there is no triable dispute that the designers
of the plan contemplated that the officers and more senior police
personnel on the scene would provide access information to the

52

public.[20] Indeed, Lt. Gannon so testified and also reported that during the event he and other police personnel on Second Avenue provided such information to members of the public, as did other senior police personnel, and that the plan called for information on street closings and available access points to be broadcast on police radios. (Gannon Dep. at 163-64, 168-78, 181-86; see also Defs.' Ex. X at 150-51; M. Esposito Dep. at 122-24, 132-33; Acerbo Dep. at 65-66). Moreover, some of the plaintiffs confirmed that the police were informing members of the public of the need to head north in order to access First Avenue. (E.g., Defs.' Ex. SS (Bryant 50-h hearing) at 7-8 ("We were going to the higher number streets thinking that we could get over to the rally from that point, because someone told us."); Spitzer Dep. at 18-19; Connor Dep. at

---

[20] Plaintiffs seem to argue the contrary, premised on the notion that the Police Department failed to take certain useful steps -- such as posting signs at the closed side streets or using loudspeakers to announce instructions as to how to access the open side streets or posting instructions on the Police Department website -- and that these omissions demonstrate the constitutional inadequacy of the plan. (Pls.' Mem. in Opp'n at 18-19; Stauber Tr. at 466-68). We assume that such omissions may buttress a claim that the implementation of the plan was inadequate, in a constitutional sense, for some demonstrators, but that is not tantamount to a showing that the plan was itself constitutionally deficient. In this regard we have noted that local authorities have broad discretion in designing the details of time, place and manner restrictions, and if they chose other means of providing practical access, including by planning for police personnel to provide the information as needed on the street to inquiring demonstrators, then no First Amendment violation would be shown.

68-69; Lamb Dep. at 61-62; Douglas Mar. Dep. at 74-75). Furthermore, the very fact that vast numbers of people ultimately filled First Avenue from 51st Street going as far north as the lower Eighties indicates that access plans were not being kept secret. Nonetheless, there is evidence in the record that the plan in this respect may not have been adequately effectuated.

The validity of time, place and manner restrictions ultimately rests on an evaluation of how they were actually implemented and not merely on how they were designed in the abstract or on paper. See, e.g., Field Day, LLC v. County of Suffolk, __ F. Supp.2d __, 2011 WL 2580346, at *9 (E.D.N.Y. June 28, 2011) (citing, inter alia, Ward, 491 U.S. 781; Million Youth March, Inc., 18 F. Supp.2d at 345-47). Given the current record, a trier of fact could find that if responsible officials failed to take adequate measures to inform the public as to how to access the demonstration site, the net effect of the time, place and manner restrictions, as implemented, unreasonably limited the ability of some members of the public, including some of the plaintiffs, to exercise their First Amendment rights. In this respect, a number of the plaintiffs have testified to having been prevented from accessing the demonstration in circumstances that suggest that some officers on Second or Third Avenues did not provide timely instructions -- or

54

any instructions at all -- which might have avoided the access problem for them. (Dodde Dep. at 49-51, 55-56; Bryant Dep. at 21-22).[21] This evidence justifies the conclusion that some of the plaintiffs would have a triable claim if those plaintiffs proffered adequate evidence as to who was at fault for this alleged lapse.

The current record does not reflect that the alleged failure to provide details to the public was traceable to a decision by the City itself or by the Commissioner. In short, the City cannot be held responsible for errors in the implementation of the plan. Since, however, defendants Joseph and Michael Esposito have claimed credit for designing, approving and implementing the plan (Defs.' Ex. X at 9-14; Gannon Dep. at 216-20; M. Esposito Dep. at 119-33, 180-82), they may be found responsible by a trier of fact for the level of public outreach by the Department in the days leading up to the demonstration and on February 15 itself, and it is

---

[21] Our point is limited to the ability of the named plaintiffs to arrive at First Avenue in the area allotted to the demonstration, that is, some place north of 51st Street. Whether all of the people who showed up on the East Side to protest the impending war could have squeezed onto First Avenue is unclear. Moreover, there is at least a strong question whether the presence of these many people in the streets and avenues adjacent to the First Avenue site amounts to their participation in the demonstration and hence an adequate means of allowing them to exercise their First Amendment rights in this unique setting of a mass demonstration involving perhaps hundreds of thousands of protesters, as one of the demonstration's organizers seems to have believed. (See Stauber Tr. at 322-23).

conceivable that a trier of fact could find those efforts so deficient as to demonstrate that the restrictions actually imposed by the Department were, in this respect, not reasonable.[22] As for which plaintiffs may pursue such a claim, the proffered deposition testimony reflects that plaintiffs Bryant, Connor, Dodde, Lamb, Silva, Spitzer, and Stevens report that they were prevented from accessing First Avenue (at least in part) by virtue of an absence of information at to how to get there, and hence they may pursue a claim against the Esposito defendants for that denial of access based on lack of information.[23]

---

[22] We address in detail in a later section of this Report and Recommendation the applicable standards for holding a supervisory official liable for violations of the constitutional rights of members of the public. See pp. 114-19, infra. For present purposes, to succeed on the lack-of-notice aspect of their First Amendment claim, plaintiffs would have to show that the individual defendants bore direct responsibility for the alleged violations. See, e.g., Scott v. Fischer, 616 F.3d 100, 110 (2d Cir. 2010) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977), cert. den., 434 U.S. 1087 (1978)). We also note that these defendants, even if found responsible for constitutional violations in this respect, might be able to invoke a qualified-immunity defense. Since, however, defendants have not specifically asserted or sought to apply that defense in the current context -- that is, the lack-of-access- information claim -- we do not address it here.

[23] As we have noted, the record reflects that UPJ failed to post the details of the Department's plan on its website. That evidence is certainly pertinent to causation, as would be any testimony concerning the availability of information through the media or from other sources as to the access plans of the Police Department. Moreover, if a plaintiff was prevented from moving north for other reasons -- such as by virtue of the crush of the crowd -- or was simply disinclined to undertake an extended walk

c. <u>First-Amendment Challenges to the Plan's Implementation:
The Use of Arrests to Preclude First-Amendment Activity</u>

In plaintiffs' opposition to defendants' motion, they assert,
as a variant of their more traditional First Amendment claim, a
theory premised on the notion that some of them were arrested
without probable cause, and that since the arrests occurred in the
context of their effort to attend a demonstration, the illegality
of the arrests reflects not only a violation of their Fourth
Amendment rights but also a First Amendment violation. In this
context they note that our Circuit Court has held that the police
may not interfere with an ongoing exercise of First Amendment
rights absent "a clear and present danger" to public safety, and
they assert that there was none. (Pls.' Mem. in Opp'n at 25-28
(citing, <u>inter alia</u>, <u>Jones v. Parmley</u>, 465 F.3d 46, 56-58 (2d Cir.
2006))).

Defendants argue that this claim should be "disregarded"
because plaintiffs failed to plead it explicitly in their
complaint. (Defs.' Reply Mem. of Law at 33). Alternatively they
assert that the arrests in question were supported by probable

---

in crowded streets for that purpose (<u>see</u> M. Esposito Dep. at
185), that litigant would be unable to show that a lack of
information caused his or her inability to access First Avenue.

cause, thus undercutting the premise for the claim, and that in any event the police did face a clear and present danger, thus immunizing the arrests from a First Amendment claim. (Id. at 34). We recommend denying summary judgment on this claim.

We reject defendants' pleading defense. In substance it amounts to a Rule 12(b)(6) challenge, which triggers a requirement that we accept all factual allegations in the complaint and draw all reasonable inferences in the plaintiffs' favor. E.g., Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2009) (quoting Johnson v. Rowley, 569 F.3d 40, 43-44 (2d Cir. 2009)). Plaintiffs' complaint adequately pleads the facts pertinent to this claim, that is, they allege that many of them were seeking to attend or were attending a mass demonstration and that they were arrested without probable cause while engaging only in lawful behavior in the midst of a generally peaceful gathering of protesters. (2d Am. Compl. at ¶¶ 53-55, 56(c)). The complaint goes on to assert claims of First Amendment violations. (Id. at ¶¶ 74-75). This form of pleading suffices. The adequacy of the complaint is to be measured by the facts alleged in it, and it will pass muster even if the pleader does not attach the correct legal label to the factual allegations. See, e.g., Oneida Indian Nation of New York v. County of Oneida, 617 F.3d 114, 132 (2d Cir. 2010) ("[A] complaint need not specify

58

the legal theory underlying its claims . . . .") (quoting Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338, 343 (2d Cir. 2006)). In this case, the complaint pleads the facts that would trigger First Amendment scrutiny and invokes the First Amendment. Hence the pleading suffices for present purposes.

As for defendants' alternative, evidence-based challenge to this claim, it too should be rejected. As explained in Jones v. Parmley, 465 F.3d at 56-60, the police may not interrupt or disperse a gathering that is the occasion for the exercise of First Amendment rights -- notably, a political demonstration -- either because they disagree with the content of the speech or because of fear of disorder. Id. at 56 (citing, inter alia, Edwards v. South Carolina, 372 U.S. 229, 237 (1963)). They may, however, "stop or disperse public demonstrations or protests where 'clear and present danger of riot, disorder, interference with traffic upon the streets, or other immediate threat to public safety, peace, or order appears.'" Id. at 56-57 (quoting Cantwell v. Connecticut, 310 U.S. 296, 308 (1940)); see also Feiner v. New York, 340 U.S. 315, 317-21 (1951). It bears emphasis, however, that the required clear and present danger is not established by "energetic, even raucous, protesters who annoy or anger audiences []or demonstrations that slow traffic or inconvenience pedestrians." Id.

59

at 58 (citing Cox v. Louisiana, 379 U.S. 536, 546-47, 549 n.12 (1965)).

The implication of this analysis is that the arrest of a person participating in a political protest, in effect entirely precluding the arrestee's further participation in that First Amendment activity, will trigger a First Amendment violation unless the arrest is supported by probable cause or the police reasonably apprehended that, absent the arrest, the peace or safety of the public would be endangered. For reasons to be noted in addressing the Fourth Amendment portion of defendants' motion, there are triable issues as to the legality of the arrests of the eleven plaintiffs who were taken into custody on February 15. See pp. 76-105, infra. Hence the lawfulness of the arrests cannot be used as a basis for summary judgment on this First Amendment claim.

Insofar as defendants also argue that the police faced such disorder during the demonstration as to immunize their arrests of the plaintiffs from First Amendment scrutiny (Defs.' Mem. of Law at 59-60), summary judgment cannot be granted on this basis because there are triable issues of fact pertaining to the circumstances surrounding those arrests and whether there was any clear and present danger of sufficient moment to justify denying those

60

particular plaintiffs the opportunity to continue to participate in the demonstration. Although defendants allude to outbreaks of disorder by some number of protesters at various locations and various times during the massive demonstration (e.g., Acerbo Dep. at 94-95, 109, 115-19), the evidence would allow a trier of fact to find that the overwhelming majority of participants at this event were peaceful and law-abiding (e.g., M. Esposito Dep. at 132, 174-75) and that the outbreaks cited in general and unilluminating detail by the defendants (Defs.' Reply Mem. of Law at 33) were isolated and did not at all involve the plaintiffs themselves. In such circumstances, the police may not use the misconduct of what may be a small minority of participants[24] to justify the exclusion of the plaintiffs from this First Amendment event. See, e.g., Jones, 465 F.3d at 58 (rejecting clear-and-present-danger argument based on some protesters having blocked a highway; court notes that plaintiffs alleged that they stayed away from the highway, that "they made no threats of physical harm to police or members of the public, [and] did not incite violence and displayed no dangerous weapons," that "only a few protesters demonstrated on the Interstate," "that their activities did not affect the peaceful

---

[24] Defendants themselves trumpet the fact that only 274 people were arrested in connection with a demonstration that appears to have involved at least one hundred thousand participants. (Defs.' Mem. of Law at 85-86).

61

tenor of the main protest," and "that the few protestors who did
enter the highway desisted from their conduct before the police
broke up the demonstration.").

Whether plaintiffs' version will be borne out is a matter of
dispute properly left for trial. For now, it suffices to note that
defendants have not linked the plaintiffs beyond triable dispute to
the alleged disorders. Accordingly this claim is triable.

In evaluating plaintiffs' arrest-based First Amendment claims,
we note that, as alleged in the complaint, they may also be
asserting that their arrests were undertaken for the purpose of
preventing their participation in First Amendment protected
activities or in retaliation for their engaging in protected
conduct. (2d Am. Compl. at ¶¶ 55, 56(c), 75). With one exception,
however, the record is bare of any evidence that would justify a
finding that any of the defendants or other unnamed arresting
officers were so motivated in making the arrests in question. In
this regard we note that at least a hundred thousand individuals
freely participated in First Amendment activities on the day of the
demonstration, and the total of arrests for the day was only 274
(Defs.' Ex. QQ at 1), a modest increment over the initial police
anticipation that there would be no more than 250 arrests in

62

connection with the demonstration. Furthermore -- as we will
discuss in connection with plaintiffs' Fourth Amendment claims --
although the question of probable cause for the various plaintiffs'
arrests is subject to triable dispute (see pp. 76-105, infra), the
evidence pertinent to all but one of the eleven arrests at issue
here reflects no evident First Amendment animus by the officers who
triggered or carried out the arrests. While such a motivation might
be theoretically possible, a trier of fact would be reduced to pure
speculation on that question, which is not an adequate basis for
trying a claim. The one exception, which we address below in
assessing the defendants' challenge to plaintiffs' Fourth Amendment
claims, concerns plaintiff Cavanna, who offers a version of his
encounter with the police -- including defendant John Beale -- that
can be read as suggesting First Amendment animus by one or two
arresting officers, including Beale. See pp. 94-99, infra.


   d. First-Amendment Challenges to the Plan's Implementation:
      The Use of Excessive Force


   Plaintiffs' remaining theory for their First Amendment claims
is the notion that at least some of the defendants engaged in
excessive force when confronting some of the plaintiffs and that
the use of such force amounted to a violation of the plaintiffs'
First Amendment rights. (Pls.' Mem. in Opp'n at 23-25). We conclude

63

that this variant of their First Amendment claims is tenable for several of the plaintiffs.

Defendants note that plaintiffs failed to plead this excessive-force claim under the First Amendment, and they accordingly urge us to ignore this legal theory. (Defs.' Reply Mem. of Law at 32). Since rejection of the claim on that basis would unquestionably trigger a request to amend the complaint and since the underlying facts for the claim have not only been pled, but thoroughly explored in discovery, there is no basis to dismiss the claim at this stage rather than assess its viability under Rule 56 standards.

That assessment leads us to conclude that the record suffices to permit several plaintiffs to take this claim to trial. The stated premise for plaintiffs' claim is that the use of force in the context of a demonstration constitutes a time, place and manner restriction, and hence if the force was excessive, then this "restriction" was necessarily unreasonable. The out-of-circuit decisions cited by plaintiffs appear to support this suggestion, at least to the extent that a plaintiff may demonstrate that the use of force interfered with or prevented his exercise of his First Amendment rights. See Logsdon v. Hains, 492 F.3d 334, 346 (6th Cir.

2007); <u>Lamb v. Decatur</u>, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996); <u>cf.</u> <u>Bourgeois v. Peters</u>, 387 F.3d 1303, 1316-17 (11th Cir. 2004). This would be akin to the theory, which we have already addressed, that a lawless arrest of a person seeking to exercise his First Amendment rights may constitute a First Amendment violation since it precluded his engagement at that time in protected activities. Although defendants urge rejection of these authorities on the basis that they do not originate within this circuit (Defs.' Reply Mem. of Law at 33), they offer no reason to do so (other than implicit provincialism). Rather, the reasoning of these cases appears generally consistent with the Second Circuit authority cited above in connection with the arrest issue, and hence we decline defendants' invitation to reject it.

As for the evidence, a number of the plaintiffs (including both arrestees and non-arrestees) testified that they were subjected to force that they contend was excessive, a contention that we find in a succeeding section of this Report to be triable for some of the plaintiffs. These include plaintiffs Haus, Connor, Dellal, Cavanna, Douglas, Silva, Venizelos, Stevens and Blair. (<u>See</u> pp. 123-70, <u>infra</u>). Their testimony also could justify a trier of fact in finding that the use of force against them interfered with or prevented their exercise of their First Amendment rights. (<u>Id.</u>).

In short, if their testimony is credited, as it must be for present purposes, their First Amendment claims in this respect are triable.

We further take note of an alternative theory for plaintiff's First Amendment claim, one pled in their complaint -- their contention that the use of force against them was intended to interfere with, or retaliate for, their exercise of their First Amendment rights, that is, their decision to engage in protected activity. (2d Am. Compl. at ¶¶ 55, 56(a), 75). Although -- for reasons to be noted -- there are triable disputes regarding whether excessive force was used in some instances by police officers (see pp. 123-70, infra), the record does not reflect any basis for a reasonable trier of fact to find that the use of such force by any of the defendant officers (except for defendant John Beale's use of force on plaintiff Cavanna) was motivated by hostility to plaintiffs' exercise of their First Amendment rights. As for plaintiff Cavanna, for reasons discussed at pp. 94-99, 157, infra, we conclude that a trier of fact could find that he was subjected to excessive force and that this misconduct was triggered by First Amendment animus.

e. <u>Political Interrogation</u>

In defendants' summary-judgment motion, they note that plaintiffs' class-certification motion seeks to certify a class of arrestees who were subjected to political interrogation by the police while they were in custody. (Defs.' Mem. of Law at 35-36 (citing Pls.' Class Mot. at 19)). Defendants suggest that the complaint makes no mention of such a transgression, and they urge that the claim therefore be disregarded or (if the class motion were deemed somehow to constitute a supplemental pleading) that the claim be dismissed as time-barred. (Defs.' Mem. of Law at 36).

Questioning by the police about political beliefs or affiliations may intrude on an arrestee's First Amendment rights (and possibly his Fourth Amendment rights as well). <u>See</u>, <u>e.g.</u> <u>Fountain v. City of New York</u>, Report & Recommendation dated May 8, 2007, at 52-58 (citing cases). Moreover, this type of questioning is not only mentioned in the complaint (2d Am. Compl. at ¶¶ 62, 71, 73), but several plaintiffs also testified to having been questioned in this fashion. (Parkel Dep. at 43-45, Venizelos Dep. at 31, Cavanna Dep. at 217, Dellal Dep. at 73, 83). Nonetheless, plaintiffs' responding papers do not directly address defendants' argument (<u>see</u> <u>generally</u> Pls.' Mem. in Opp'n), but rather glancingly

67

refer to it in a context that seems unresponsive to defendants'
point.

Plaintiffs' only mention of this issue is in their response to
defendants' assertion that the complaint fails adequately to
identify which individual defendants were involved in the violation
of which plaintiff's rights. (See Pls.' Mem. in Opp'n at 129). In
response, plaintiffs contend that their pleading of allegations of
personal responsibility by the defendants has been clarified by
discovery, a process that the Federal Rules contemplate and that
assertedly justifies denial of a Rule 12(b)(6) dismissal on that
basis. They then go on to say that "plaintiffs are permitted to
conform the complaint to the facts," although they do not actually
request amendment of their pleading. Instead they simply assert, as
follows: "For example, although not specifically stated as a claim,
plaintiffs who were interrogated about their political beliefs at
One Police Plaza are permitted to raise this point now as the
complaint identifies the conditions of confinement and the First
and Fourth Amendment as the sources of plaintiffs' rights". (Id.).

This assertion is, to say the least, odd. The complaint
alleges a variety of asserted unconstitutional conditions of
detention, and political questioning is in fact among them,

68

although not as commonly referenced as, for example, lengthy exposure to the cold. Had plaintiffs in fact failed to allege such misconduct,[25] we would be inclined to agree with defendants that, although plaintiffs casually refer to being "permitted to raise now" a hitherto-unarticulated claim, they plainly have no such right through the guise of either a memorandum of law opposing a summary-judgment motion or by way of a class-certification motion. If plaintiffs were to seek to assert a previously unmentioned claim, they would be required to move to amend their complaint, and in this specific context they would need to justify not only the validity of the proposed new claim but the timing of the application, as well as explain why the proposed claim is not time-barred.

Since, however, three of the plaintiffs initially pled that they were subjected to political interrogation (2d Am. Compl. at ¶¶ 62, 71, 73), and affirmed as much in their depositions (Parkel Dep. at 43-45, Venizelos Dep. at 31, Cavanna Dep. at 217), we reject

---

[25] The complaint contains references to political interrogation of plaintiffs Cavanna, Parkel, and Venizelos. Plaintiff Jasmine Dellal testified at her deposition that she was repeatedly questioned about her political affiliation by Detective Hannon and another unidentified officer (Dellal Dep. at 73, 83), but the narrative of her arrest and detention in the complaint does not contain any reference to political interrogation. (2d Am. Compl. at ¶ 70).

defendants' contention that such a claim cannot now be asserted. Although defendants have not requested summary judgment on the merits of this claim, we briefly examine the basis for it to determine whether plaintiffs may proceed with it at trial.

Plaintiffs' claim that the custodial interrogation violated their constitutional rights is most likely based on a line of precedent holding that compelled disclosure of organized political activity can constitute a violation of the First Amendment right to associate for political purposes. See, e.g., NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460-62 (1958); Church of the Am. Knights of the KKK v. Kerik, 356 F.3d 197, 208-09 (2d Cir. 2004). The record reflects undisputed testimony that some police representatives quizzed three plaintiffs about their political affiliations or activities, and we are mindful of other cases arising out of the February 15, 2003 demonstration that generated testimony of the same conduct directed at other arrestees. E.g., Fountain Report & Recommendation at 15-16.

As we mentioned in Fountain, defendants have failed to articulate any interest that the City may have had in obtaining these disclosures. Particularly in the absence of any articulated law-enforcement justification for the questioning, there is at

70

least a triable issue of fact as to whether defendants' conduct constituted a violation of plaintiff's associational rights. See, e.g., NAACP, 357 U.S. at 463-64; Kerik, 356 F.3d at 208 & n.10. There is one complication for these claims, however: none of the three plaintiffs who complained that they were subjected to political interrogations were able to identify the officer who questioned them. (Parkel Dep. at 43-45, Venizelos Dep. at 31, Cavanna Dep. at 217).[26] Hence they cannot assert these claims against any individual officer. See, e.g., Scott, 616 F.3d at 110.

The evidence suggests, however, that there may have been a Police Department policy or practice in place requiring officers to inquire about certain arrestees' political affiliations. In addition to the three plaintiffs asserting claims for unconstitutional political interrogation, plaintiff Dellal testified that she was interrogated regarding her political affiliations, as did the plaintiff in another case arising out of the February 15, 2003 demonstration and two other individual witnesses in that case (Fountain Report & Recommendation at 15-16 & n.8), one of whom was arrested on February 15, 2003, the other of

_____

[26] Plaintiff Dellal alleged that she was questioned about her political affiliations by defendant Hannon (Dellal Dep. at 73), but she did not plead a political-interrogation claim. (2d Am. Compl. at ¶ 70).

71

whom was arrested at a later demonstration and filed his own case against the City. (<u>Id.</u>; <u>see also</u> Defs.' Ex. WWW (<u>Bradley v. City of New York</u>, 04 Civ. 8411, Report & Recommendation dated Oct. 19, 2006)). This circumstantial evidence suggests that there may have been a police directive of some sort requiring officers to inquire about arrestees' political affiliations, indicating that it may have reflected a Police Department policy or practice. Defendants neither contest the fact that these political interrogations took place nor offer a legitimate law-enforcement justification for such questioning.[27] Hence we believe that there is an issue of material fact as to the existence of a municipal policy or practice of political interrogation of certain arrestees that may have infringed plaintiffs' First Amendment rights, and therefore plaintiffs Cavanna, Parkel, and Venizelos may proceed with this claim against the City at trial.

---

[27] The plaintiff in <u>Bradley</u> testified that he was interrogated twice, by two police officers. One of these officers "remarked that plaintiff did not look like a radical protestor, and that the officer would therefore skip the 'affiliation questions' . . ., but another officer asked him whether he belonged to any political organizations or whether he was affiliated with any particular group." (<u>Bradley</u> Report & Recommendation at 13 (quoting Pl. Dep.)).

### C. Defendants' Motion: the False-Arrest Claims

Defendants have moved for summary judgment on the false-arrest claims of nine plaintiffs -- Connor, Sanchez, Blair, Dodde, Dellal, Venizelos, Cavanna, Douglas and Parkel.[28] They represent that they do not at this stage contest the equivalent claims of plaintiffs Bryant and Silva (Defs.' Mem. of Law at 89), and they also fail to address the same claim by plaintiff Stevens.[29]

### 1. Legal Standards

A section 1983 claim for false arrest is based on an individual's Fourth Amendment right to be free from unreasonable searches and seizures. See, e.g., Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). In analyzing federal claims for false arrest, courts "have generally looked to the law of the state in which the arrest

---

[28] At one point defendants represent that they do not challenge the false-arrest claims of Ms. Douglas and Ms. Parkel on the current motion (Defs.' Reply Mem. of Law at 53 n.33), but their initial papers do in fact seek such relief on these plaintiffs' claims. (See Defs.' Mem. of Law at 115-16; see also id. at 89 (stating that defendants do not seek Rule 56 relief on the false-arrest claims of Messrs. Bryant and Silva)).

[29] Three plaintiffs -- Haus, Lamb and Spitzer -- were not arrested and therefore do not assert such claims. (Pls.' Mem. in Opp'n at 44-45 n.14; see also Compl. at ¶¶ 58, 68, 72).

occurred." Id. (quoting Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004)). Under New York law, for a plaintiff to prevail on a false-arrest claim, he must demonstrate that the defendant intentionally confined him, that the plaintiff was aware of being confined, that he did not consent to the confinement, and that the confinement was not justified or otherwise privileged. See, e.g., Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant, 101 F.3d at 852 (2d Cir. 1996)); Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). The existence of probable cause would justify the arrest, and thus is an absolute defense to a false-arrest claim under both federal and state law. See, e.g., Jaegly, 439 F.3d at 152; Savino, 331 F.3d at 76; Weyant, 101 F.3d at 852. Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Jaegly, 439 F.3d at 152 (quoting Weyant, 101 F.3d at 852); see also Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979).

Defendants argue that none of the targeted plaintiffs can demonstrate that they were arrested without probable cause. (Defs.' Mem. of Law at 89-111). Alternatively, they assert that, even if

74

probable cause was lacking, the arresting officers are shielded by qualified immunity. (Id. at 114-22). To invoke such immunity at this stage to fend off liability for a false arrest, the defendants must demonstrate beyond triable dispute that they had what has been referred to as "arguable" probable cause, that is, that "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well established law." Cerrone v. Brown, 246 F.3d 194, 202-03 (2d Cir. 2001). Moreover, summary judgment may not be granted on this defense unless the defendant establishes beyond triable dispute the facts that would demonstrate the reasonableness of his belief that he had probable cause to arrest. See, e.g., Wong v. Yoo, 649 F. Supp.2d 34, 60-61 (E.D.N.Y. 2009) (denying motion for summary judgment on qualified-immunity basis due to disputes of material fact); Searles v. Pompilio, 652 F. Supp.2d 432, 446 (S.D.N.Y. 2009) ("[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.") (quoting Kerman v. City of New York, 261 F.3d 229, 240 (2d Cir. 2001)).

Apart from these arguments, defendants assert that some of the plaintiffs cannot demonstrate that their criminal case ended

75

favorably to them because they received adjournments in contemplation of dismissal. (Defs.' Mem. of Law at 111-12). They further argue that various of the individual defendants are entitled to judgment because there is no evidence that they were involved in the alleged improper arrests. (Defs.' Mem. of Law at 112-13). Finally, defendants argue that the plaintiffs cannot prevail on the municipal-liability variant of their false-arrest claims because the City was not responsible for any unlawful arrests. (Defs.' Mem. of Law at 84-89).

## 2. Probable Cause & Arguable Probable Cause

We first address whether there are triable issues as to the existence of probable cause for the arrests of the targeted plaintiff's claims and whether the arresting officers may prevail at this stage on the basis of claimed qualified immunity. We conclude that the evidence, including principally the plaintiffs' testimony, establishes triable issues as to whether probable cause existed for each of the contested arrests. Moreover, that testimony also ensures that there are triable issues as to whether the arresting officers had arguable probable cause, thus precluding summary judgment by reason of qualified immunity.

a. <u>John Connor</u>

Defendants rely exclusively on Mr. Connor's deposition
testimony to argue that his arrest was lawful. (Defs.' Mem. of Law
at 94-95). To the contrary, his testimony establishes triable
issues as to probable cause and arguable probable cause.

Connor testified that he had walked north with crowds of
people on Lexington Avenue up to 53rd Street, and then crossed over
to Third Avenue. As he and vast numbers of others attempted to
cross Third Avenue, still heading east, he found that he could not
reach the east side of the avenue because of the crush of people in
the vicinity. He and a large crowd of other would-be demonstrators
remained stalled in that position, unable to move to the east side
sidewalk or to return to the west side sidewalk. (Connor Dep. at
58-59, 62-65). While stuck in that position, he observed other
demonstrators standing on top of a white van filming or taking
pictures of the demonstration, and stated that he saw mounted
police officers "pulling [the demonstrators] off the van, and
beating on them." (<u>Id.</u> at 66; <u>see also</u> <u>id.</u> at 66-68). Connor then
made his way to the east side of Third Avenue, where he was
informed by a police officer that he could not continue east on
53rd Street and needed to travel further north. Connor then

77

proceeded north to 54th Street and was permitted to walk east with
the crowd to the intersection of 54th Street and Second Avenue,
where he was again forced to stop by the crush of people. (Id. at
68-73). He then observed a row of mounted police clear a portion of
the avenue just south of where he was. (Id. at 73-74). Connor
testified that he was not able to proceed once the intersection was
clear, as the crowd was still too thick and police barricades
prevented the crowd from moving east, as did two groups of mounted
police, who positioned themselves back-to-back on Second Avenue
facing the crowd. (Id. at 74-76). At this point, Connor testified,
he assumed "that there was a concerted effort by the City, and
police, to make sure that people did not get to this rally[,]" and
that he had observed the police permit a woman to cross the
intersection after she informed them that she was not part of the
demonstration. (Id. at 78). He then saw the mounted police
officers, who had turned their horses around, back their mounts
into the crowd. One officer in particular "back[ed] up forcefully,"
striking a woman with his horse and knocking her into the crowd;
the same officer then "appeared to lose control" of his horse,
which then "stepped on [Connor's] foot, knocking [Connor]
backwards." (Id. at 78-79). The horse pushed Connor to the street
and knocked to the ground a flag that he was carrying. (Id. at 80-
81).

In Connor's account, when he stood up, he picked up his flag, and the same mounted officer who had backed his horse into Connor -- and who, by then, had turned his horse so that it was again facing the crowd -- attempted to grab Connor's flag, but failed to do so and slipped in his saddle, causing laughter by people in the area. The officer then motioned to another mounted officer, and the two of them pushed their mounts against Connor. The horses' heads made contact with Connor, pushing him back a step, at which point two officers on foot approached Connor through the crowd, seized him and took him to the intersection, where he was thrown to the ground, kneed and cuffed. (Id. at 84-91). He was later processed and charged with disorderly conduct. (Pls.' Ex. 14).

Defendants offer no basis for their contention that this sequence of events demonstrates beyond triable dispute that Connor's arrest was supported by probable cause. If Mr. Connor was one of a large number of people unable to get to either sidewalk simply because there was too large a crowd in the area, he was presumably not committing any crime or violation -- and was certainly not committing the crime of disorderly conduct[30] -- and

_____

[30] "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . (5) he obstructs vehicular or pedestrian traffic; or (6) he congregates with other persons in a public place and refuses to comply with a lawful

there would have been no reason for an officer to conclude otherwise. Moreover, the alternative defense of qualified immunity would not apply because there would at least be a triable issue as to whether an officer in such circumstances could have reasonably believed that he had probable cause to arrest Connor.

The potential complication for Connor's claim is that he is unable to identify the officers who arrested or caused his arrest. (Connor Dep. at 87, 91). Since, however, defendant Bruce Smolka signed his citation as the purported arresting officer (id. at 118-19; Pls.' Ex. 14), he is certainly an appropriate defendant on this claim.

b. Carlos Sanchez

Mr. Sanchez was arrested on Second Avenue while he was attempting to cross the Avenue with two friends. Again, defendants seek summary judgment based solely on his deposition testimony. (Defs.' Mem. of Law at 95-96). In doing so, defendants mischaracterize that testimony, which does not at all support their argument.

---

order of the police to disperse." N.Y. Penal Law §§ 240.20(5)-(6).

Mr. Sanchez's testimony was not a model of clarity and detail, but he did testify that he was attempting to cross Second Avenue with others, that a police officer ordered him to hurry up, that he was slowed by the large crowds surrounding him, that mounted police came close, and that he was then arrested and charged with disorderly conduct. (Sanchez 50-h Hearing Tr. at 15, 20-21, 25-26). Although defendants seem to say that he conceded that he had violated a police order (Defs.' Mem. of Law at 95), he did not so testify, and his actual testimony does not demonstrate beyond triable dispute that the police had probable cause to arrest him or even a reasonable basis to believe that they had such probable cause.

As for the appropriate defendant on this claim, plaintiff could not identify who arrested him. (Sanchez 50-h Hearing Tr. at 23). Since, however, defendant Smolka signed the summons as the purported arresting officer (Defs.' Ex. S), he plainly is a permissible defendant on this claim.

c. <u>Abraham Blair</u>

Abraham Blair was arrested on 42nd Street between Sixth and Seventh Avenues, as he was walking with friends towards the Port

Authority bus terminal after they had given up their attempt to
access First Avenue. Defendants invoke his testimony and that of
the arresting officer, Det. Daniel Ryan, to argue that his arrest
was supported by probable cause. Specifically, they contend that
Blair refused an order by a police officer and assaulted one or
more officers. (Defs.' Mem. of Law at 97-101). For reasons that
follow, we conclude that triable issues remain regarding the facts
that would demonstrate whether there was probable cause and whether
the arresting officer is entitled to immunity.

In describing the encounter that led to his arrest, Blair's
testimony was somewhat vague -- possibly in part because of
language limitations[31] -- but, if favorably construed, indicated
that while walking west on 42nd Street towards Seventh Avenue, he
and his friends observed a number of would-be demonstrators walking
east, presumably in the direction of First Avenue, and a phalanx of
police running after them. (Blair Dep. at 31-32). He and his
friends stopped for a moment to observe the chase, when he was
confronted by an officer who said to Blair "get out". (Id. at 45).
Blair recounted in general terms that he asked the officer why he
was supposed to leave the sidewalk -- apparently his interpretation

---

[31] Defendants' counsel noted during the deposition that
plaintiff was not a native English speaker. (Blair Dep. at 20).

of the cryptic order -- at which point he was surrounded by a number of officers, thrown to the ground and arrested. (<u>Id.</u> at 46, 47-51). He was later charged with resisting arrest,[32] second-degree assault of a police officer,[33] and two counts of disorderly conduct. (<u>Id.</u> at 78; <u>see also</u> Ryan Dep. at 63).

Det. Ryan's version was quite different from Blair's and, if credited, would justify the arrest based on his assertion that Blair, together with hundreds of others, were ordered to leave a corner at 42nd Street and Seventh Avenue because the crush of people was interfering with vehicular traffic, and Blair refused, in a hostile manner, to do so. (Ryan Dep. at 68-85). Ryan also reported that at some point he had observed Blair shoving another police officer and determined to arrest Blair; that during the course of that arrest, Blair had resisted by flailing his arms to avoid being handcuffed, and in doing so Blair had knocked off his helmet and elbowed him in the eye, thus adding a second basis for

---

[32] "A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer from effecting an authorized arrest of himself or another person." N.Y. Penal Law § 205.30.

[33] "A person is guilty of assault in the second degree when . . . (3) With intent to prevent . . . a police officer . . . in the course of performance of duty as such . . . from performing a lawful duty . . . as such . . . police officer . . . he or she causes physical injury to such . . . police officer . . . ." N.Y. Penal Law § 120.05(3).

the arrest. (Ryan Dep. at 65-68, 84-91).

The difficulty with defendants' argument is that it reads Blair's testimony in a manner that, although arguably permissible, is not compelled. As we have noted, probable cause requires a very fact-specific assessment. In this case, if Blair, when faced with a somewhat ambiguous and puzzling police order, asked a quick question of explanation, that would not necessarily establish probable cause to arrest. Depending on how his question was phrased and depending further on whether the police officer's order was, in context, clearer or more reasonable than it appears from plaintiff's testimony, the officer might well have had probable cause and, by extension, a reasonable basis to believe that he had probable cause. But those contextual facts are not established beyond triable dispute because the testimony of the plaintiff is not self-evidently consistent with that of Det. Ryan. Moreover, although Det. Ryan reported that Blair had assaulted him and another officer, plaintiff denied that he had done so. (Blair Dep. at 55-56).

In short, there are triable issues as to the validity of the arrest and the factual basis for defendants' invocation of the qualified-immunity defense.

d. <u>Robert Dodde</u>

Defendants seek summary judgment on Mr. Dodde's false-arrest claim based on his deposition testimony. (Defs.' Mem. of Law at 102-04). Given the circumstances immediately preceding the arrest, as testified to by Dodde, we disagree.

Dodde reported that he and two friends had walked east on 42nd Street from Grand Central Terminal to Third Avenue and then turned north, planning to access First Avenue from a more northerly side street. In his account, they reached 53rd Street and sought to proceed east but were blocked by the police. (Dodde Dep. at 42-51). They then wanted to head further north but again were blocked at the intersection by another row of police and at least one police vehicle. (<u>Id.</u> at 51-52). Seeking then to head west to Lexington Avenue in order to try to go north on that avenue, they were again prevented from reaching the avenue by still more police. Finally, they tried to head south on Third Avenue, but were stopped at 52nd Street by the police. (<u>Id.</u> at 52-53). Eventually they returned to the southeast corner of 53rd Street and Third Avenue, where they and a very large crowd attempted without success to obtain some information from the nearby police as to how to exit the area. (<u>Id.</u> at 53-56).

Since they effectively were trapped, they and the rest of the crowd waited in that location for about fifteen minutes, when a large contingent of mounted police entered the intersection, apparently coming west from Second Avenue, and began to press south and north on Third Avenue to move the large number of people who were standing in the street onto the sidewalk. (Id. at 56-57). At about the same time, Dodde observed officers on foot placing metal barriers along 53rd Street and in Third Avenue and then using those barriers to press against the crowd in the street, apparently to force them onto the sidewalk. At some point all the crowd was on the sidewalk, but, according to Dodde, the police continued to press against the front of the crowd, apparently using the barriers and possibly some of the horses to do so. (Id. at 57-61). Because of the very intense congestion at that point, many people were complaining about the increasing crush caused by this police tactic, including particularly people at the back of the crowd, who were being pressed against the wall of the nearby buildings. Since some of the police were insisting that it was the crowd that was pushing against them, people began to sit down to show that they were not doing so, and ultimately the entire crowd sat, at which point the police stopped pushing. (Id. at 61-64).

As recounted by Dodde, after a peaceable few minutes, people

began to stand up again, at which point the police again began to press against the front of the crowd. Dodde then urged the crowd to resume sitting, hoping to repeat the pacifying effect of the immediately preceding sit-down. Once the crowd did so, however, officers came through the crowd, seized his companions and arrested him. (Id. at 65-71). He was later charged with disorderly conduct. (Id. at 93; Defs.' Ex. S).

If this account is credited, as it must be for present purposes, there is plainly a triable issue as to whether the arrest was supported by probable cause. According to Dodde's testimony, he did not fail to obey any police orders, and neither he nor the rest of the crowd blocked pedestrian entry or egress. Rather, given the size and compactness of the crowd, no such passageway was possible on the sidewalk, and the collective decision of the crowd to sit down was intended to avoid the dangerous effects of the police pressing against the front of the gridlocked crowd. Moreover, the fact that the police stopped the pressure after the crowd had sat down the first time and only resumed it when they stood up again indicates that the officers themselves recognized that the act of sitting was intended to avoid a confrontation with law enforcement, not to provoke one. Under these circumstances, a trier of fact would be permitted to find no probable cause for the arrest and no

reasonable basis for the arresting officers to believe that they had probable cause for the arrest of the plaintiff.

As for the identity of the individual defendant on this claim, there seems to be no dispute that Chief Smolka signed Dodde's summons. (Dodde Dep. at 112-14; Defs.' Ex. S). Hence he is a proper defendant for Dodde's false-arrest claim.

e. Jasmine Dellal

Defendants target the false-arrest claim of plaintiff Jasmine Dellal based on her deposition testimony. (Defs.' Mem. of Law at 104-05). The circumstances of her arrest, as she described them, bear some modest resemblance to those of her co-plaintiff Dodde.

She testified that she arrived with a friend by subway at 51st Street and Lexington Avenue and proceeded east to Third Avenue, where she was told to head north to access First Avenue. (Dellal Dep. at 42-44). She arrived at 53rd Street and waited for a short time on the northeast corner for friends to meet her. Initially there were no barriers preventing people from proceeding east on that side street, but within a few minutes the police began erecting barriers across 53rd Street. (Id. at 45-51). The barriers

88

blocked the north sidewalk, on which she was standing, as well as part of the roadway, but there were gaps between the barriers -- indeed, one gap remained on the south side of 53rd Street -- and the police at that point were allowing people to pass through the gaps going both east and west. Indeed, she estimated that there were equal numbers of civilians on both sides of the barriers. (Id. at 51-53).

According to Ms. Dellal, she was on the west side of the barriers trying to move south towards the gap in the barriers through which people were passing eastward, but at some point she was being pressed by the compacted crowd behind her into the barrier directly in front of her. She recounted that, even as an officer called "get back" to "the crowd," she and others were being "squashed" into the barriers, a situation aggravated by the fact that the police themselves had begun pressing the barriers against the crowd. She said that some people in that situation were going over the barriers in order to avoid the pressure. (Id. at 53-56, 59).

Frightened by the situation and pressed from both sides, she too attempted to climb over the barrier that was directly in front of her, which the police were pressing against her. She did so by

89

putting one leg on the top, at which point an officer, identified as Det. Dennis Hannon, approached with another barrier, put it directly on her elevated foot, which was partly over the other barrier, and he then pressed down on the new barrier, thus trapping her. While she was stuck in this position, she told the officer that he was pressing on her foot, but he continued to do so. Moreover, he told her to get back and shoved her in the chest, but she could not move because the officer continued to press the barrier down on her foot despite her asking him not to do so. (Id. at 56-58).

At some point Det. Hannon stopped pressing the barrier against her as he became engaged in conversation with someone else. In an effort to escape the press of the barriers that he and the other police officers were pushing, Ms. Dellal pulled herself over the barrier on which she had been stuck. In her testimony she explained that going forward rather than backwards was the only way she could get out since her foot was still partly trapped by the barrier that Hannon had placed on top of it. After she surmounted the barrier, she walked a short distance and was then arrested. (Id. at 60-67).

Defendants argue that, based either on Det. Hannon's pushing her and telling her to get back, or the similar command of other

90

officers to the crowd, plaintiff was in violation of a police order when she surmounted the barrier in front of her, thus justifying her arrest. (Defs.' Mem. of Law at 105). A trier of fact could certainly so find, but, depending on the details of the testimony of both parties involved in this episode, a contrary finding cannot be ruled out.

According to Ms. Dellal, she was compelled to climb over the barrier as a matter of self-protection by virtue not only of the crowd pressure behind her but the insistent pushing by Det. Hannon and other police personnel of the barriers in front of her, as well as Hannon's continuing to press down a barrier on her foot, thus effectively trapping her in place and preventing her from complying with any directive to "get back". Moreover, if her account is credited, Hannon was aware, or should have been aware, that his actions and those of his fellow officers had precluded her compliance with any directive to retreat. Although a trier of fact is of course not compelled to credit this scenario, it is a permissible one on the current record, and if it were credited, it would be permissible to find that Hannon did not have probable cause to arrest her.

As for arguable probable cause, the record leaves open some

modest question as to whether the arresting officers had a
reasonable basis to believe that they had probable cause to arrest
Dellal. It is apparent from plaintiff's own testimony that at some
point the police sought to have the crowd move away from the
barriers that they had placed in the street. If, however, they used
the barriers as a weapon to push the crowd, a trier of fact could
conclude that they should reasonably have known that people
directly in front of the barriers could not obey because of the
crush of the crowd behind them. As for Ms. Dellal in particular,
since she testified that she had communicated her distress and
quandary directly to Det. Hannon and that his actions had prevented
her compliance with such an order and necessitated her climbing the
barrier to extract herself, a trier of fact might also find --
depending on the precise circumstances -- that the defendant had
reason to understand that his efforts had both trapped her and
compelled her to surmount the barrier in order to release her
pinioned leg. In such a scenario, the trier of fact might well make
findings inconsistent with the contention that defendant Hannon
reasonably believed that he had probable cause to arrest Dellal.

    f. Emily Venizelos

    Defendants also seek summary judgment on the false-arrest

92

claim of Emily Venizelos. Ms. Venizelos was arrested and charged
with two counts of disorderly conduct. (Venizelos Dep. at 66).
Defendants base their application on the deposition testimony of
the arresting officer, Rocco Loccisanno, who reported that Ms.
Venizelos had repeatedly pushed him when he directed her to proceed
in a particular direction in the Times Square area.  (Defs.' Mem.
of Law at 105-07; Loccisanno Dep. at 84-88).

Defendants' argument is surprising, to say the least, since
plaintiff testified to a completely different version of the facts.
According to plaintiff, she and several friends were directed by a
police officer, apparently not Loccisanno, to cross the street at
42nd Street in the direction of a subway entrance that they were
seeking to access, and while she crossed behind the others, another
officer demanded to know where she was going. (Venizelos Dep. at
18). When she responded that she had been told by the first officer
that she could cross that street, she was set upon by a number of
police officers -- apparently including Officer Loccisanno -- who
shoved her into a wall, cursed at her, and seized and handcuffed
her without explanation. (Id. at 19).[34] At the same time, she

---

[34] While Venizelos did not identify Loccisanno as one of her
assailants, his testimony that he had participated in her arrest
(Loccisanno Dep. at 81-96) would allow a trier of fact to find
that he was directly involved in the allegedly violent
interaction with her that led to her arrest.

recounted, another group of police officers set upon one of her friends when he told one of the officers that Ms. Venizelos was with him and his friends, and violently beat him. (Id. at 19, 40-45). She further specifically denied that she had disobeyed any order, pushed any officer or offered any resistance. (Venizelos Dep. at 106-07, 109). Finally, it bears mention that Ms. Venizelos went to trial on the criminal charges filed against her and was acquitted. (Venizelos Dep. at 122).

Given this acute divergence in the two versions of plaintiff's arrest, it is painfully obvious that summary judgment cannot be granted on the basis of Loccisanno's testimony. There are triable issues both as to probable cause and with respect to the immunity defense asserted by the officer.

g. Matthew Cavanna

Defendants seek summary judgment on the false-arrest claim of Matthew Cavanna. In doing so they rely in part on the plaintiff's deposition testimony and in part on the testimony of defendant Det. John Beale. (Defs.' Mem. of Law at 107-10). We conclude that there are triable issues as to the legality of the arrest and the detective's qualified-immunity defense.

94

Again, the versions of the events at issue offered by the
plaintiff and the defendant arresting officer differ radically. Mr.
Cavanna, after describing his attending the demonstration on First
Avenue (Cavanna Dep. at 127-50), testified that he had subsequently
walked with two friends to the vicinity of 39th Street east of
Broadway, apparently on Seventh Avenue. He was using a video camera
to films scenes throughout the day and at one point while in the
vicinity of Seventh Avenue, he observed several hundred individuals
trapped between streets and chanting. (Id. at 160-63). He did not
join in, but rather approached four officers standing together
about half a block away on the sidewalk and engaged them in
conversation about how their day had gone and whether there was any
logic to how the police had been instructed to handle the crowds of
the day. (Id. at 163-64, 167). The discussion went on for at least
five minutes in an apparently friendly way with two of the
officers, but one other (hereafter "the angry officer"), seemingly
annoyed with the protesters and possibly with Cavanna for filming,
screamed at him at one point "Get the fuck out of here" and "You've
had your fun already." (Id. at 164-65). He may also have said "Get
off the sidewalk." (Id.). According to Cavanna, despite this
outburst he continued his conversation not only with the other
officers, who admitted that they were uncertain what they were
supposed to do, but also with the angry officer, who apparently

95

then offered his view that the demonstrators should remember the events of September 11, 2001. In Cavanna's account, this discussion went on for several minutes, and he then started to leave. (Id. at 164-72). As he walked away, still filming, the officers followed him and were supplemented by another officer, in riot gear, who yelled, in substance, "What's going on here." (Id. at 176). At some point while Cavanna continued to walk away, that officer -- who appears to have been defendant Det. John Beale -- lunged at him, grabbing his arm and throwing him to the ground, while the previously described angry officer tried to grab Cavanna's camera. (Id. at 176-77). Cavanna tried to pass his camera to his friends but one of the officers threatened them with arrest. (Id. at 177-78). Cavanna was then placed under arrest and later charged with disorderly conduct. (Id. at 178-79, 211). As for his camera, it was not returned to him when he was released. It took four months for him to locate the camera in a collection of property held by the Police Department for destruction, and when he retrieved it he discovered that the film had been removed. (Id. at 225-29).

     In contrast to this account, Det. Beale testified that Mr. Cavanna was part of a large group of disorderly and possibly violent protestors, that Cavanna had repeatedly disobeyed orders to clear the street and move on, and had returned to the area after

being physically escorted away by Det. Beale, and that, as Cavanna
was being escorted away from the area for a second time, he pushed
the officer escorting him. (Beale Dep. at 13-17, 24-26). These two
accounts are irreconcilable, and if plaintiff's version is
credited, there would be at least a triable issue regarding whether
there was probable cause or arguable probable cause for his arrest.

Defendants appear to rest their argument principally on the
contention that, according to Cavanna's testimony, he disobeyed an
order -- presumably to "get the fuck out of here" and possibly to
get off the sidewalk -- and that failing to comply with a police
order provides a ground for arrest. (Defs.' Mem. of Law at 107-08,
110). This argument is misguided.

From the plaintiff's testimony it is not at all clear that the
statement "get the fuck out of here" amounted to an order rather
than simply a colorful expression of one officer's distaste for the
demonstrators and for Mr. Cavanna's use of a video camera. Given
the context, including the inaction of the other officers at the
time of the expletive-laden comment, and even the inaction of the
angry officer at that point -- according to Cavanna, he continued
the conversation and was clearly engaging in political debate with
Cavanna -- it is more plausible to infer that none of the officers

97

at the time took that comment to be an actual order (much less one grounded in any legal basis whatsoever, as opposed to simple fury at the events of the day or at Cavanna's videotaping). In fact, according to Cavanna the discussion between him and the officers -- which covered such topics as the anger of the demonstrators at the impending war, the significance of September 11, the manner in which the police were handling the demonstrators, and the logic of what was going on down the street -- continued for several minutes after the "get the fuck out of here" comment. (Cavanna Dep. at 164-72). Moreover, plaintiff then started to walk away, an action that at least would seem to comply with the "get the fuck out of here" directive -- if such it was. As for the events that immediately followed -- including the additional officer's statement to get off the sidewalk -- since the assault on plaintiff allegedly began right after that statement and there is no context from the plaintiff's testimony indicating why he should have been ordered off the sidewalk, there is adequate ground for a trier of fact to view the order as having no basis and to view the seizure of plaintiff and his camera as predicated, not on his purported failure to instantaneously start walking in the roadway, but rather on animus to his use of the camera.[35]

---

[35] Notably, there is no testimony that the officers ordered plaintiff to stop filming, and hence there is no need to parse the legitimacy of such an order, if it had been given.

In sum, there are substantial disputes as to the nature and evolution of the interaction between plaintiff and the police at 39th Street, and plaintiff's version is consistent with his arrest not having been supported by probable cause and as having actually been motivated by animus towards his exercise of his First Amendment rights. Under the circumstances we cannot find that the legality of the arrest is beyond triable dispute. We also cannot find that an arrest arguably triggered by a policeman's anger about the demonstrations and/or plaintiff's use of a video camera can be protected by qualified immunity as a matter of law.[36]

Finally, insofar as Det. Beale concededly participated in plaintiff's arrest (Beale Dep. at 26; see also Defs.' Ex. T), he is an appropriate defendant on this claim.

h. Delaine Douglas

The next false-arrest claim targeted (at least initially) by defendants is that of Delaine Douglas. In support of their application for summary judgment, they rely on the deposition

---

[36] In view of plaintiff's testimony, we also find that the arrest may be viewed as having been triggered by animus towards plaintiff's exercise of his First Amendment rights, and if so the arrest may also provide the basis for a First Amendment claim. See pp. 65-66, supra.

testimony of the arresting officer, defendant Wesley Otero, and argue that he is entitled to qualified immunity as a matter of law. In substance, they characterize him as reporting that he had arrested her because "she was amid a group that breached a police barricade." (Defs.' Mem. of Law at 116).

This assertion does not accord with Ms. Douglas's testimony. She recounted having journeyed to First Avenue by way of 72nd Street, at which point she was directed into a pen between 72nd and 71st Streets. (Douglas Mar. Dep. at 74-75). Over a period of one hour or more, she and the other people in that pen were allowed to move southward, street by street, into pens further downtown, until she and the others arrived at the block between 60th and 59th Streets. As she described it, that pen was very crowded, and she began at some point to move her way through the crowd towards the front of the pen, that is, to the barriers closest to 59th Street. She and the others in this crowded pen waited for some time to see if they would be permitted to leave it. (Douglas Apr. Dep. at 25, 32-33). We infer that most of the people were seeking to move further south, but Ms. Douglas had planned to do some shopping and have a pre-scheduled facial at Bloomingdale's on 59th and Lexington Avenue. (Douglas Mar. Dep. at 71-72). She and others repeatedly asked the police stationed at the front barriers, including Officer

Otero, when and if they would be permitted to advance further or
(in plaintiff's case) would be allowed to exit in order to head
west. Each time the officers indicated that no such permission
would likely be forthcoming, and Otero at some point suggested that
they should seek to exit from the rear of the pen, that is, by way
of the barriers nearest 60th Street. (Douglas Apr. Dep. at 36-39).
As narrated by Ms. Douglas, she squeezed her way to the rear of the
pen but was unable to leave that way because the police there were
barring any exit by others who were also seeking to leave. (Id. at
39-40). She then returned to the front end of the pen and informed
the officers there, including Officer Otero, that she had not been
permitted to exit the rear of the pen and again asked to be
released at the front of the pen. (Id. at 40-42, 43-44). As time
passed, she moved back from the front barriers several times to
make cell phone calls to a friend and to her husband. (Id. at 49-
50). At some point while she was standing some distance away from
the front of the pen, she observed people around her moving
forward, and she took several steps in the same direction. (Id. at
53-54, 57-59). She did not see anyone move the barriers, but she
observed a small opening between two of the front barriers and saw
that a number of people who had been in the pen were now in the
cross-section in front of that pen, that is, in or around 59th
Street. She also saw a number of police officers initially standing

101

in front of the opening on the outside of the pen. (Id. at 59-62).

According to Ms. Douglas, while she was standing inside the pen and still away from the front barriers, a group of four officers, including Otero, charged into the pen. She heard Otero yell "get her" and at that moment two officers barreled into her, knocking her onto her back and side. (Id. at 62-67). They and Otero then pressed her into the ground, grabbed her by her legs and one arm, flipped her over, rear-cuffed her and dragged her out of the pen and into the intersection, ripping her coat and frightening her. (Id. at 67-70, 74-75, 77). They then jerked her up and slammed her onto the hood of a patrol car, and then threw her into the car, banging her head against the door jamb in the process. (Id. at 77-82).

Eventually the three officers brought Ms. Douglas to the 19th Precinct, where she was given a summons for disorderly conduct and told by an officer that if she showed up in court, the charge would almost surely be dismissed. (Id. at 104-05, 110). She appeared several times in court, and the charge was eventually dismissed when Officer Otero reported that he could not positively identify her. (Id. at 106-09).

102

Given this testimony, it is readily apparent that defendants cannot prevail on summary judgment. Based on Ms. Douglas's testimony, she was doing nothing illegal, and there was no evident reason for Officer Otero to think otherwise.[37] The fact that others in front of her may have dislodged a police barrier and left or attempted to leave the pen gave the officers no justification for arresting people who did not do so and were simply standing peacefully inside the designated pen. For the same reason, judgment cannot be granted to Otero on his immunity defense since, if plaintiff's version is credited, Otero could not have reasonably believed that he had probable cause to arrest her.

i. <u>Sara Parkel</u>

Defendants seek summary judgment for defendant Jeff Millenbach, the officer who arrested Ms. Parkel. (Defs.' Mem. of Law at 115-16). The record precludes such relief.

Ms. Parkel testified that she was walking with a group of people on 39th Street heading east towards Sixth Avenue, with the

---

[37] Indeed, if Otero represented at the state court appearance that he could not identify plaintiff (<u>see</u> Otero Dep. at 94-95, 100), it is at least open to question whether he can credibly testify now inconsistently with plaintiff's representation.

object of getting to a demonstration at First Avenue near 39th Street. She testified that at some point while the group was walking on the sidewalk under scaffolding, the police surrounded the entire group, bringing it to a halt. (Parkel Dep. at 18-20). According to plaintiff, one of the officers warned the trapped individuals that they were not to go onto the roadbed or they would be arrested. (Id. at 20-21). Subsequently the police told the assembled crowd that they would be allowed to leave, heading either east or west -- Ms. Parkel was unclear as to which direction the people in question would be allowed to head towards -- but that anyone going in the opposite direction would be arrested. (Id. at 25). In Ms. Parkel's account, the police subsequently let approximately five people leave, but then proceeded to arrest everyone else, including her, even though the arrestees were on the sidewalk and were being blocked from walking away by the police. She further confirmed that if she had been allowed to move, she would have gone home. (Id. at 18-29, 74-75; see also id. at 67-70).

Under this scenario, the police obviously had no probable cause to arrest anyone in this crowd. The arrestees had been walking on the sidewalk, and thus not blocking pedestrian traffic, until they were stopped by the police. If civilian traffic was then blocked, it was only because the police refused, for no apparent

104

reason, to permit the bulk of the approximately fifty people to continue walking in either direction. In short, it was the police who, in this account, manufactured the purported crime by blocking a large number of people from moving.

It follows as well that if Ms. Parkel's account is credited, Officer Millenbach cannot demonstrate as a matter of law that he had a reasonable basis to believe that he had probable cause to arrest her. Defendants rely on Millenbach's deposition testimony to the effect that he heard an order to the crowd to disperse, that he saw people blocking pedestrian traffic, that he observed another officer lead Ms. Parkel out of the group, and that he then placed her in handcuffs and became her arresting officer. (Millenbach Dep. at 65-66). Accordingly, he says that he had probable cause to arrest her or at least that he reasonably believed that he had such a legal justification for her arrest. (Defs.' Mem. of Law at 116).[38]

As noted, however, Ms. Parkel testified in substance that she had not violated any police order, and that it was the police who

---

[38] We note that Ms. Parkel testified that she did not see Millenbach at the time of her arrest and first met him at the 7th Precinct. (Parkel Dep. at 41-42). In view of defendant's testimony that he in fact participated in her arrest, there is no occasion for excusing him from the case on the theory that he had nothing to do with her arrest.

had blocked her and the others from moving. Moreover, although

Millenbach refers to another officer having led Ms. Parkel out of

the crowd, that fact does not in itself excuse his taking credit

for the arrest, in which he concededly participated. (Millenbach

Dep. at 65-66; Defs.' Ex. T). He either had a basis (or an arguable

basis) for arresting her or he did not. The record on that point is

not settled, and hence summary judgment should be denied.


3. The Effect of Some Plaintiffs' Receipt of
   Adjournments in Contemplation of Dismissals


Three of the plaintiffs -- Parkel, Dellal and Cavanna --

received an adjournment in contemplation of dismissal ("ACD").

Defendants argue that this disposition of the charges against them

precludes their assertion of false-arrest claims, because it is

inconsistent with the required proof of a lack of probable cause

for the arrest. (Defs.' Mem. of Law at 111-12). We disagree.


The federal courts look to state law for the elements of

false-arrest and malicious-prosecution claims. Jaegly, 439 F.3d at

151-52 (false arrest); Manganiello v. City of New York, 612 F.3d

149, 160-61 (2d Cir. 2010) (malicious prosecution). As noted, to

demonstrate a false arrest the plaintiff must show that he was

deprived of his liberty, that this was done without his consent and

106

that the seizure was not privileged, a standard that in this context looks to whether the seizure was supported by probable cause. See, e.g., Escalera, 361 F.3d at 743; Savino 331 F.3d at 75. Unlike the tort of malicious prosecution, a false-arrest claim does not require the plaintiff to demonstrate that any criminal proceeding that followed the arrest ended in her favor. Compare Savino, 331 F.3d at 75 (listing elements of false-arrest claim) with Manganiello, 612 F.3d at 161 (listing elements of malicious-prosecution claim as "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.") (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997))(emphasis added).

The New York courts have long held that acceptance of an ACD precludes a malicious-prosecution claim because the ACD is not a favorable termination for the plaintiff, which is a required element of that tort. See, e.g., Rothstein v. Carriere, 373 F.3d 275, 286-87 (2d Cir. 2004) (quoting, inter alia, Smith-Hunter v. Harvey, 95 N.Y.2d 191, 196-97, 712 N.Y.S.2d 438, 441-42 (2000)). That remains the case today. Id.; see also Smith-Hunter, 95 N.Y.2d at 197, 712 N.Y.S.2d at 441-42 (citing Hollender v. Trump Vil.

Coop., 58 N.Y.2d 420, 461 N.Y.S.2d 765 (1983)). In contrast,
however, the New York courts recognize with some consistency that
an ACD does not preclude the assertion of a false-arrest claim,
since a favorable termination is not an element of that tort. See,
e.g., Scherr v. City of Lackawanna, 79 A.D.3d 1785, 1786, 913
N.Y.S.2d 602, 602 (4th Dep't 2010) (quoting Hollender, 58 N.Y.2d at
423, 461 N.Y.S.2d at 433). If we are obliged to apply New York law
to this federal tort, as we must, see, e.g., Weyant, 101 F.3d at
852, then it follows that the ACD does not itself provide a defense
to the false-arrest claim, a conclusion that several courts in this
circuit have adopted. See, e.g., Picciano v. McLoughlin, 723 F.
Supp.2d 491, 501 n.38 (N.D.N.Y. 2010); Worytko County of Suffolk,
2007 WL 1876503, at *2-3 (E.D.N.Y. June 28, 2007); Cumberbatch v.
Port Auth. of N.Y. & N.J., 2006 WL 3543670, at *10 & n.17 (S.D.N.Y.
Dec. 5, 2006).

     To the extent that some decisions have held that the ACD bars
a false-arrest claim, e.g., Bowles v. State, 37 F. Supp.2d 608,
611-12 (S.D.N.Y. 1999), they seem to rest on a Second Circuit
decision predating Weyant that indicated that a favorable
termination is a prerequisite for such a claim. See Roesch v.
Otarola, 980 F.2d 850 (2d Cir. 1992); cf. Johnson v. Bax, 63 F.2d
154, 159 (2d Cir. 1995). The Second Circuit's subsequent decision

in _Weyant_ addressed _Roesch_ and distinguished it in part on the
basis that New York law clearly did not impose a favorable-
termination requirement on false-arrest claims, whereas _Roesch_ had
originated in Connecticut district court and Connecticut state law
was unsettled on that point. _Weyant_, 101 F.3d at 853 (citing
_Broughton_, 37 N.Y.2d at 456, 373 N.Y.S.2d at 93; _Roesch_, 980 F.2d
at 853). Given the clear indication in _Weyant_ and later cases that
we should follow the lead of the New York courts, we reject the
notion, espoused here by defendants, that the false-arrest claims
should be barred if the plaintiffs received an ACD.[39] _Accord_, _e.g._,

_____

[39] We note that _Roesch_ reasoned that if a malicious-
prosecution claim is barred absent a favorable termination, it
would make sense to preclude a plaintiff from prevailing on a
false-arrest claim, even in the provable absence of probable
cause for the arrest, if the charges in question ultimately led
to a conviction. Regardless of whether that be a convincing point
as a policy matter, the New York courts have disagreed with that
suggestion, and if we must look to state law, then we are bound
by their conclusion. In any event, it is not all clear why a
plaintiff should be denied any remedy if he was arrested without
probable cause, merely because the charges were later disposed of
on a basis that was not inconsistent with guilt. The two torts
are distinct, and address different conduct. _Weyant_, 101 F.3d at
853 (quoting _Broughton_, 37 N.Y.2d at 456, 373 N.Y.S.2d at 93).
The false-arrest claim rests on the contention that the decision
to arrest was unlawful and that the time spent in custody as a
consequence, until the filing of formal charges, is compensable.
_See_ _Broughton_, 37 N.Y.2d at 459-60, 373 N.Y.S.2d at 96. In
contrast, the malicious-prosecution claim looks to the subsequent
decision to file formal charges, and it challenges the propriety
of that separate decision. _Id._ It makes perfect sense, given the
nature of that type of claim, to impose a favorable-termination
requirement, since, absent such a termination, the decision to
charge was presumably justifiable. Moreover, this distinction is
further appropriate since it is entirely possible that an arrest,

MacNamara, 2011 WL 1991144, at *18 n.18; Wahhab v. City of New York, 386 F. Supp.2d 277, 293 (S.D.N.Y. 2005).

### 4. Disposition of the False-Arrest Claims Against the City and Supervisory Individual Defendants

Although the false-arrest claims should survive against the arresting officers, plaintiffs also seek to press those claims against the City itself and against various supervisory defendants, specifically, defendants Kelly, Joseph and Michael Esposito, Grasso and Smolka. (Pls.' Mem. in Opp'n at 71-81).[40] Defendants argue that these claims should not survive against these defendants for lack of proof that the City or the supervisory defendants bore responsibility for any unjustified arrests. (Defs.' Reply Mem. of Law at 55-58, 74-76).

With respect to the City, plaintiffs argue in general terms that the plan approved by the Police Department for the event was defective either in design or in implementation because it did not

---

with consequent injury, may have been made without basis, but that the authorities subsequently acquired enough evidence to file formal charges.

[40] Plaintiffs at this stage do not press false-arrest claims against defendants Acerbo, Aanonsen, Flynn, Willoughby, Brady, Carney, Secreto, Scali and Reilly. (Pls.' Mem. in Opp'n at 79 n.25).

110

adequately prepare the police on the ground for crowd control on
the scale required by such a large demonstration -- a failing that
led to unnecessary crowd congestion and confusion by the police as
to how to deal with that circumstance -- and that this failing
represents a policy decision by the City that ignored the
overwhelming likelihood that police personnel would engage in
large-scale false arrests as a means of handling such a large
turnout. (Pls.' Mem. in Opp'n at 71-72, 76). Plaintiffs further
argue that the City may also be held liable for failure to
supervise the police force because a number of supervisory
defendants were at the site of the event and they should have
realized during the demonstration that the officers under their
command were making numerous false arrests and that this behavior
must be stopped. (Id. at 72, 77-78).

As for the supervisory defendants, plaintiffs argue, in like
terms, that since they were present for the demonstration, they
were surely aware of extensive misconduct by their subordinates in
making arrests, and yet failed to correct the problem. Hence,
according to plaintiffs, they may be found individually liable for
their subordinates' conduct in making arrests. (Id. at 79-81).

Plaintiffs' Monell arguments are not buttressed by evidence

sufficient to permit a finding that the City may be held liable for any of the arrests in question. Insofar as they attack the crowd-control plan, they argue in effect that it was not well-designed, and that in particular its crowd-control provisions -- including the blocking of side streets and the failure to ensure that all officers assigned to the demonstration knew what access plans were in place -- led to overcrowding, which in turn led to arrests without basis as a means of clearing the overcrowded streets. (Pls.' Mem. in Opp'n at 71-72, 76-78). As we have already noted, we have found that the plan, as designed, was within the discretion of the Police Department and hence not subject to First Amendment challenge and that its implementation by senior Department personnel was (with the triable exception of the failure to provide updated access information to the crowd) also consistent with municipal policing discretion. (See pp. 35-66, supra). Even if that were not the case, however, plaintiffs offer no evidence that the plan embodied a policy or practice by the Department as an institution to direct, encourage or approve of unlawful arrests. At most, plaintiffs argue that the plan was poorly designed, an assertion that, even if correct in some respects, does not assist them in showing that the Department had, either explicitly or by unavoidable implication, adopted such an unconstitutional policy.

112

Plaintiffs do not attempt, as an alternative ground for <u>Monell</u> liability, to demonstrate that there was a Department practice before February 15 to control these types of demonstrations by the use of unlawful arrests. They also cannot show that the Department knew in advance of the likelihood that police officers would confront a huge (and, in places, unruly or even riotous) throng and would try to handle it by making numerous, or any, unjustified arrests. Rather, they seek to impose liability on the City based on a theory of failure of supervision, but this theory founders for lack of evidence.[41]

As we have noted, a claim of failure to supervise cannot succeed unless the plaintiff proffers evidence from which a trier of fact may infer that the senior City personnel were aware that their subordinates were engaging in unconstitutional behavior or that they were highly likely to do so absent more stringent supervision, and that the senior supervisors then failed to act to

_____

[41] At one point plaintiffs appear to articulate, in passing, a theory of failure to train the police. (Pls.' Mem. in Opp'n at 72). This nascent argument fails for lack of any specific evidence as to how the police were trained in crowd control, what defects were reflected in that training, and why the Department should have known to a moral certainty that failure to provide more extensive or better training would lead to a pattern of false arrests in the context of mass demonstrations. <u>Cf.</u> <u>Connick</u>, 131 S.Ct. at 1359-60 (discussing "deliberate indifference" requirement for failure-to-train claims); <u>Reynolds</u>, 506 F.3d at 192-93 (same); <u>Walker</u>, 974 F.2d at 296-98 (same).

113

correct or avoid the problem. See Thomas v. Roach, 165 F.3d 137, 145-46 (2d Cir. 1999) (granting summary judgment to defendant city where "[plaintiff's] evidence was not sufficient to show that the City . . . had a policy of deliberate indifference that led to his injuries."); Searles, 652 F. Supp.2d at 443-44 (dismissing failure-to-supervise claim where "[plaintiff]'s evidence . . . fails to establish 'that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and [that] the policymaker's failure to investigate or rectify the situation evidences deliberate indifference . . . .'") (quoting Amnesty Am., 361 F.3d at 128). Rhetoric aside, plaintiffs do not proffer an adequate showing to permit such findings to be made here. The closest that they come in this regard is citing the fact that defendant Smolka signed a number of summonses for arguably unjustified arrests and that he did so without having witnessed the events that had triggered the arrests. His role, while it may open him to liability for his conduct in approving these specific arrests, does not translate into a Department policy not to supervise the behavior of patrol officers in making arrests despite knowledge to a moral certainty that, absent such supervision, the officers on the ground would engage in a pattern of false arrests.

As for the possible liability of the various supervisory defendants, we start by addressing the pertinent legal standards, which are currently in some flux. As we have noted, a plaintiff may not prevail on a constitutional tort claim against an individual defendant absent proof that the defendant was personally responsible in some way for the alleged misconduct. It is well settled that, regardless of a defendant's position in the governmental hierarchy, he cannot be held liable under section 1983 for an award of damages absent some form of personal involvement in the constitutional tort. See, e.g., Scott, 616 F.3d at 110 (quoting McKinnon, 568 F.2d at 934); Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

Until recently the accepted standard for personal involvement by a supervisor was that articulated in Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). In Colon the Court identified five categories of conduct that may demonstrate the personal involvement of a supervisory defendant. Such personal involvement, the Court held, may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices

115

occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiff]s by failing to act on information indicating that unconstitutional acts were occurring.

Id.; accord Provost, 262 F.3d at 154; Wright, 21 F.3d at 501; see also Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (quoting Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Recently, however, the scope of what qualifies as "personal involvement" by a supervisor has come into question by virtue of a 2009 decision in which the Supreme Court held, in a pleading context, that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 129 S.Ct. at 1948. The Second Circuit has not yet addressed how Iqbal affects the five categories of conduct that give rise to supervisory liability under Colon. However, because Iqbal specifically rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," several decisions in this district have held that Iqbal has nullified most of the

116

longstanding <u>Colon</u> factors. <u>See</u> <u>Bellamy v. Mount Vernon Hosp.</u>, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009)[42]; <u>Newton v. City of New York</u>, 640 F.Supp.2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in Ashcroft v. Iqbal."). These courts have concluded that "[o]nly the first and part of the third <u>Colon</u> categories pass Iqbal's muster," and that "[t]he other <u>Colon</u> categories impose the exact types of supervisory liability that Iqbal eliminated," because only the first and third categories sufficiently allege personal involvement to permit supervisory liability to be imposed after <u>Iqbal</u>. <u>Bellamy</u>, 2009 WL 1835939 at *6; <u>Spear v. Hugles</u>, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009) ("The Supreme Court explicitly rejected the argument that, 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' . . . Accordingly, only the first and third Colon factors have survived the Supreme Court's decision in Iqbal.").

We disagree with this narrow interpretation of <u>Iqbal</u>, as have

---

[42] "Only the first and part of the third Colon categories pass Iqbal's muster - a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred." <u>Bellamy</u>, 2009 WL 1835939, at *6.

a number of other courts. See, e.g., Delgado v. Bezio, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011); Qasem v. Toro, 2010 WL 3156031, at *3 (S.D.N.Y. Aug. 10, 2010); D'Olimpio v. Crisafi, 2010 WL 2428128, at *4 -5 (S.D.N.Y. June 15, 2010). We believe, as observed in Sash v. United States, 674 F. Supp.2d 531 (S.D.N.Y. 2009), that "[i]t was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." Id. at 544 (internal citation omitted). Thus, as in the present case, where the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in Colon should still apply. Id. (citation omitted); D'Olimpio, 2010 WL 2428128 at *4-5. Hence we look to earlier Second Circuit precedent that applies the tests of deliberate indifference or gross negligence to assess supervisory liability, a standard that defendants themselves invoke (see Defs.' Reply Mem. at 49 (citing Meriwhether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989)), and that demands a showing of actual or constructive notice by the supervisory defendant of constitutional torts committed by their subordinates. Sash, 674 F.Supp.2d at 544;

118

cf. Connick, 131 S.Ct. at 1360.[43]


Applying these standards, we conclude that plaintiffs cannot

sustain a false-arrest claim against any supervisory defendant

other than Smolka. There seems to be no dispute that defendant

---

[43] Although Connick dealt solely with municipal liability
under section 1983, we believe that its analysis is informative
as to the scope of personal liability for supervisors and
supports our conclusion that Colon remains viable. In the context
of either municipal liability or supervisory liability, the
Supreme Court has clearly stated that a defendant is only
responsible for his own actions. Compare Connick, 131 S.Ct. at
1359 ("[U]nder § 1983, local governments are responsible only for
'their own illegal acts' . . . [t]hey are not vicariously liable
under § 1983 for their employees' actions.") (quoting Pembaur,
475 U.S. at 479) (emphasis in original), with Iqbal, 129 S.Ct. at
1948 ("Because vicarious liability is inapplicable to . . . §
1983 suits, a plaintiff must plead that each Government-official
defendant, through the official's own individual actions, has
violated the Constitution."). Hence, if failure-to-train claims
or the "deliberate indifference" test for a supervisor's personal
involvement in constitutional violations under § 1983 were no
longer viable after Iqbal, we would expect that the same type of
§ 1983 claims would fail if asserted against a municipality. Yet
in Connick, the Supreme Court applied the "deliberate
indifference" test to a failure-to-train claim. 131 S.Ct. at
1360-66. Connick ultimately rejected municipal liability on the
grounds that the plaintiff had not proven the "pattern of similar
violations" establishing that the supervisory defendant had
received adequate notice of the specific constitutional violation
allegedly resulting from his failure to adequately train his
subordinates, and thus failed to show a "'policy of inaction'
that [was] the functional equivalent of a decision by the city
itself to violate the Constitution." Id. at 1366 (quoting City of
Canton, 489 U.S. at 395). The Court did not, however, suggest
that municipal liability was unavailable because it was premised
on a failure-to-train claim, compare Newton, 640 F. Supp.2d at
448, or allegations of deliberate indifference, which would seem
to fall within Colon's fifth category of personal. Compare
Bellamy. See 2009 WL 1835939, at *6.

Grasso was neither involved in planning for the policing of the demonstration nor present for the event. (See Scanlon Aff. at ¶¶ 11-46). Hence he plainly cannot be held liable for it. As for Commissioner Kelly, since the plan that he appears to have approved or acquiesced in was not itself constitutionally inadequate, and since there is no indication that he was present at the demonstration or handling on-the-spot decisions by the Department's senior supervisors, he too cannot be held responsible for the arguably false arrests.[44]

As for defendants Joseph Esposito and Michael Esposito, plaintiffs' argument for supervisory liability against the two Espositos fails because they do not proffer an adequate evidentiary basis for the assertion that these defendants knew that the level of supervision that they were providing at the demonstration would be inadequate to protect against the likelihood of false arrests by the police. In substance, plaintiffs suggest that these defendants should have been aware at some point during the day that too many people were being arrested and that this was a red flag that

---

[44] This is not the sort of claim for which the head of the Department may be held liable for police misconduct because he surrendered to more junior personnel the responsibility to make policy decisions that should have been his. Cf. Gutierrez v. City of New York, 756 F. Supp.2d 491, 514-15 (citing, inter alia, Praprotnik, 485 U.S. at 130).

matters were out of control and that the arrests being made were
unjustified. (Pls.' Mem. in Opp'n at 77-78, 81). This argument is
based on rhetoric rather than evidence. The Department's plan
projected up to 250 arrests, and the final total was only
marginally higher. (See O'Connell Dep. at 113, 116-17, 180-81;
Defs.' Ex. QQ). Moreover, plaintiffs offer no specifics to justify
their implied assertion that the projection of 250 legitimate
arrests was too high.[45] The actual number of purely lawful arrests
at a mass demonstration is inevitably a product of crowd behavior
as well as police responses to that behavior, rather than pre-
ordained police planning, and there is undisputed evidence that in
a number of instances on February 15 groups of protesters or others
present at the event engaged in unlawful behavior, thus triggering
the need for at least some arrests. (Acerbo Dep. at 94-95, 109,
115-19; M. Esposito Dep. at 131-33, 159-63, 196-97; Gannon Dep. at
184-85, 191-94; Beale Dep. at 13-14, 64-67). Plaintiffs offer no

---

[45] At one point plaintiffs seem to argue that this estimate
was too high and somehow betokens the notion that the police
intended to pursue unjustified arrests. (Pls.' Mem. in Opp'n at
76). The only articulated basis for this is the plaintiffs'
assertion that the police had never arrested that many people at
prior demonstrations, an argument that, apart from being
undocumented, is beside the point, since there is no dispute that
the February 15 protest was the largest political demonstration
that the police had ever confronted. In any event, for reasons
already noted, plaintiffs fail to demonstrate a basis for finding
that the plan as originally designed -- even if in haste -- was
outside the broad discretion of the police in seeking to ensure
public safety and order.

basis for inferring that the supervisory defendants should have known at any particular moment that their supervision of the officers on the scene was manifestly inadequate to protect the right of the public to demonstrate peacefully.

Finally, defendant Smolka was actively involved on the streets, including in making arrests and then later signing summonses for other arrestees. (Smolka Dep. (Pls.' Ex. 76) at 45-46; see also Defs.' Ex. S, Pls.' Ex. 14). To the extent that he made or approved arrests for which there was no basis, he may be held liable.[46] But plaintiffs offer no basis for holding him in particular liable for arrests that he neither carried out nor approved.[47]

_____

[46] These arrests include the arrests of plaintiffs Silva and Bryant, for whom Smolka signed summonses. (Pls.' Exs. 10, 31). As stated above, defendants do not challenge these plaintiffs' false-arrest claims on summary judgment. (See pp. 72, supra). Defendants also fail to address the false-arrest claim of plaintiff Melvyn Stevens, whose summons was signed on behalf of defendant Neil Spadaro. (Pls.' Ex. 31; Spadaro Dep. at 51-70).

[47] At one point plaintiffs appear to criticize Smolka, and perhaps the Espositos, for placing themselves on the streets rather than at a command post, where they supposedly could have more effectively monitored the day's events and performance by the police under their command. (Pls.' Mem. in Opp'n at 77-78). Whether, as matter of police management efficiency, this is a valid criticism is uncertain, but it does not save plaintiffs' claims, since the constitutional claims that they are asserting do not turn on an after-the-fact grading of management competence. For purposes of a deliberate-indifference claim against either the City or the supervisory defendants, the

122

D. Defendants' Motion: The Excessive-Force Claims

Defendants also target most or all of plaintiffs' claims of excessive force. These claims are based mainly, but not exclusively, on confrontations between some of the plaintiffs and police officers in the context of an arrest. They include assertions by many of the arrestee plaintiffs that the police officers, in arresting them, unjustifiably threw them to the ground, pushed or pummeled them, and then exerted additional and unnecessary force on them as part of the handcuffing process. Some also contend that the police placed handcuffs on them that were so tight as to cause pain or other injuries, and that other officers refused over many hours either to loosen or to remove the cuffs even though there was no need for such painful restraints. A few plaintiffs also contend that the police improperly used horses to physically engage demonstrators, causing needless harm or fear. (Pls.' Mem. in Opp'n at 86-88).

Defendants argue that plaintiffs Lamb, Parkel, Bryant, Dellal

plaintiffs must demonstrate knowledge by senior Department personnel of a specified likelihood of illegal behavior by the police absent more stringent supervision and the feasibility of such more intensive supervision. For purposes of this analysis, even proof of negligence does not trigger constitutional liability. See Amnesty Am., 361 F.3d at 128 (citing, inter alia, City of Canton, 489 U.S. at 389).

and Stevens cannot show that they were subjected to any or more than de minimis force; that plaintiff Haus has admitted that the force to which she was subjected was unintentional on the part of the police officer, thus precluding liability on her constitutional claim; and that the claims of plaintiffs Connor, Sanchez, Stevens, Bryant, Dodde, Spitzer, Cavanna, Venizelos, Douglas, Silva, Blair, Parkel and Lamb must also fail because they cannot identify which individual defendant, if any of them, was involved in the application of force. (Defs.' Mem. of Law at 73). Plaintiffs respond that all of the excessive-force claims are based on actions that constituted more than de minimis use of force, that the arresting officers are liable for the use of force, as are the supervisory defendants, and that the City too may be held liable. (Pls.' Mem. in Opp'n at 85-107).

### 1. The Standards for Assessing Force as Excessive

We first address defendants' challenges to the evidence underlying six of the plaintiffs' contentions that they were subjected to excessive force by City police. We start by summarizing what we understand to be the pertinent criteria for determining whether a particular degree of force is constitutionally excessive.

124

A claim of excessive force in the context of an arrest must be evaluated under the Fourth Amendment standard of reasonableness. See, e.g., Graham v. Connor, 490 U.S. 386, 397 (1989); Anderson v. Branen, 17 F.3d 552, 558-59 (2d Cir. 1994). In applying this test, the trier of fact must look to whether, in light of the circumstances confronting the arresting officers, the amount and nature of the force used was "objectively reasonable." Graham, 490 U.S. at 397; Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995); Anderson, 17 F.3d at 559. As emphasized by the Supreme Court, the "determination of reasonableness under the Fourth Amendment" is fact-specific, and "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396. Accord, e.g., Kerman, 261 F.3d at 238-39. In making this assessment the court must consider all of the pertinent facts, "including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

In assessing a force claim, context is of course crucial. It is thus essential for the court to avoid conflating excessive-force

125

analyses from the prison context with such claims made in non-prison contexts, for two reasons. First, the standard for assessing uses of force is less forgiving when the force is applied to a member of the public, including particularly during the course of an arrest. Compare, e.g., Hudson v. McMillian, 503 U.S. 1, 7-10 (1992) (court looks to whether force was used by prison guard "maliciously and sadistically," that is, "wantonly," and whether it was more than de minimis), with Graham, 490 U.S. at 398-99 (test is whether the amount of force used in arrest was reasonably necessary to accomplish the arrest safely). Second, the courts recognize that in a prison setting the need for some degree of force is more commonly encountered than would likely be true on the outside. See, e.g., Hudson, 503 U.S. at 9 ("not every malevolent touch by a prison guard gives rise to a federal cause of action.") (citing Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973)). Hence the courts are generally careful to treat force claims in a prison context somewhat differently from those that arise when the police deal with members of the public. See, e.g., United States v. Walsh, 194 F.3d 37, 47-50 (2d Cir. 1999) (addressing Hudson and specifying that its test applies to force claims "in a prison context").

As for the amount of force that would trigger liability, the courts do seem to recognize a requirement that the force used in

either context should usually be more than <u>de</u> <u>minimis</u>. Nonetheless, even in prison cases the Supreme Court has cautioned that the <u>de</u> <u>minimis</u> use of force triggers an Eighth Amendment violation if its application is "repugnant to the conscience of mankind", <u>Hudson</u>, 503 U.S. at 10, a term that the Second Circuit has held to cover any "malicious use of force". <u>Walsh</u>, 194 F.3d at 50 (quoting <u>Blyden</u> <u>v. Mancusi</u>, 186 F.3d 252, 263 (2d Cir. 1989)).

   In the context of an arrest, some courts, in decisions cited by defendants, have said that a use of force is <u>de</u> <u>minimis</u> -- and by implication not litigable -- if it does not cause injury. <u>E.g.</u>, <u>Davis v. United States</u>, 2004 WL 324880, at *10 n.6 (S.D.N.Y. Feb. 19, 2004); <u>Bowles v. New York</u>, 37 F. Supp.2d 608, 612 (S.D.N.Y. 1999). Invoking those cases, defendants argue that a number of the plaintiffs cannot prevail on their excessive-force claims because they conceded in their deposition testimony that the pertinent use of force, even if arguably disproportionate to the circumstances, did not cause them physical injury. (Defs.' Mem. of Law at 75). We disagree.

   As a general matter, the Fourth Amendment formulation of the test for excessive force does not itself impose an injury requirement. All that it requires is proof that the amount of force

127

used was objectively unreasonable under all of the circumstances. Presumably the infliction of injury -- that is, a physical manifestation that may arise in the wake of the use of force -- is pertinent on two issues: it is probative of the degree of the force actually used and it will likely affect the amount of damages. See, e.g., Tracy v. Freshwater, 623 F.3d 90, 97 (2d Cir. 2010). Consistent with this analysis, a number of courts have explicitly rejected a requirement of injury to sustain a Fourth Amendment excessive-force claim. As the Seventh Circuit recently observed in an arrest case involving a police officer's display of a firearm:

> Plaintiffs need not show physical injury in order to sustain an excessive force claim. Such a rule would be inconsistent with the Supreme Court's ruling in California v. Hodari D., 499 U.S. 621 . . . (1991), recognizing that an arrest can be effectuated by the slightest application of physical force, or by some show of authority. Id. at 625. The issue is simply whether, once it is clear (as it is here) that a seizure has occurred, that seizure meets Fourth Amendment standards.

Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir. 2009); accord Mlodzinski v. Lewis, __ F.3d __, 2011 WL 2150741, *12-13 (1st Cir. June 2, 2011) (rejecting summary judgment on excessive-force claim for pointing firearm at unthreatening plaintiff); see also, e.g., Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005) (en banc); Holland v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001); Baker v. Monroe Township, 50 F.3d 1186, 1193-94 (3rd Cir. 1995).

The panel in <u>Baird</u> went on to say:

> As noted earlier, . . . the physical injury requirement has not been adopted by this circuit, and for good reason. Rigid insistence on physical injury would be tantamount to a rule under which pointing a gun is always *per se* reasonable. This would not be consistent with *Graham* or *Hodari D,* which require us to delve into the facts to determine the context in which the gun pointing occurs.

<u>Baird</u>, 576 F.3d at 346. To similar effect is the concurring opinion of Justice Kennedy in <u>Muehler v. Mena</u>, 544 U.S. 93 (2005), a decision that addressed the handcuffing of occupants of an apartment during a police search. In offering future guidance for police, Justice Kennedy noted that the use of handcuffs entailed the exercise of force, thus triggering Fourth Amendment analysis, and he specified that under the pertinent reasonableness test, even if the initial use of handcuffs was reasonable to protect the searchers, "[t]he restraint should . . . be removed if, at any point during the search it would become readily apparent to any objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search." 544 U.S. at 103 (Kennedy, J., concurring). The implication of this observation is, of course, that the Fourth Amendment would compel that step even if the handcuffs did not cause injury or even transient pain. Justice Kennedy also observed that the handcuffs must be removed or

129

loosened, seemingly even if there was some danger, in the event
that the handcuffed person complained that the handcuffs were too
tight and were causing pain. Id.


The Second Circuit has not conclusively decided this precise
issue, but it has indicated in a number of decisions that the
plaintiff may prevail on a Fourth Amendment excessiveness claim
absent physical injury, as for example in the context of (1) the
police pointing a gun at a civilian, e.g., Mills v. Fenger, 216
Fed. Appx. 7, 9-10 & n.1 (2d Cir. Dec. 26, 2006) (citing DiSorbo v.
Hoy, 343 F.3d 172, 184 (2d Cir. 2003), and Robinson v. Solano
Cnty., 278 F.3d 1007, 1015 (9th Cir. 2002)), or (2) an officer
orally threatening to "blow [arrestee's] brains out," Kerman, 261
F.3d at 232, 239-40. Other panels in this Circuit have indicated
repeatedly that a plaintiff need not show serious injury to prevail
on an excessive-force claim, although in those cases they have
cited some evidence of injury that the plaintiff claimed to have
suffered. See, e.g., Maxwell v. City of New York, 380 F.3d 106,
108-10 (2d Cir. 2004); Robison v. Via, 821 F.2d 913, 924-25 (2d
Cir. 1987).


Based on this legal authority, we infer that a plaintiff
asserting a claim for excessive physical force in this context must

130

demonstrate, at most, that the force was disproportionate to the circumstances and that it either was enough to cause some pain or other physical discomfort at the time that the force was applied or else resulted in some injury, even if minor. Based on this standard, we conclude that the testimony of some of the targeted plaintiffs suffices to create a triable issue as to the excessiveness of the force that the police applied. Among these plaintiffs, however, many fail to attribute the violation to any of the named individual defendants. Finally, plaintiffs fail to demonstrate a basis for liability by the City or, with one exception, by the supervisory defendants.


2. Assessment of the Targeted Claims


a. Donna Lamb


Donna Lamb was not arrested, or even touched, by a New York City police officer, much less injured. (Lamb Dep. 68, 71). She testified only that, while in the vicinity of 53rd and 54th Streets on Third Avenue, she and others were "forced" onto a sidewalk from a roadway by police oral commands and the maneuvering of mounted police. (Lamb Dep. at 68, 71). Although she reported that the police had admonished her, in peremptory terms, to stay on the

sidewalk (Lamb Dep. at 65, 77), that does not constitute a constitutional tort. See, e.g., Bowles, 37 F. Supp.2d at 613. Hence her claim should be dismissed, as plaintiffs now concede. (See Pls.' Mem. in Opp'n at 86 n.28).

### b. Don Bryant

Don Bryant complains that he was handcuffed and that the cuffs caused him discomfort and abrasions. (Bryant Dep. at 48). Defendants argue that he did not refer to such a complaint when he testified at his 50-h hearing, but first mentioned this injury at his deposition. (Defs.' Mem. of Law at 77). For this reason, they argue that he should not be allowed to pursue his claim.

Contrary to defendants' contention, Bryant did refer at his 50-h hearing to the tightness of the handcuffs and the fact that he suffered abrasions from wearing them for some number of hours. (Defs.' Ex. SS at 20). That testimony offers no basis for striking this claim.

Defendants' alternative argument is that the handcuffing of an arrestee is standard practice, that no additional force was used upon Bryant, and hence that Bryant cannot show that any force used

on him was excessive. (Defs.' Mem. of Law at 77). We disagree.

Plaintiff bears the burden of demonstrating that the force used on him was unreasonable under the circumstances. Bryant testified that the only force used at the time of his arrest involved an unidentified arresting officer tapping him on the shoulder (Defs.' Ex. SS at 13-14) and the application of the handcuffs. (Id. at 15, 20). Plainly the shoulder tap does not amount to excessive force. As for the handcuffs, plaintiff does not argue, and certainly cannot demonstrate, that their use under the circumstances was impermissible. The handcuffing of arrestees is standard procedure (Defs.' Ex. II (NYPD Patrol Guide § 208)), and was particularly appropriate in the circumstances presented during the demonstration, when the police were confronted with vast numbers of people, some apparently engaging in one form or another of civil disobedience (Acerbo Dep. at 109, 115-19; Defs.' Ex. X at 155-56), and some engaging in at least minor violence. (Acerbo Dep. at 94-95; Beale Dep. at 13-14, 63-67; M. Esposito Dep. at 196-97). In these circumstances, there was ample justification for the arresting officers to initially cuff all arrestees, even those -- such as Mr. Bryant -- who were neither violent nor actively resisting arrest. See generally Muehler, 544 U.S. at 99-100; see

133

also id. at 102-04 (Kennedy, J., concurring).[48]

That said, it is possible for a plaintiff to sustain a case for excessive force based on the use of handcuffs if he can show that the handcuffs were unduly tight or that he was kept in cuffs for an unreasonable amount of time. Id. at 102-04 (Kennedy, J., concurring) (discussing the possibility that objectively reasonable handcuffing could become unreasonable if unreasonably prolonged); Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp.2d 459, 468-69 (S.D.N.Y. 2008) (unduly tight handcuffs) (listing cases). Bryant testified that he was tightly rear-cuffed, and then spent at least four hours with the handcuffs on even though he was confined in four different police vehicles. He further reported that he had repeatedly asked the police to loosen the handcuffs and was ignored until the prisoners on the last bus were taken off and shackled to each other. (Bryant Dep. at 27-37, 39-40). In view of the fact that, according to Bryant's testimony, he was rear-cuffed and held in that position for many hours even though he was not resisting and seemed to pose no threat whatsoever when confined in police

---

[48] Bryant was one of a number of people arrested at the time in the vicinity of 54th Street for remaining in the roadway after the police had ordered demonstrators in his area to return to the sidewalk. (Defs.' Ex. SS at 11-12, 14-15). He was charged with disorderly conduct. (Defs.' Ex. SS at 21). Defendants do not contest the fact that he has a triable claim for false arrest. See (Defs.' Mem. of Law at 89).

vans and buses, that he repeatedly complained that the cuffs were
too tight and that the abrasions that the cuffs left in the wake of
his detention corroborate his complaints of pain and excessive
tightness, there is sufficient evidence in the record to permit a
trier of fact to find that the force used on him in the form of
extended tight handcuffing was constitutionally excessive.

This claim fails, however, for a different reason. Bryant
conceded that he could not identify the officer who had placed the
handcuffs on him (Bryant Dep. at 30-32), and he also does not
identify any of the officers who refused to loosen them when he
complained. (See id.). Plaintiff thus fails to show that any of the
defendant officers were responsible for such injury as he may have
suffered in this respect. Absent a showing of personal involvement
by a defendant in an alleged constitutional tort, the plaintiff may
not hold him liable. E.g., Scott, 616 F.3d at 110.

We further note that to the extent that Bryant may contend
that the City or supervisory police personnel were responsible for
this injury, the claim also fails for lack of proof. There is no
evidence that the City promoted or tolerated a practice of using
handcuffs that were too tight for their stated purpose, and there
is no indication that any of the defendant supervisors were aware

135

that the unidentified arresting officer who placed cuffs on Bryant
had done so, or would do so, in a manner to cause him unnecessary
pain, much less that other officers would fail to loosen them when
he complained. Indeed, we note that one of the plaintiffs testified
that the handcuffs with which she were confined were not too tight,
and another reported that when she complained that her handcuffs
were too tight, an officer loosened them. (Dellal Dep. at 77;
Parkel Dep. at 27-28, 52).

c. Sara Parkel

Sara Parkel testified that when she was arrested, she was
handcuffed. She admitted that while she was restrained in handcuffs
for about five hours, the handcuffs were not unduly tight and that
she suffered no injury. (Parkel Dep. at 27-28, 52). She also never
asked that the cuffs be loosened. (See id. at 35-36). Absent any
other physical contact by the police -- for which there is no
evidence -- and with no injury, she cannot demonstrate that the
force used by the police was excessive and hence cannot sustain an
excessive-force claim.

136

d. <u>Jasmine Dellal</u>

Jasmine Dellal also asserts a claim for excessive force. As already noted, the evidence reflects that while she was standing in front of a barrier on a side street between Second and First Avenues, she was told to back away from the barricade, and the officer who gave her that order -- described by Dellal as possibly being defendant Hannon -- then pushed her away from the barrier with his hand. According to Ms. Dellal, defendant Hannon was assembling a barricade and in the course of attempting to do so he pressed it down on her foot while her leg was partly over the barrier directly in front of her, and he continued to do so despite her protestation that it prevented her from withdrawing her leg, a process that caused her pain for about a half hour. (Dellal Dep. at 56-58). She testified at her deposition that she experienced hip pain severe enough to cause her to limp "for several days afterwards," presumably as a result of Det. Hannon's actions. (<u>Id.</u> at 91-92).

Dellal later climbed over the barrier, as described above, leading to her arrest. In the wake of the arrest, unidentified officers took her from behind by the arms and marched her to what was identified as the Lipstick Building for detention and later

137

processing. (Id. at 63-67). She testified that in the wake of the seizing of her arms by these officers, some of her fingers on both hands became numb or tingly, a symptom that she had previously experienced in her left hand as a result of a herniated disc. (Id. at 91-92). During her detention she did not seek medical attention for either of her alleged injuries. She was asked whether she had any medical conditions -- in her words, "if [she] had any life-threatening diseases" -- but she did not alert any police personnel to this sensation in her hands or the pain in her hip. (Id. at 87-88). She later sought treatment by an acupuncturist and two different chiropractors. (Id. at 92-96).

This evidence is sufficient in only one respect to permit a trier of fact to find that a defendant violated plaintiff's rights by the use of excessive force. The push by the officer to move her away from the barricade, even if unwarranted, does not amount to excessive force under the circumstances. Moreover, the pressing of a barricade on plaintiff's leg, if accidental, would not trigger liability for a constitutional tort even if the force thereby generated was "excessive." See, e.g., O'Neill v. Krzeminski, 839 F.2d 9, 11 n.1 (2d Cir. 1989). Plaintiff's testimony, however, could lead a trier of fact to find that the officer's conduct in this respect was not accidental, particularly since she reports

138

telling him repeatedly that her leg was trapped, and he nonetheless continued to press the barrier down on her lower leg, causing her pain during and after the episode. Absent some justification for his behavior, that testimony could suffice to buttress a finding of excessive force, even if of a modest nature. As for the identity of the offending officer, Ms. Dellal tentatively identified him as defendant Hannon (Dellal Dep. at 60-61), thus permitting her to pursue this claim against him.[49]

As for the alleged pinioning of plaintiff's arms by unidentified officers, we assume that there would be a triable issue as to whether the force exerted in that instance was excessive (based on the plaintiff's testimony about the resulting injury and asserted need for treatment).[50] Nonetheless, the claim

---

[49] Defendants also assert a defense of qualified immunity for defendant Hannon. (Defs.' Mem. of Law at 83). This argument is unavailing because, as stated above, there is a dispute of material fact as to the reasonableness of the force used against Dellal, and "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." Searles, 652 F.Supp.2d at 446 (quoting Kerman, 261 F.3d at 240).

[50] Defendants hint at a contrary conclusion based on the fact that the plaintiff had suffered a similar symptom on an earlier occasion as a result of herniated disk and did not report the injury while in custody. (Defs.' Mem. of Law at 78). We view those facts as supportive of an argument to the trier of fact that the force used was not as substantial as might otherwise be inferred from the fact that the pinioning allegedly led to numbness and tingling, but ultimately the extent of the force

139

fails since plaintiff has not identified any of the defendants as having been responsible for the force used on her arms, much less proffered evidence to support that identification.

Finally, we note that plaintiff has failed to demonstrate a triable case for pursuing her claim against the supervisory defendants or against the City. There is no indication that the supervisory defendants were on notice of the likelihood that Det. Hannon or the officers who arrested Ms. Dellal would cause her unnecessary pain or injury, and there is no basis for a finding that such behavior was either a product of a municipal policy or practice or attributable to any failure by the Police Department to train or supervise the officers adequately.

e. Melvyn Stevens

Melvyn Stevens testified that he had unsuccessfully attempted to reach First Avenue from as far north as the Sixties, and that while returning south on Second Avenue, he was in the midst of a large crowd in the roadbed, apparently because the sidewalks were filled at the time to overflowing. According to Mr. Stevens, the

_____

used would seem to be a triable issue in view of both plaintiff's report of the effect of that force and her testimony about the need for follow-up treatment.

police ordered everyone to leave the roadway, but he and the others
were unable to do so because the sidewalk was completely filled and
the crowd was also hemmed in by barriers and police officers, some
mounted. (Stevens Dep. at 17-22). At some point, he reported, half
a dozen mounted police used their horses to push into the crowd,
apparently in an effort to press them onto the sidewalks. Although
one horse came in contact with him, apparently bumping him in the
chest, the contact did not injure him or knock him down. (Id. at
23-25). However, shortly after that, unidentified police officers
grabbed him, threw him to the ground, placed tight handcuffs on
him, pulled him off the ground and marched him to a police van.
(Id. at 25-26). As they threw him to the ground, he called out that
they were hurting him, but the police did not respond. (Id. at 26).
Once placed in the van, he remained there for perhaps four hours
with the handcuffs holding his arms behind his back. He repeatedly
complained of pain but was told by other officers that he would
have to wait. He was transported in the van to One Police Plaza,
where the cuffs were removed and he was placed on a Department of
Corrections bus, where he remained uncuffed. (Id. at 34). After two
to three hours on the bus, he was shackled to other prisoners and
taken to a waiting area outside One Police Plaza, where he remained
in the cold for another two hours. (Id. at 36-39). Eventually, he
was again handcuffed and placed in a police van, where he waited

141

for another hour, but he testified that these handcuffs were "bearable". (Id. at 42-44).

Based on this evidence Stevens may well have been subjected to excessive force by the police, but he cannot prevail on an excessive-force claim. The momentary contact by a police horse, which did not knock him down or, apparently, cause him any pain or injury, does not suffice to trigger potential liability since it appears to have been a de minimis, if somewhat unusual, contact. As for his being forced to the ground at the time of his arrest, rear-cuffed, picked up and pulled to the van, and then forced to remain rear-cuffed for many hours, a trier of fact could find that the police used excessive force. By his account, he was trapped in a crowd and offering no resistance. His being thrown to the ground and cuffed in a manner that apparently caused him at least some pain appears not to have been justified. He was then forced to wear handcuffs that were unduly tight and to bear the pain for perhaps four hours while confined in a police van. Moreover, he repeatedly told the available officers that he was in pain and asked in vain for relief. These circumstances, again, would justify a finding of force that was unnecessary and damaging to the plaintiff.[51]

_____

[51] Indeed, the lack of necessity for the tight handcuffs was underscored by plaintiff's testimony that, when placed in a police bus after standing outside, he was put in handcuffs that

All of that said, Mr. Stevens was unable to identify any individual defendant who might have been responsible for tackling him at the time of his arrest, placing him in tight handcuffs, and refusing to loosen them for many hours despite his requests. Moreover, plaintiffs offer no evidence that the specific conduct of these unidentified officers was attributable either to a City policy or practice, or to a failure by the City or police supervisors to train or supervise these officers.

f. Amy Haus

Amy Haus is asserting a claim of excessive force based on an incident in which she was allegedly stepped on by a police horse. Defendants argue that her testimony demonstrates that this constitutional claim is not viable. (Defs.' Mem. of Law at 79-80). We disagree.

As she recounted her experience, she and her friends, after meeting at the subway station at the intersection of Lexington Avenue and 53rd Street, had attempted unsuccessfully to get to First Avenue for the demonstration. (Haus Dep. at 44-48). They got as far as Second Avenue in the Fifties or perhaps further north but

_____

were "bearable". (Stevens Dep. at 44).

were prevented by the congestion of people and the blocking of side streets from going any further. (Id. at 49-50). They then started back down Second Avenue, but the crush of the crowd was so great that the people could not move in any direction, and as a result she and they became stranded in the roadway in the vicinity of 54th Street, along with some mounted police. (Id. at 50-54). At some point she fell to the ground, possibly because the crowd was pressing her from behind, although she did not observe how this occurred. While lying on the ground, she saw a horse above her and felt a pain in her leg. She observed the horse walk over her and felt it step on her leg, causing extreme pain and ultimately serious permanent injury requiring surgery. (Id. at 55-59; see also id. at 72-86, 88-91 (describing the extent of her injury)). The horse apparently moved away, and her friends were ultimately able to get her to a sidewalk, then to a nearby store to examine the wound and ultimately to a hospital. (Id. at 60-71). In her testimony, she was unable to identify the rider of the horse, presumably a mounted officer. (Id. at 63).

In the absence of any other evidence pertaining to this incident, defendants argue that her claim for excessive force cannot succeed because she conceded that the contact between the horse and her body was an accident. (Defs.' Mem. of Law at 79-80).

That is not the case.

The evidence reflects that, at the time in question, the entire street, including the roadway, was taken up with people. Thus Haus testified that the crowd was unable to move, either north or south or towards either sidewalk. The mounted police were apparently also present in the street, and a trier of fact could find, based on Ms. Haus's testimony, that one or more of these mounted officers started moving through the crowd in an apparent attempt to disperse them. The trier of fact could also find that Ms. Haus was knocked off her feet by the movement of the crowd when pressed against by the horses, and plainly she was badly injured as a result of a horse moving through that crowd and stepping on her.

It is certainly true that there is no evidence that, in the crowded conditions of the street as described by Ms. Haus, the officer in question was seeking to use the horse to step on pedestrians. Nonetheless, the scenario that she described would permit a finding that the officer and perhaps other mounted police were using their mounts to physically force the crowd off the roadway, which was plainly blocked. The question, then, is whether such an action could be found to involve constitutionally excessive force. We conclude that it could.

The testimony of defendant Capt. Christopher Acerbo, the Commanding Officer of the Mounted Patrol, supports this conclusion. Acerbo described the protocol used by the Police Department in both its training and its utilization of the mounted police to disperse crowds from the street. He noted that horses would not be used for dispersal unless the crowd that was intended to be dispersed had a means of egress. (Acerbo Dep. at 31). He further stated that the horses would be held to a slow walk and that they would approach the crowd but not come in contact with it because of the danger of injury. (Id. at 32-35). If the crowd did not disperse when the horses neared them, the horses would be halted and the foot patrol would assess the situation and use other means of dispersal. (Id. at 34-37). He further emphasized that the horses would not go into a crowd except in very extreme, "life-threatening situations", and would not be used in this manner to seize or arrest people. (Id. at 37-39).[52]

From the testimony of Ms. Haus, a trier of fact might deduce that the mounted police at 54th Street and Second Avenue

---

[52] At one point Acerbo left some ambiguity as to whether the horses would be allowed any initial contact with a group of people who refused to disperse when nose-to-nose with the horses. (Acerbo Dep. at 71-82). Nonetheless he reaffirmed that any such contact was to be avoided and in ordinary situations proper police procedure would not involve sending the horses into a crowd. (Id.).

146

disregarded this protocol and proceeded to attempt to use their mounts to physically push demonstrators out of the street and to do so when, because of the crush, those people had no means to disperse, since they were pressed together by virtue of the volume of people at that location. This inference is further supported by the testimony of co-plaintiff Melvyn Stevens, who, as noted, was apparently in the same area at about the same time and was subjected to contact by a police horse. (Stevens Dep. at 23-25).

If the mounted police acted in the manner suggested by this evidence, the trier of fact could conclude that the police at the time were using force -- in the form of horses actually pressing into a dense and compacted crowd -- even though the Department recognized that this form of force was so great as to imperil public safety. Such findings would permit a trier of fact to conclude that whoever undertook this tactic was using excessive force under the circumstances.[53]

---

[53] At one point Acerbo described the use of horses to disperse demonstrators by contact as a use of force and as potentially involving excessive force. (Acerbo Dep. at 46-49). As noted, he also testified that actual contact with members of the public would be appropriate only in a "life threatening situation," but later diluted this statement by suggesting that any blockage of vehicular traffic or even of a sidewalk for part of a block would constitute a life-threatening circumstance. (Id. at 37-39, 66-67, 69). In applying the constitutional excessive-force standard, the court and any trier of fact would obviously not be bound by this standard in assessing whether the use of

In seeking to avoid this conclusion, defendants assert that plaintiff herself characterized the event as an "accident." (Defs.' Mem. of Law at 80 (citing Defs.' Rule 56.1 Statement at ¶¶ 151, 122). This assertion is a misrepresentation of plaintiff's testimony. At no time did Ms. Haus opine as to the mind-set of the mounted officer in question or as to that of whoever instructed him to engage in the maneuver that led to the incident. Although she used the term "accident" once during her deposition, she was plainly referring simply to the event -- whether called accident or incident or something else -- and not seeking to characterize the intent with which the horse was led to step on her. (See Haus Dep. at 87). Indeed, given her account -- in which she was pushed from behind by an unidentified force (possibly the crowd or a horse) and then stepped on by the horse -- she would have had no independent knowledge regarding the officer's intent.

Furthermore, if we are to parse plaintiff's use of descriptive words to characterize the encounter, the inference drawn would not be what defendants suggest. At her deposition, Haus plainly used terms that suggest malign intent by the police. Thus she described the police as "literally attacking me in an event where I had shown

---

horses to make physical contact with a member of the public
involved excessive force.

up to do nothing unlawful" (id. at 103) and reported that the experience felt like "brutal aggression." (Id. at 104).

In any event, regardless of whether the rider or his supervisors were seeking to cause injury -- and there is no evidence that they were -- if any defendant undertook actions that he knew were likely to endanger members of the public, that action may be viewed as a use of force (whether or not excessive) and not as an accident.[54]

3. Individual Defendants

As a separate matter, defendants seek either dismissal or, alternatively, summary judgment on the excessive-force claims for either all or a number of individually named defendants as well as the City. The dismissal is requested based on the asserted pleading inadequacies of the complaint, and summary judgment is sought based

---

[54] We infer that plaintiff did not harbor a belief that the officer intended to have his mount step on a fallen member of the public -- indeed we share that assumption -- but that is not determinative of the issue. Rather, the question for the trier of fact would be whether the aim was to use the horses to disperse the crowd, if necessary by physical contact, a step that, in the circumstances described by Ms. Haus, would be potentially extremely dangerous even in the estimation of the Mounted Patrol commanding officer. In that event the encounter could fairly be held to involve excessive force.

on the absence of evidence linking the various individual defendants with the alleged instances of excessive force. (Defs.' Mem. of Law at 80-83). We address these arguments separately.


a. Dismissal


In support of the dismissal version of defendants' motion, which is presented in their initial motion papers, they argue principally that the complaint fails sufficiently to identify which defendants were responsible for which alleged exercise of excessive force, and they contend that this omission from the pleading is fatal to the claims. (Defs.' Mem. of Law at 80 (citing Ruben H. Donnelley Corp. v. Mark I Mktg. Corp., 893 F. Supp. 285, 291 (S.D.N.Y. 1995)). Unfortunately, this argument is vague to the point of obscurity, defendants having failed to identify which specific excessive-force claims are defective as a matter of pleading and which individual defendants ought to be dismissed from the case as a result. We also note that this pleading argument was not raised until after the close of discovery, during the course of which the parties presumably either fleshed out the details of which defendants supposedly used excessive force against which of the plaintiffs or determined that, as an evidentiary matter,

150

plaintiffs could not prove such involvement by an identified
defendant.

It is perhaps for this reason that defendants shift course
somewhat in their reply papers, where they argue that judgment
should be granted to all individual defendant officers because
plaintiffs are still unable to identify any of them as responsible
for the excessive force or because those officers are entitled to
qualified immunity. (Defs.' Reply Mem. of Law at 48). Defendants
then add a new argument, that summary judgment should be granted to
the supervisory defendants based on plaintiffs' inability to link
them to any of the alleged instances of excessive force. (Id. at
48-52).

Because the alleged original pleading deficiency has only been
noted at this late stage, we conclude that granting relief on this
point would involve substantial inefficiencies and lead to no
practical closure. If the claims in question were found deficient
as a pleading matter, they would almost certainly be dismissed with
leave to re-plead. See, e.g., Bellikoff v. Eaton Vance Corp., 481
F.3d 110, 118 (2d Cir. 2007) ("[w]hen a motion to dismiss is
granted, 'the usual practice is to grant leave to amend the
complaint.'") (quoting Ronzani v. Sanofi S.A., 899 F.2d 195, 198

(2d Cir. 1990)); see also Fed. R. Civ. P. 15(a). At that point plaintiffs -- to the extent that they could, by virtue of the discovery that has taken place, link specific plaintiffs and defendants -- would then re-plead those claims and drop those for which discovery has not demonstrated participation by any named defendant. In short, the exercise would simply disclose the fruits of discovery, leaving the parties and the court to parse the evidentiary record on a subsequent summary-judgment motion. Furthermore, to the extent that defendants invoke qualified immunity as an alternative basis for dismissal on the face of the complaint (Defs.' Reply Mem. of Law at 48), they ignore the fact that immunity turns on an assessment of the particular circumstances in which the defendant dealt with a given plaintiff, see Searles, 652 F. Supp.2d at 446, and that in this case such an assessment cannot be made (particularly on an excessive-force claim) based on the allegations of the complaint.

In any event, the defendants have, on their current motion, offered arguments for summary judgment with respect to most of the named defendants, including some of those with supervisory rank, and we address those arguments now. To the extent that defendants have also pressed qualified immunity as a basis for summary judgment, we consider those arguments as well.

b. The Summary-Judgment Arguments

(i). The Officer Defendants

Defendants note that a number of the plaintiffs asserting excessive-force claims were unable to identify the officers who allegedly exercised the force that they claim was excessive. These plaintiffs are said to include Connor, Sanchez, Silva, Dodde, Spitzer, Cavenna, Venizelos and Blair, as well as the plaintiffs whose claims we addressed above. Defendants argue, therefore, that the claims of excessive force by these plaintiffs, insofar as they are asserted against officers Millenbach, Ryan, Otero, Loccisanno, Spadaro, Beale, Aanonsen, Willoughby, Brady, Carbey, Secreto, Scali and Reilly, should be dismissed.[55] (Defs.' Mem. of Law at 73, 80-82). This argument is not sustainable with respect to a number of the plaintiffs' claims.

As for John Connor, he testified that, while at Second Avenue and 54th Street, he was stepped on and knocked down by a police

---

[55] Defendants do not press this argument regarding plaintiff Dellal's claims against defendant Hannon. As we have noted, plaintiff Dellal testified about the encounter with Hannon and a trier of fact could find that her version of events reflected the excessive use of force by that officer. Hence her claim against Hannon should not be dismissed.

153

horse immediately after its rider had ridden it backwards into a
female demonstrator, knocking her into the crowd. (Connor Dep. at
78-81). Although he initially said that the rider may have lost
control of the horse, he then observed more specifically that the
mounted police were all backing their horses into the crowd at that
point, and he could not tell whether the one officer had lost
control or was simply more aggressive in backing his horse into the
crowd. (Id.). Since, however, Connor testified that he was unable
to identify the mounted officer (id. at 82-83), his claim cannot be
pursued against that officer, although, for reasons to be noted
with respect to Ms. Haus, Connor has a potentially triable claim
against defendants Acerbo, Smolka, and Joseph Esposito, who were
apparently present for this encounter. (See pp. 167-70, infra.).
Although Connor also testified to having been thrown to the ground
and mauled by arresting officers, with consequent shoulder and
kidney issues (Connor Dep. at 91, 127-133), he cannot identify the
offending officers and thus likewise cannot pursue his claim
against any of the defendant officers for that incident. (Id. at
87, 91).


    Carlos Sanchez testified that he was beaten by the police when
they arrested him, and that this occurred despite the fact that he
was not resisting, or indeed engaging in any misconduct. (Sanchez

154

50-h Hearing Tr. at 20-21, 23-25). He too, however, has not been able to identify the officers who used this seemingly unjustified force (Id. at 23), and hence his claim cannot survive against the defendant officers for that incident.

Carlos Silva testified that, while standing near the corner of 53rd Street and Third Avenue, he was forced onto the sidewalk by mounted police. (Silva Dep. at 74-80). While on the sidewalk, a horse's chest made contact with his head and he was "stunned." (Id. at 80-81). Shortly afterwards, he was arrested by defendant Officer Kelly. While being arrested, he was grabbed by the collar and thrown face-down on the ground, then beaten and sat upon by multiple officers. When he complained that he could not breathe, defendant Officer Kelly told him to "shut the fuck up," and deliberately bent back the fingers on his left hand, injuring them. (Silva Dep. at 84-90). He also reported having suffered through many hours of tight handcuffs placed on him by Kelly, which at least one other officer refused to loosen. (Id. at 109-11). However, he also reported that he was able to slide his right hand free of the cuffs (id. at 118), and it appears that he was not re-cuffed until he was shackled to another arrestee after arriving at One Police Plaza. (Id. at 118-20). To the extent that he asserts a claim about the cuffs, he cannot pursue it against the unidentified

155

officer, although he has a triable claim against Officer Kelly for the violence allegedly used during his arrest.[56]

Robert Dodde reported that he was seized, knocked down and dragged some distance by the police before being brought to his feet and walked to a police vehicle waiting at the intersection of 53rd Street and Second Avenue. (Dodde Dep. at 71-72, 75-78). He was unable, however, to identify the officers who were involved in this alleged violence. (Id. at 75). His claim therefore also subject to summary judgment as against the officer defendants.

Adele Spitzer described being clubbed in the back by an unknown police officer, an assault that was entirely without provocation. (Spitzer Dep. at 22-26). Since she cannot identify the offending officer, she cannot assert an excessive-force claim against him, although she presumably may pursue at least a battery claim against the City if she has preserved it through the

_____

[56] We note that defendants have not included Officer Kelly among those defendants for whom they seek summary judgment on the plaintiffs' excessive-force claims. They do represent that this officer was never served with a summons and the complaint (Defs.' Mem. of Law at 81 n.21). Although we infer that this footnoted assertion is correct since plaintiffs do not explicitly respond to it, there has as yet been no motion by defendants to dismiss under Rule 4(m) and no competent proffer of evidence as to non-service. Accordingly we view it as inappropriate to dismiss as against Officer Kelly on the current motion.

administrative-claim process.[57]

Matthew Cavanna reported an encounter with a group of police officers that led to his arrest, and he described in particular the efforts of two officers, apparently including defendant Beale, to seize him, throw him forcefully to the ground and wrestle his video camera from him. (Cavanna Dep. 176-78). Beale confirms that he was directly involved in the arrest. (Beale Dep. at 26; Defs.' Ex. T). Since the viability of this plaintiff's excessive-force claim is contested only on the basis that Cavanna fails to identify his attackers (Defs.' Mem. of Law at 81), that challenge should be rejected and the claim allowed to proceed against Beale, including insofar as Cavanna alleges that the use of excessive force was triggered by First Amendment animus.

Emily Venizelos testified that she was set upon by a group of police officers who, without provocation, not only arrested her and her companion but treated them with unwarranted violence. (Venizelos Dep. at 18-19, 40-45, 106-09). Since Officer Loccisanno

---

[57] Similarly, other plaintiffs who proffered sufficient evidence of excessive force by a police officer may be able to assert common-law tort claims against the City. See, e.g., Disorbo v. Hoy, 74 Fed. Appx. 101, 102-02 (2d Cir. 2003) (upholding jury verdict in favor of plaintiff on claims of excessive force, battery, and abuse of process claims against police officer).

confirmed that he was a participant in subduing Ms. Venizelos (Loccisanno Dep. at 81-96), her claim of excessive force should survive against him.

Abraham Blair testified to an encounter with a group of police officers who allegedly used excessive force in subduing him. (Blair Dep. at 46-51). There is no dispute that defendant Ryan was one of these officers. (Ryan Dep. at 84-93). Accordingly, since Mr. Blair's testimony suffices to permit a trier of fact to find that the officers used excessive force in subduing him, his claim may proceed against Ryan.

Delaine Douglas testified that a group of four officers, including defendant Otero, tackled her forcefully, held her to the ground, rear-cuffed her, then dragged her to a patrol car (ripping her coat in the process), slammed her onto the hood of the car to effect a search, then forced her into the back of the car, banging her head on the door jamb. (Douglas Apr. Dep. at 62-70, 74-75, 77-82). There is no question that Otero was one of the officers involved in this altercation, although his testimony differs on the amount of force used and the number of officers involved. (Otero Dep. at 88-92). Accordingly, a trier of fact could find that Otero used excessive force against Douglas, and hence Douglas's claim may

158

proceed against Otero.

As for Amy Haus, she cannot identify the rider whose horse caused her serious injuries. (Haus Dep. at 63). Accordingly, she cannot link any of the officer defendants to the incident, and they therefore may not be held responsible for it, although, for reasons to be noted, defendants Acerbo, Smolka, and Joseph Esposito may be found liable for his supervisory role in that encounter. (<u>See</u> pp. 167-70, <u>infra</u>).

(ii). <u>The Supervisory Defendants and the City</u>

Defendants also seek summary judgment for the supervisory defendants and the City on the excessive-force claims, contending that these defendants were not responsible for alleged acts of violence by the defendant officers. (Defs.' Mem. of Law at 82-83). In responding to this aspect of defendants' motion, plaintiffs focus on the alleged responsibility of some of the supervisory defendants, who include Kelly, Grasso, Joseph and Michael Esposito, Smolka, Acerbo and Flynn. (Pls.' Mem. in Opp'n at 97). Plaintiffs argue that these supervisory defendants and the City are liable for the individual officers' use of excessive force because (1) they failed to train the officers in proper crowd control and instead

supposedly advised the officers to use illegal arrests and excessive force, and (2) they failed to train the mounted police in the proper limits on the use of horses in close proximity to members of the public. (Id. at 97-98). We conclude that -- except with respect to defendants Acerbo, Smolka, and Joseph Esposito, whose involvement in the use of the Mounted Patrol we discuss below in connection with the claim of Ms. Haus -- plaintiffs' argument in this respect does not succeed. (See pp. 167-70, infra).

        To the extent that plaintiffs press a claim against the City and supervisory defendants for excessive force generally -- whether it involves throwing arrestees to the ground, kneeing them in the back, rear-cuffing them or engaging in other arguably unnecessarily forceful behavior -- they fail to establish a triable case. They do not make any showing that the City, through the Police Commissioner, adopted a policy or pursued a practice of requiring, encouraging or acquiescing in the use of excessive force at the February 15 demonstration. Plaintiffs also fail to identify any specific failing in the Department's training of officers in the need to limit the use of force to what is reasonable under the circumstances of each encounter with members of the public. Plaintiffs also fail to demonstrate that the Department knew, in advance of the February 15 demonstration, that greater supervision

160

of individual police officers was needed to avoid the strong
likelihood of violations of the rights of the public not to be
exposed to undue police violence and that it failed to undertake
such necessary additional steps.

As for the cited supervisory defendants, the plaintiffs offer
no evidence that would justify a finding that -- insofar as any
individual police officers may have exceeded permissible bounds in
their physical handling of any of the plaintiffs -- defendants
Kelly, Joseph Esposito, Michael Esposito or any other supervisory
defendants were responsible in any cognizable way for those
violations.

Plaintiffs do press a more specific contention regarding
municipal liability for the use of horses in crowd control at the
February 15 demonstration. Thus they assert that there were
deficiencies in the training of the Mounted Patrol because a number
of plaintiffs testified to the aggressive use of horses to push
back crowds of people. (Pls.' Mem. in Opp'n at 101, 103-07). This
theory of municipal liability also fails. The testimony of several
plaintiffs indicates that on several occasions horses used by the
police came into contact with, or came close to, crowds of
demonstrators (see Haus Dep. at 55-59; Connor Dep. at 74-87;

161

Stevens Dep. at 23-25), and they assert that this use of horses was improper. (Pls.' Mem. in Opp'n at 91-94, 97-98). Aside from the opinion of their purported police-practices expert -- who proffers no independent evidence (see Reiter Dep. at 89-92, 118) -- they offer no basis on which a trier of fact could find that the training provided at the Police Academy concerning the use of horses in crowd control was so deficient as to amount to deliberate indifference to the constitutional rights of the public to be free from excessive force.

As defendants point out, a plaintiff may not demonstrate the constitutional deficiency of training based on a single incident, except perhaps in the rare circumstance that "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations," Connick, 131 S.Ct. at 1361, or "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Tuttle, 471 U.S. at 824; see also, e.g., Kirsch v. City of New York, 1997 WL 375684, at *11 (S.D.N.Y. July 7, 1997) (citing cases). Moreover, the City cannot be deemed to be constitutionally deficient in training if it fails to train employees for "rare or unforeseen events." Walker, 974

162

F.2d at 297. Defendants argue that a demonstration of the magnitude of this event, involving more than 100,000 people, is sufficiently sui generis to excuse the municipality if it failed adequately to train the police for its occurrence. In this regard they note that this was the first demonstration of this magnitude in the City and that in preparation the Department relied on its experience with the somewhat different circumstances that they do traditionally encounter, that is, crowd control during the annual New Year's gathering in Times Square. (Defs.' Reply 56.1 Statement at ¶ 289; see also M. Esposito Dep. at 205-06).

We do not believe that the City's training or planning concerning crowd control is shielded in this case from constitutional scrutiny merely because no prior demonstrations of this magnitude have ever occurred in New York. Nonetheless, the size of the crowd and undisputed evidence that some participants did engage in intentionally disruptive and occasionally illegal behavior is pertinent to the manner in which the police acted. It also follows that, to the extent that the plaintiffs challenge police training based on the actual conduct of the police at this demonstration, the full context in which the police acted is obviously pertinent to evaluating the deficient-training argument.

163

In challenging the City's training regarding mounted patrols, plaintiffs complain that officers exhibited a lack of restraint by charging their mounts into crowds, thus causing unnecessary injuries and panic. (Pls.' Mem. in Opp'n at 92-94, 98-99). Plaintiffs themselves, however, in asserting that such activity took place, characterize it as contrary to Police Department training (id. at 94-95), and indeed the record reflects that the training and conduct standards of the Department are unexceptionable. They require that mounted officers always approach members of the public at a very slow pace and not make contact with them unless absolutely necessary. Those standards further require that if a crowd is ordered to clear an area and does not do so once the horses approach, the mounted officers are required to consult police supervisors. Moreover, if arrests must be made, that will normally done by unmounted officers. (Acerbo Dep. at 28-39, 43-44).

Implicit in plaintiffs' argument is the unstated implication that it is constitutionally improper to use horses to assist in clearing a street during a mass demonstration. There is no case law suggesting such a proposition, and with good reason. The police have a responsibility to ensure public health and safety, and that obligation involves keeping major thoroughfares clear of people to allow for passage of vehicular traffic, particularly emergency and

164

law-enforcement vehicles, as well as to ensure that other traffic has a means of ingress and egress in a crowded city. N.Y. City Charter § 435(a) (2009)[58]; see also Cox, 379 U.S. at 554-55; Cox v. New Hampshire, 312 U.S. 569, 574 (1941). When large crowds end up blocking major arteries that are not set aside for purely First Amendment activities, it is incumbent on the police to clear such arteries. N.Y. City Charter § 435(a) (2009).

The evidence in this case reflects that the use of mounted police was limited to clearing streets -- notably short sections of Second and Third Avenues -- that had been blocked by large crowds, some engaged in civil disobedience and occasionally engaging in violent acts. (Acerbo Dep. at 65-66, 86-119; Defs.' Ex. Z at 18-19; Defs.' Ex. UU at 206-211, 219-20, 228). Although there is evidence

_____

[58] The New York City Charter provides (and provided in 2003, see Stauber, 2004 WL 1593870, at *25) in relevant part as follows:

> The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks and places . . . regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; [and] remove all nuisances in the public streets, parks and places[.]

165

of instances in which the use of horses may have been so aggressive as to transgress standards inculcated in Mounted Police training, that does not demonstrate that the training itself was so deficient as to trigger potential municipal liability. To demonstrate deliberate indifference by way of inadequate training, the plaintiffs must be able to point to specific deficiencies in such training. See, e.g., Connick, 131 S.Ct. at 1363 ("failure-to-train liability is concerned with the substance of the training"); Amnesty Am., 361 F.3d at 129. In this case, plaintiffs have failed to do so.

Captain Acerbo's testimony makes plain that the mounted police are subjected to a continuing and rigorous training regimen that fully incorporated the requirements of the mounted patrol guide concerning the stringent limitations on the use of horses in dealing with crowd dispersal. (E.g., Acerbo Dep. 18-22, 26-39). Although plaintiffs seek to characterize the testimony of two mounted officers as reflecting confusion as to the guiding rules (Pls.' Mem. in Opp'n at 106 (citing Reilly Dep. at 125-26, Scali Dep. at 130-31)), the testimony they cite does not so indicate, nor does it reflect a basis for finding that the City training program is defective or that any such defect led to the injury of any of the plaintiffs.

There is also no evidence that the City, in planning for the February 15 demonstration, adopted a policy or practice that ignored the normal caution that applies to use of the Mounted Patrol when confronting crowds of people in the street. Moreover, liability cannot be imposed on the City for lack of supervision, since there is no indication that the Department was aware from prior experience that greater supervision at the most senior level was called for to avoid likely violations of the rights of the public not to be assailed by horse-borne officers.

All of this said, we do conclude that the evidence of record creates a triable issue as to the liability of defendant Acerbo for the injuries or other discomfort suffered by Amy Haus, John Connor and William Silva when allegedly struck by Mounted Patrol horses. Such liability would not be premised on plaintiffs' principal theory of liability -- a claim of failure to adequately train the mounted officers -- but rather on Acerbo's possible direct responsibility for the tactics used by the officers on the day in question or his manner of supervision of his command when he was apparently present at the scene. Acerbo was fully knowledgeable about the dangers of using horses in massed crowds and indeed testified extensively about the protocol for such use for dispersal purposes, and the training that is undertaken to ensure proper

167

control of the Mounted Police when engaged in such maneuvers.
(Acerbo Dep. at 18-22, 26-39, 48-50). Moreover, he was present for
the demonstration and, according to his testimony, was closely
overseeing what his subordinates were doing to clear both Second
and Third Avenues, as well as Lexington Avenue in the lower
Fifties, when they became blocked because of the crush of the crowd
or, in one or two instances, because of civil disobedience by some
demonstrators. (See Acerbo Dep. at 64-126). Given this testimony,
a trier of fact could find that Acerbo, though fully aware of the
restrictions on the use of horses in physically confronting massed
demonstrators and equally aware of the great danger in allowing
horses to be used to come into physical contact with such people,
authorized or tolerated the use of the horses in violation of those
limitations, with the consequent great danger -- fully realized in
the case of Ms. Haus and to a lesser extent in the cases of Messrs.
Connor and Silva -- of serious injury.[59]

The evidence also creates a triable issue as to the liability

---

[59] Acerbo testified that the use of the horses in and around
52nd to 54th Streets on Second, Third and Lexington Avenues was
carefully done and was consistent with Department standards.
(E.g., Acerbo Dep. at 114). Since, however, the testimony of
plaintiffs Haus, Stevens, Silva and Connor suggests that the
horses were moved into crowds in a more aggressive and dangerous
manner (Haus Dep. at 55-59; Stevens Dep. at 23-25; Silva Dep. at
74-81; Connor Dep. at 74-87), there is plainly a triable issue as
to what Acerbo directed or authorized the mounted officers to do.

of defendants Smolka and Joseph Esposito for the injuries caused to these plaintiffs by police horses. Captain Acerbo testified that the Mounted Unit is not deployed to disperse crowds except pursuant to a decision made "between [him]self and the zone commander." (Acerbo Dep. at 100; see also id. at 70-71). While Acerbo could not recall who the zone commander was at the various locations where the Mounted Unit was deployed on February 15 (id. at 87, 101), he also testified that Chief Joseph Esposito was present at several of those locations. (Id. at 136-37, 140-42). While Acerbo could not recall having a conversation with Chief Esposito about deploying the Mounted Unit at any of those locations, Acerbo also stated that "[Esposito] is the chief of department so . . . if he was at the scene any directive that was given would be under his purview." (Id. at 140). Esposito himself testified that he had ordered and observed the deployment of the Mounted Unit to disperse crowds on two to five occasions, although he was unsure whether he had given the order to deploy the horses on all of the occasions he observed, and he testified at another point that he did not know who had ordered in the Mounted Unit at one of the locations where they had been deployed. (Defs.' Ex. CC at 238-39; Defs.' Ex. UU at 206-11, 218-231; see also Stauber Tr. at 450-54). Esposito's testimony also reflected that he was at least somewhat aware of the danger

inherent in sending horses into a crowd of people,[60] and that he would only do so in certain conditions. (Defs.' Ex. CC at 239-40; Defs.' Ex. UU at 209-12). Given this testimony, a trier of fact could find that Esposito ordered or tolerated the deployment of the Mounted Unit in situations where their use constituted excessive force. Similarly, it appears that Chief Bruce Smolka was present at one of the locations where the Mounted Unit was used to disperse demonstrators, and may have given the order to deploy the Mounted Unit. (Acerbo Dep. at 128-34; Defs.' Ex. UU at 220-21). Indeed, Smolka himself testified that he may have given the order to deploy the Mounted Unit. (Ex. 8 to Pls.' Mem. in Opp'n at 135-36). Hence we believe that a trier of fact could find that he was sufficiently involved in the deployment of the Mounted Unit into the crowd that he could be held personally liable for the resulting injuries.

In sum, the City cannot be held liable for the alleged use of excessive force by named or unnamed officers, nor may the supervisory defendants (except for Captain Acerbo, Chief Smolka, and Chief Joseph Esposito) be shown to have been responsible for the conduct of officers under their command that may have exceeded

---

[60] In fact, Esposito testified at one point that deliberately directing a horse to strike members of a crowd would be covered under the Department's policy governing the use of force. (Defs.' Ex. UU at 120).

170

Fourth Amendment bounds.


E. Malicious Prosecution


Plaintiffs assert malicious-prosecution claims under section 1983 and the Fourth Amendment. Defendants have now moved for summary judgment on these claims or for their dismissal for failure to state a claim. They assert that some plaintiffs did not receive a favorable outcome in their respective criminal cases, that in all instances the plaintiffs' claims fail because the individual defendants did not initiate the prosecutions, that the claims are also barred because there was probable cause for the charges, and that the defendants did not act with malice. (Defs.' Mem. of Law at 122-26). Defendants' motion, insofar as it targets malicious-prosecution claims against the arresting officers by plaintiffs who did not receive ACDs, is groundless. It is justified, however, with respect to the three plaintiffs who did receive ACDs and also with regard to most of the supervisory defendants.


A section 1983 malicious-prosecution claim is governed largely by state law. See Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995); see also Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002). To establish a malicious-prosecution claim under New York law, "a

plaintiff must show that a proceeding was commenced or continued against him, with malice and without probable cause, and was terminated in his favor." Id. at 195; see also Savino, 331 F.3d at 72; Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997); Russell, 68 F.3d at 36. To establish a malicious-prosecution claim under section 1983, a plaintiff must also show, in addition to the state-law elements, that there was a "sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." Rohman v. New York City Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000); see Murphy, 118 F.3d at 944-46; see also Davis v. City of New York, 373 F. Supp.2d 322, 329 (S.D.N.Y. 2005).

The arrested plaintiffs other than Parkel, Dellal and Cavanna all received either dismissals of the charges or, in the case of Venizelos, an acquittal after trial. In short, for those defendants the charges ended in a favorable termination -- that is, a disposition not inconsistent with the plaintiff's innocence. See, e.g., Rothstein v. Carriere, 373 F.3d 275, 286 (2d Cir. 2004).[61] For

---

[61] Defendants' argument on this point in their initial brief is confusing, to say the least. In the text they assert that all of the plaintiffs except Venizelos cannot show a favorable termination, thus implying that all of those claims should be dismissed at this stage. (Defs.' Mem. at 125). In a subsequent footnote, however, defendants say that they are not seeking summary judgment on this theory except for the plaintiffs who received ACDs. (Id. at 125 n.35).

reasons already noted, however, insofar as plaintiffs Parkel, Dellal and Cavanna received ACDs, they cannot pursue this claim, since such a disposition is deemed not to be favorable for purposes of a malicious-prosecution claim. (<u>See</u> pp. 106-09, <u>supra</u>).

Defendants do not dispute that the other plaintiffs suffered a deprivation of liberty by being forced to appear in court on one or more occasions to answer the criminal charges that had been brought against them. <u>See</u>, <u>e.g.</u>, <u>Jocks v. Tavernier</u>, 316 F.3d 128, 136 (2d Cir. 2003) (being required to attend criminal proceedings suffices as a post-arraignment deprivation of liberty). The parties disagree, however, on each of the other elements of these plaintiffs' claims.

First, defendants argue that plaintiffs' claims against the defendant officers must fail because plaintiffs cannot show that the officers did anything more than sign a criminal complaint, which does not constitute "initiating a criminal proceeding" for the purpose of a malicious-prosecution claim. (Defs.' Mem. of Law at 124 (quoting <u>Rohman</u>, 215 F.3d at 217)). In the same vein, they argue that the Manhattan District Attorney's Office made an independent decision to prosecute plaintiffs, and that no officer can therefore be said to have proximately caused plaintiffs'

173

prosecution. (Id.).

Defendants' argument -- which largely reiterates the arguments their counsel have made in a number of other related protest-case motions (see, e.g., Bradley Report & Recommendation at 5-6)[62] -- plainly fails. Civilians who simply report a crime to the police and serve as witnesses cannot be said to have initiated a prosecution for purposes of a malicious-prosecution claim. See Rohman, 215 F.3d at 217. However, the courts have applied a different standard in cases where malicious-prosecution claims are asserted against police officers. See, e.g., White v. Frank, 855 F.2d 956, 961 (2d Cir. 1988) (noting that police officers may be held liable for malicious prosecution if their actions cause criminal proceedings to be commenced, for example, by serving as "complaining witnesses"); Rosario v. Amalgamated Ladies' Garment Cutters' Union, 605 F.2d 1228, 1250 (2d Cir. 1979) (holding that "the issuance of an Appearance Ticket commences a prosecution for purposes of determining whether an action for malicious prosecution lies"); Llerando-Phipps v. City of New York, 390 F. Supp.2d 372,

---

[62] Strangely, defendants' counsel annex to their reply memorandum a copy of the Bradley Report & Recommendation (Decl. of Elizabeth M. Daitz, Esq., in Opp'n to Pls.' Mot. for Partial Summ. J., at Ex. WWW), but ignore its holding with respect to Bradley's malicious-prosecution claim, a holding that rejects precisely the argument that defendants now make here. (See Bradley Report & Recommendation at 72-74).

382-83 (S.D.N.Y. 2005) (explaining that plaintiffs in a number of cases had satisfied the initiation element by showing that officers "filled out complaining and corroborating affidavits . . . or swore to and signed a felony complaint") (citations omitted).

The defendant officers, by their own account, arrested and assisted in booking plaintiffs, issued a summons or desk appearance ticket, and swore out at least one criminal complaint. (E.g., Loccisanno Dep. at 52-61, 90-101, 107-11, 114-17; Millenbach Dep. at 61-65, 73-75; Otero Dep. at 88-92; Ryan Dep. at 6-7, 62-68). A finder of fact could therefore conclude that they were sufficiently involved in initiating the criminal proceedings against plaintiffs to be held liable for malicious prosecution. See, e.g., Ricciuti v. N.Y. City Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); Davis, 373 F. Supp.2d at 334; Sulkowska v. City of New York, 129 F. Supp.2d 274, 295 (S.D.N.Y. 2001).

Next, defendants argue that there was probable cause to prosecute plaintiffs. (Defs.' Mem. of Law at 125-26). According to defendants, since the officers had probable cause to arrest plaintiffs, they also had probable cause to initiate their prosecution. Unsurprisingly, plaintiffs argue that since the officers had no probable cause for their arrests, they could have

175

had no probable cause to initiate the prosecutions. (Pls.' Mem. in Opp'n at 83).

While "[p]robable cause for an arrest is often sufficient to provide probable cause for the ensuing prosecution," Davis, 373 F. Supp.2d at 334, the two analyses are distinct because they are measured at different points in time. See id.; see also Posr v. Court Officer Shield No. 207, 180 F.3d 409, 417 (2d Cir. 1999); see generally Rounseville v. Zahl, 13 F.3d 625, 629 (2d Cir. 1994) (defining probable cause in the context of a malicious-prosecution claim as "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of") (citations omitted). Nonetheless, since probable cause for the underlying arrests is at issue in this case, so too is probable cause for the prosecutions. See Posr, 180 F.3d at 417. As we have already noted, the competing versions of the circumstances surrounding the various plaintiffs' arrests preclude summary judgment on the issue of probable cause to arrest. Moreover, there is nothing in the record to indicate that any new evidence came to light to demonstrate probable cause in the time between the plaintiffs' arrests and the filing of charges against them. Therefore, summary judgment cannot be granted to defendants based

176

on their assertion that probable cause supported the criminal
charges.

Defendants further argue that they should be granted summary
judgment on plaintiffs' malicious-prosecution claims because
plaintiffs fail to proffer any evidence that their prosecutions
were undertaken with malice on the part of the defendants. (Defs.'
Mem. of Law at 126). We disagree. Under New York law, malice can be
inferred from a lack of probable cause. See Lowth v. Town of
Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the
lack of probable cause -- while not dispositive -- tends to show
that the accuser did not believe in the guilt of the accused, and
malice may be inferred from the lack of probable cause.");
Llerando-Phipps, 390 F. Supp.2d at 383. Once again, since the
evidence in the record would permit a finding that there was no
probable cause for the plaintiffs' arrest or prosecution, it also
would justify an inference of malice on the part of the arresting
officers.

In sum, summary judgment should be denied to the arresting-
officer defendants on the plaintiffs' malicious-prosecution claims,
except for those of plaintiffs Parkel, Dellal and Cavanna.

177

Finally, to the extent that plaintiffs may seek to press these claims against any of the supervisory defendants other than Bruce Smolka, the defendants' motion should be granted. Plaintiffs offer no evidence that the supervisory defendants (other than Smolka, who actually signed charging documents (see Defs.' Ex. S, Pls.' Ex. 14)) participated in or could otherwise be held legally responsible for the prosecution of baseless charges against any of the plaintiffs.

F. Post-Arrest Detention Claims

Plaintiffs pled a series of complaints about the conditions under which most of the arrested plaintiffs were held. These include accusations that some arrestees were improperly sent to One Police Plaza for processing and issuance of desk appearance tickets rather than issued summonses on the spot, with the result that they were kept in custody for undue lengths of time and exposed to very cold weather. (2d Am. Compl. at ¶¶ 55(b), 58-60, 64-68, 69-71). They also allege that they were kept handcuffed, and that some were shackled, for a lengthy period of time and that they were not provided food or water or, in some cases, toilet facilities. (Id. at ¶¶ 55(b), 58-67, 69-71).

Defendants have moved for summary judgment on these claims. (Defs.' Mem. of Law at 4-47). In plaintiffs' response they appear to eschew any argument that the individual defendants may be held responsible for these asserted violations and rather press a theory of municipal liability. (Pls.' Mem. of Law at 125-26). We conclude that plaintiffs have failed to demonstrate a basis for these claims.

As noted, to prevail on a Monell claim, the plaintiff must demonstrate either affirmative action by the City, through its ultimate decision-makers, compelling a practice that predictably violates the constitutional rights of its residents or inaction in the face of a pattern of misconduct, suggesting that "the local government has acquiesced in or tacitly authorized its' subordinates' unlawful actions." Reynolds, 506 F.3d at 192 (citing Jett v. Dallas Indep. School Dist., 491 U.S. 701, 737 (1989)). As the Second Circuit has noted, "[s]uch a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of Monell." Id. (citing, inter alia, Monell, 436 U.S. at 690-91; Jeffes v. Barnes, 208 F.3d 49, 61 (2d Cir. 2000)).

The governing standard for assessing challenges to conditions

179

of confinement in the context of arrests -- that is, before charges are filed or a probable-cause assessment is made -- is the "objective reasonableness" criterion of the Fourth Amendment. See, e.g., Bryant v. City of New York, 404 F.3d 128, 135-36 (2d Cir. 2005) (citing cases); see also Albright v. Oliver, 510 U.S. 266, 278-81 (1994) (Ginsburg, J., concurring). That general standard must be applied to testimony by eleven of the arrested plaintiffs that involved in substance the following, as articulated in plaintiffs' memorandum in opposition (at pp. 109-13):

- Abraham Blair was held in handcuffs for five to six hours. He was transported after his arrest to One Police Plaza for processing. During his transport, he sat in an unheated van for approximately one to two hours, and stood on line outside in the cold for approximately one hour. He was later transported to Criminal Court and was not released until 35 hours after his arrest.[63]

- Don Bryant was transported in police vans for a number of hours, during which he was subjected to the cold in those vehicles, and was not given toilet facilities, food and water despite his requests. He was then transported to One Police Plaza, where he was

---

[63] Blair Dep. at 52, 59, 62, 81.

shackled with other prisoners and required to stand in line in the cold for several hours before being given a summons. He was not released until approximately twelve hours after his arrest.[64]

- Matthew Cavanna was handcuffed on arrest with metal cuffs that were so tight as to cause bruising and was placed in a van for two to four hours. He was then taken to One Police Plaza and required to stand in the cold for approximately two hours before being given a desk appearance ticket. He was released about twelve hours after his arrest.[65]

- John Connor was tightly handcuffed on arrest, placed in an overcrowded police wagon and transported to One Police Plaza for processing. He remained in these handcuffs for four hours, despite his complaints. His handcuffs were then removed, and he was shackled. He remained in the cold outside One Police Plaza and denied toilet facilities, food and water, despite his requests and his statements to the police . He was released approximately twelve hours after his arrest.[66]

---

[64] Bryant Dep. at 33-41.

[65] Cavanna Dep. at 185-86, 196, 198-200, 211.

[66] Connor Dep. at 93-110.

181

- Jasmine Dellal was handcuffed on her arrest and placed in a police van for about six hours before being deposited at One Police Plaza. She was kept outside in the cold for about 45 minutes and denied access to toilet facilities and water during that time. She was then placed in a holding cell, processed and finally released about twelve hours after her arrest.[67]

- Robert Dodde was handcuffed, placed in a police van for about ninety minutes and then taken to One Police Plaza. He was then placed in another van and remained there for about four and a half hours, during which time the police refused to remove the handcuffs despite his request and did not give him access to toilet facilities. He was then shackled, and placed outside in the cold for another hour and a half, when he was given a summons and released, about twelve hours after his arrest.[68]

- Sarah Parkel was handcuffed on arrest and transported first to the Javits Center, then to One Police Plaza and finally to the 7th Precinct, a process that consumed five-and-a-half to six-and-a-half hours. During this period, she and other arrestees asked that their cuffs be removed but they were not. She and the others also

---

[67] Dellal Dep. at 67-68, 70-71, 80-91.

[68] Dodde Dep. at 79-97.

asked for access to toilets, which was not granted. At about 11:30 p.m. she was locked in a cell at the 7th Precinct and remained there until about 7 a.m the following morning, when she was issued a summons and released. During that time she had access only to a dirty, unusable toilet and was not given "suitable" food (she was offered a ham sandwich, but is a vegetarian).[69]

- Carlos Sanchez was handcuffed after arrest in tight cuffs that caused pain, and held in a police vehicle for some hours. He was then brought to One Police Plaza, processed, and released approximately fourteen hours after his arrest.[70]

- William Silva was handcuffed and placed on a police bus that transported him to One Police Plaza. He remained on the bus for nine to ten hours. During that time he asked for his cuffs to be loosened, but the police did not do so. He was, however, able to free his right hand from the cuffs of his own accord. He was not re-cuffed, but was shackled to other prisoners in lieu of handcuffs and made to stand outside in the cold for some hours before being placed back on the bus and issued a summons. He was denied toilet facilities throughout his detention and was released about twelve

---

[69] Parkel Dep. at 27-39.

[70] Sanchez 50-h Hearing Tr. at 25-29.

183

hours after his arrest.[71]

    - Melvyn Stevens was tightly handcuffed on arrest and placed in a police van for an hour and a half, during which time he unsuccessfully asked that the cuffs be loosened. He was brought to One Police Plaza and remained in the van for three hours. He was then uncuffed and transferred to a bus, where he waited for two to three hours, during which time he requested that he be allowed to use a bathroom, but his request was denied. He was then shackled to other prisoners and required to stand outside in the cold. While outside, he and the other arrestees to whom he was shackled requested food, water, and bathroom breaks, as well as to be allowed to wait in a heated area, but all of their requests were denied. He and the other prisoners ultimately urinated outside One Police Plaza while they were shackled together, with the group forming a circle around the person urinating to create some semblance of privacy. After approximately two hours standing outside, Stevens was handcuffed again and placed in a police van for an hour before he was given a summons and released. During his detention he was never provided toilet facilities, food or water.[72]

---

[71] Silva Dep. at 98-101, 109-10, 112-15, 118-20, 160-61.

[72] Stevens Dep. at 25-44.

184

- Emily Venizelos was tightly handcuffed at her arrest and put in a van for about an hour. During this time, she asked that the police loosen her cuffs, but they did not do so. She was next transported to One Police Plaza, where she waited outside in the cold for two hours, with her hands turning blue from the chill. She was then brought inside and placed in a very cold cell where she waited until 7:30 the next morning in handcuffs, and was denied food and water despite her requests. The cell also lacked access to a clean toilet. At some point during the night -- her testimony was not clear as to exactly when -- her handcuffs were removed. At about 7:00 a.m. she was taken to Central Booking, where she was subjected to a partial strip search and denied water and access to an attorney despite requesting both. She was offered a ham sandwich, but did not eat it because she is a vegetarian. Finally, she was given a desk appearance ticket and released thirty hours after her arrest.[73]

To assess the reasonableness of the conditions of an arrestee's confinement, the court must apply an objective standard. As the Second Circuit has noted, "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." Bryant, 404

---

[73] Venizelos Dep. at 18-26, 59-80, 90, 115-16.

F.3d at 136 (quoting Graham, 490 U.S. at 397). In this case, since plaintiffs are asserting these claims solely against the City, they must also demonstrate that the City bore legal responsibility for the conditions about which they complain. See, e.g., Solomon v. Nassau Cnty., 759 F. Supp.2d 251, 262-63 (E.D.N.Y. 2011) (citing, inter alia, Maxwell v. City of New York, 108 Fed. Appx. 10, 12 (2d Cir. 2004)); Woodward v. Morgenthau, 740 F. Supp.2d 433, 440 (S.D.N.Y. 2010).

In seeking to satisfy these demanding standards, the plaintiffs make three related arguments. First, they assert that the City normally handles disorderly-conduct arrests by issuing summonses, a process that can be accomplished on-site or at the precinct level, and they contend that it was only because the arrests at the February 15 protest grew out of the public's exercise of First Amendment rights that the police chose to subject arrestees to the more drawn-out process of booking at One Police Plaza, thus ensuring that the arrestees would be held in custody for extended periods. (Pls.' Mem. in Opp'n at 108). According to plaintiffs, this treatment reflected a hostility to the invocation of plaintiffs' free-speech rights and constitutes a violation of their rights under the First Amendment. (Id. at 118-19). Second, plaintiffs argue that the extended time that they spent in

186

detention was unnecessary, and hence unreasonable, in view of the availability of the quicker processing procedure, and therefore constituted an unreasonable detention, in violation of their Fourth Amendment rights. (Id. at 118, 120-22). Third, plaintiffs argue that the conditions under which they were held -- including prolonged exposure to cold, extended tight handcuffing, denial of access to toilets, and failure to provide food and water when requested -- also amounted to unreasonable conditions of detention, in violation of the Fourth Amendment. (Id. at 122-25).

### 1. The Length of the Detentions

We start with the arguments regarding delay. In the context of warrantless arrests, the Fourth Amendment requires a prompt judicial determination of probable cause as a "prerequisite to any extended restraint on liberty" following the arrest. Gerstein v. Pugh, 420 U.S. 103, 114 (1975). "'[P]rompt' generally means within forty-eight hours of the warrantless arrest," Powell v. Nevada, 511 U.S. 79, 80 (1994), and a pre-trial detention that exceeds forty-eight hours is thus presumptively unreasonable. Id. at 83. In addition, a pre-trial detention that does not exceed forty-eight hours may violate the Fourth Amendment if an arrestee can show that

187

the detention was unreasonably delayed. In distinguishing reasonable from unreasonable delay, the Supreme Court has explained:

> Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

County of Riverside v. McLaughlin, 500 U.S. 44, 56-57 (1991).

Plaintiffs argue that they could have been given summonses or DATs at the place of their arrests or a local precinct and that defendants' failure to do so reflected retaliation for their protected activity as protesters and also resulted in their excessive detention. More specifically, they assert that under ordinary circumstances, their arrests could have been processed within four hours, and that the policy decision to process the demonstration arrestees at One Police Plaza resulted in their detention for up to thirty-five hours for no legitimate law-enforcement purpose and in contrast to the normal handling of

188

disorderly-conduct arrests. (Pls.' Mem. in Opp'n at 118-21).

Defendants assert that plaintiffs cannot demonstrate any basis for municipal liability. (Defs.' Mem. of Law at 4-19). As for the merits of these claims, they argue, first, that plaintiffs have no legal right to a DAT and, second, that in any event most of them were held for only twelve or so hours, a time period so short -- given the logistical demands of the occasion, which involved 274 protest-related arrests in a limited time -- that the time consumed was both reasonable and necessary to process demonstration arrestees at a central facility. (Defs.' Mem. of Law at 23-24; Defs.' Reply Mem. of Law at 4).

a. Undue Delay: First Amendment Retaliation

Insofar as plaintiffs contend that their First Amendment rights were violated by a municipal decision that was hostile to their engaging in protected activities, they fail to proffer any evidentiary basis for the claim. The record reflects that the Police Department undertook hurried, last-minute planning to accommodate a gathering expected to involve up to 100,000 people and which in fact appears to have encompassed more, and that they

189

apparently modestly underestimated the number of arrests to flow

from that gathering. (<u>See</u> O'Connell Dep. at 113, 116-17, 180-81;

Defs.' Ex. QQ). Whether the Department's planning for arrest

processing was or was not deficient, we see no evidence either that

the decision-makers harbored any hostility to people engaging in

this protest or that they designed the arrest-processing portion of

the plan to retaliate against the anticipated arrestees. Moreover,

plaintiffs' comparison to asserted police practices regarding the

arrest of individuals in other circumstances for disorderly conduct

(Pls.' Mem. in Opp'n at 108) does not save their claim. The record

does not reflect the frequency with which such arrests end with

DATs, and in any event, the processing of large numbers of people

at any one time involves unique logistical considerations, which

are not encountered in routine day-to-day arrests of individuals

for unruly behavior. <u>Fountain</u> Report & Recommendation at 49-52

(quoting, <u>inter alia</u>, <u>McLaughlin</u>, 500 U.S. at 57). In any event,

pointing to a change of practice for this event is not a substitute

for probative evidence of First Amendment animus.


b. <u>Undue Delay: Fourth Amendment Unreasonableness</u>


As for plaintiff's Fourth Amendment claim, with the possible

exception of Ms. Venizelos and Mr. Blair -- who were held for

190

thirty and thirty-five hours, respectively -- plaintiffs have
failed to proffer an evidentiary basis to demonstrate that their
detentions were unreasonably long. We first note that their
contention that their rights were somehow violated by defendants'
failure to issue them DATs has been squarely rejected by the Second
Circuit, which has reiterated that arrestees have no constitutional
right to a DAT at all, let alone a right to a DAT immediately
following an arrest. See Bryant, 404 F.3d at 138-39; see also
Mandal v. City of New York, 2006 WL 2950235, at *6 (S.D.N.Y. Oct.
17, 2006); Greenfield v. City of New York, 2000 WL 124992, at *9
(S.D.N.Y. Feb. 3, 2000) (discussing authorities and noting that
"[u]nder New York law, a 'defendant has no constitutional or
statutory right to a DAT, and a police officer who has arrested a
defendant for a misdemeanor may choose instead to retain custody of
the defendant until his arraignment in a local Criminal Court.'").
Indeed, we rejected a similar claim in a parallel suit growing out
of an arrest involving the same demonstration. Fountain Report &
Recommendation at 50-51. Thus, a claim of excessive detention
cannot be based on the contention that plaintiffs should have been
immediately issued a DAT.

   In addition, nothing about the plaintiffs' detentions (apart
from those of plaintiffs Venizelos and Blair) suggests unreasonable

191

delay. Their detentions, which generally lasted between twelve and fourteen hours from the moment of arrest to the moment of release, fall well short of the presumptively unreasonable forty-eight-hour mark. See, e.g., Bryant, 404 F.3d at 131, 138 (finding no Fourth Amendment violation where plaintiffs had been held in custody for between five and twenty-three hours before being released); Mandal, 2006 WL 2950235, at *6 (dismissing plaintiffs' excessive-detention claims because plaintiffs' twenty-four-hour detentions were not presumptively unreasonable). Moreover, plaintiffs have not even hinted at the existence of circumstances that would suggest "unreasonable delay," such as delay for delay's sake, malicious delay or delay to permit further investigation. The record amply shows that whatever delay occurred falls within the category of reasonable, "often unavoidable" delays resulting from "practical realities" such as "transporting arrested persons from one facility to another" or "handling late-night bookings." McLaughlin, 500 U.S. at 57. Indeed, plaintiffs effectively acknowledge that the delay was a result of such practical realities when they blame their extended detentions on the back-up in post-arrest processing that occurred, as opposed to any malevolence on the part of defendants. (See Pls.' Mem. in Opp'n at 125).

As for Ms. Venizelos and Mr. Blair, even if we assume that the

192

very length of their detentions -- including the disproportion
between their time in custody and the time spent by the other
plaintiffs -- may be indicative of a lack of justification, their
claims cannot survive. As noted, these claims target only the City,
since the record does not reflect the personal responsibility of
any individual defendant for the asserted delays, and these
plaintiffs fail to proffer any evidence that would suggest that the
unusually long waits that they encountered -- in contrast to the
experience of all of the other arrested plaintiffs -- were caused
by a policy or custom of the City. Indeed, the very fact that all
of the other plaintiffs were released far more quickly strongly
suggests otherwise.

In the absence of evidence linking the disproportionate delays
suffered by Ms. Venizelos and Mr. Blair to any decision by a City
policy maker or to deliberate indifference on the part of the City,
summary judgment for the City is appropriate.

2. Conditions of Confinement

The arrested plaintiffs further argue that, given the length
of time they were in custody, their exposure to a variety of
adverse or unpleasant conditions violated their rights under the

193

Fourth Amendment. These include exposure to the cold in the open at One Police Plaza and in one or several cold police buses and in one case in a cold cell, prolonged failure to loosen or remove tight handcuffs, prolonged failure to provide access to toilets or to a clean bathroom, and failure to supply food or water. Again, they assert this set of claims only against the City. (Pls.' Mem. in Opp'n at 125-26).

Defendants respond that the conditions described by plaintiffs do not amount to a violation of the Fourth Amendment protection against unreasonable seizures. (Defs.' Mem. of Law at 24-35). They also argue that plaintiffs are unable to demonstrate that the City itself was responsible for the  conditions about which plaintiffs complain. (Id. at 5-19).

We start by noting that the planning for the demonstration involved a prediction that about 250 people might be arrested, and that in the event, although it appears that far more people showed up than the 50,000 to 100,000 originally estimated by UPJ, the number of arrests -- 274 -- did not substantially exceed the original estimate. (Defs.' Exs. NN, PP, QQ; O'Connell Dep. at 113, 116-17, 180-81). As for the adverse conditions cited by the plaintiffs, they cannot be simply lumped together, as they each

194

involve somewhat different circumstances. In addition, contrary to much of defendants' initial argument, since the governing standard derives from the Fourth Amendment, the proper analysis does not look to whether the police acted with intent to punish -- as would be the case in an Eighth Amendment analysis -- or whether the conduct "shocks the conscience," as would be required of a Fourteenth Amendment substantive-due-process analysis. (<u>See</u> Defs.' Mem. of Law at 20-22).

The exposure to the cold for each of the defendants of course occurred because (a) the day of the demonstration happened to be very cold and (b) the complaining plaintiffs and others were required to stand outdoors for between 45 minutes and several hours at One Police Plaza. In addition, a few plaintiffs complained that the bus or van in which they sat was also cold, and one plaintiff asserted that the cell in which she was held for a number of hours was cold. Exposure to cold for a limited number of hours as an incident to arrest processing would normally not in itself be properly viewed as a constitutional violation unless it could be shown to be intended to harm the arrestee or to reflect deliberate indifference to the arrestee's well-being. In the context of a <u>Monell</u> claim, the plaintiff must presumably demonstrate that the City's policy-maker anticipated that the weather would be very cold

195

and either chose to arrange a processing system that would keep arrestees out in that cold for a prolonged period or at least anticipated that failure to ensure that all arrestees could be promptly sheltered would likely expose those individuals to harsh conditions and that the decision-maker ignored that likelihood.

Plaintiffs fail to offer a basis for a trier of fact to make such findings. We start by noting that there is evidence, notably in the testimony of a number of the plaintiffs, that the initial arrest-processing plan proved to be inadequate in that significant numbers of arrestees were required to stand outside One Police Plaza for some limited period of time in fairly harsh conditions. (See supra pp. 178-87). That said, the record is also undisputed that the Department recognized the problem at some point during the day and undertook some corrective measures, including transporting some arrestees to the 7th Precinct for quicker processing, putting some arrestees who had been standing in the cold at One Police Plaza back onto heated vehicles, and -- to minimize the backlog -- issuing summonses to some of the arrestees on the buses rather than processing them through the system at One Police Plaza. (Defs.' Rule 56.1 Statement at ¶¶ 28, 30, 32, 34, 38; Defs.' Reply Rule 56.1 Statement at ¶ 326). Moreover, it is not disputed that more than half the arrests -- 170 of them -- took place during a four-

196

hour period (Defs.' Rule 56.1 Statement at ¶ 272), thus triggering the processing backlog in which most of the plaintiffs were caught.

Whether the initial planning for arrest processing can be said to have been negligent in not anticipating the large number of arrests in a short time period, the plaintiffs fail to make a triable case for the notion that City policymakers -- specifically the Commissioner -- adopted a plan geared to cause discomfort or turned a blind eye to the discomfort caused. Moreover, we conclude in any event that the fact that some of the plaintiffs were exposed to cold for up to several hours as they awaited processing -- the very same cold that they chose to brave to participate in the demonstration -- did not constitute such a harsh condition that whoever was responsible for it may be deemed to have violated their Fourth Amendment rights. Finally, insofar as a few plaintiffs complained that the police vehicles in which they were held, or their cell, was cold, that assertion does not demonstrate either a violation of Fourth Amendment norms or municipal responsibility and liability for those conditions.

The prolonged denial to detainees of access to food, water and toilets may, depending on the circumstances, be viewed as inconsistent with due-process standards. Nonetheless, the evidence

197

does not permit a finding that the plan developed by the Police Department was so deficient in this respect as to trigger Fourth Amendment violations, and the implementation of the plan with respect to these plaintiffs cannot be viewed as in violation of those standards.

The failure of the Department to prepare to provide food and water for arrestees who were to be processed and then released with a summons or a desk appearance ticket was not unreasonable in view of the assumption that the arrestees could have been processed more efficiently than actually occurred (see O'Connell Dep. 113, 116-17, 122) and in view of the fact that these individuals were not going to be spending the night in police custody. Insofar as some of the plaintiffs may have had to wait longer to be processed -- most being held between twelve and fourteen hours -- it is not surprising that some asked for food or water, which was not provided, but these instances have not been shown to have resulted from a decision by a City policy maker or from deliberate indifference by the Police Department as an institution to an obvious threat to the well-being of the arrestees. In fact, a witness for the City testified that he contacted the Department of Corrections and asked them to provide meals for arrestees on February 15 -- and that doing so was standard procedure for events

where large numbers of arrests were expected (id. at 51) -- and placed water coolers outside the cells at One Police Plaza. (Id. at 116-17). Moreover, if individual police officers chose not to provide water when they could have or did not go out of their way to find food to feed the arrestees who made the request, that is clearly not a basis for holding the City liable for a violation of the arrestees' Fourth Amendment rights.

As for the three plaintiffs who were held overnight -- Blair, Parkel and Venizelos -- it does not appear that Blair and Parkel were denied access to food. Blair did not testify that he was denied food. (See generally Blair Dep.). Although Parkel is characterized as having been denied "suitable" food (Pls.' Mem. of Law at 109) -- the police offered ham sandwiches but she is a vegetarian (Parkel Dep. at 39) -- this critique of the nature and quality of the food supplied does not remotely trigger any Fourth Amendment concerns. As for Venizelos, she says that she asked for food and water but received no water at any time during her confinement and was not offered food until she was transferred to Central Booking the next morning.[74] (Venizelos Dep. at 115-16). If so, that might well seem to be a sufficient allegation to trigger

---

[74] As with Parkel, Venizelos was offered a ham sandwich that she could not eat because she is a vegetarian. (Venizelos Dep. at 115-16).

Fourth Amendment concerns. The difficulty, however, is that she offers no evidence from which it can be inferred that the failure to give her food and water was attributable to the City, that is, to a policy decision by a municipal policy-maker or to deliberate indifference by the Police Department or other municipal agency to an anticipated prospect that subordinate City personnel would deprive an arrestee housed in jail for more than a one-day period of any sustenance.[75]

Some plaintiffs testified that they requested access to toilets and were not given it for the twelve to fourteen hours during which they were held for processing. (Bryant Dep. at 33-34; Connor Dep. at 102, 105-09; Dellal Dep. at 73-74; Dodde Dep. at 97; Stevens Dep. at 35, 40-41). On the other hand, Inspector John O'Connell, the police official in charge of the mass-arrest-processing facility at One Police Plaza on February 15, 2003, testified that he saw numerous arrestees brought inside to use the bathroom after requesting to do so, then taken back outside and put on police buses to await their turn for processing. (O'Connell Dep. at 153-57). That testimony is undisputed and undercuts any

---

[75] With regard to food, the very fact that plaintiff Parkel was offered a sandwich suggests that a failure to provide the same to Venizelos until the following morning was not a product of a policy or practice adopted by the Department, much less approved by the Commissioner or other senior management.

assumption about the existence of a contrary City policy. As for the three plaintiffs held overnight, one -- Ms. Parkel -- complains that the toilet to which she had access had a plumbing problem causing some overflow and as a result was dirty and, she implies, unusable. (Parkel Dep. at 38-39). Similarly, Ms. Venizelos complained that the toilet in her cell was so dirty as to be unusable. (Venizelos Dep. at 66).

The failure to provide access to any toilets for the length of time at issue for most of the plaintiff arrestees -- setting aside for the moment any factual dispute over whether such a failure in fact occurred -- was obviously a serious inconvenience for them, particularly for those, if any, with weaker bladders. Whether the failure to provide such access for such a time period could amount to a Fourth Amendment violation is less clear and would seem to depend on the circumstances. See Groves v. New York, 2010 WL 1257858, at *8 n.15 (N.D.N.Y. Mar. 1, 2010) (discussing potential Eighth Amendment claim for denial of prisoner's request to use the bathroom). Whether the City itself can be taxed for such a failing is still a further question. Given the previously noted assumption by the officials who planned the policing for the demonstration that arrest processing would take less time than it ultimately did, it is not surprising that more elaborate plans had not been made

201

for the toilet needs of arrestees who were going to be released on a summons.

In any event, the record does not reflect that the denial of toilets for up to fourteen hours, even if it triggered potential Fourth Amendment violations, can be found to be attributable to a policy-making decision by the Police Department's ultimate decision-maker that contemplated encouraging, approving or acquiescing in such a violation or that it reflected deliberate indifference to a contemplated and predictable violation of arrestees' rights. The difficulty of dealing with an unexpectedly large and sudden influx of arrestees in a short time span cannot be reconciled with the notion that the Commissioner had, in effect, given his blessing to the violation of arrestees' rights to access a toilet within a reasonable time or that he and other senior officials were deliberately indifferent to a predictable violation of arresteees' rights in respect to the availability of toilets during arrest processing.

The remaining challenged adverse condition involved the prolonged use of handcuffs that a number of the plaintiffs found to be too tight. Some complained during their detention, and they generally were met either with no response by officers or by the

202

reply that the officers lacked the tools to loosen the handcuffs. (Bryant Dep. at 27-37, 39-40; Connor Dep. at 101-03; Dodde Dep. at 83-84; Stevens Dep. at 25-26; Silva Dep. at 109-11, 124; Venizelos Dep. at 20-25)   For reasons already discussed, we have concluded that the failure or refusal to remove or loosen handcuffs over a period of many hours may justify a claim for the use of excessive force. (See pp. 128-30, 134, supra). That excessive-force claim is pressed by plaintiffs under the Fourth Amendment, and to the extent that they re-characterize it here as part of a claim for unreasonable conditions of detention, they again assert it under the Fourth Amendment. Since the standards ultimately are the same -- that is, whether this insistence on keeping the cuffs on and tight amounted to an unreasonable use of force under the circumstances -- we see no need to reiterate our earlier analysis.

In any event, as we have already noted, plaintiffs fail to demonstrate a basis for municipal liability for this arguable example of excessive force. There is no evidence that the ultimate policy-maker approved either handcuffs that were too tight on arrestees or prolonging that status unduly, or that the Department was guilty of deliberate indifference to the refusal of some officers to loosen remove the cuffs to end arrestees' suffering. Indeed, we note that some plaintiffs reported that one or more

officers proved able and willing to loosen cuffs on request and
that others had initially placed handcuffs on them in a manner that
was not unduly tight. (Dellal Dep. at 77; Douglas Apr. Dep. at 97;
Parkel Dep. at 27-28, 52). This testimony reflects an absence of
any proof of a practice commanded or encouraged by the Police
Department. Finally, plaintiffs offer no evidence of a failure of
training in this respect or of a failure of supervision in the face
of a known prior pattern of pertinent misconduct.

G.   State-Law Claims

In plaintiffs' complaint they asserted an array of common-law
tort claims against the defendants. These include assault, battery,
trespass on the person, false imprisonment, negligence, intentional
infliction of emotional distress, negligent hiring and retention,
negligent screening, negligent supervision, negligent training, and
conspiracy to commit these torts. (2d Am. Compl. at ¶¶ 79-81). They
also assert claims for  violation of provisions of the New York
State Constitution. (Id.).

Defendants have launched a potpourri of arguments in favor of
dismissal or summary judgment with respect to these claims. First,
they contend that plaintiffs failed to properly exhaust their

204

statutorily mandated administrative procedures because their claim forms specified only claims of false arrest, false imprisonment, malicious prosecution, excessive force and First Amendment violations. Accordingly, in defendants' initial papers they say that plaintiffs cannot pursue state-law claims for any negligence theory, intentional infliction of emotional distress, conspiracy and violations of the State constitution, although in their reply papers they appear to limit the argument to plaintiffs' negligence theories. (Defs.' Mem. of Law at 128; Defs.' Reply Mem. of Law at 84). Second, they argue that the complaint fails to identify with the requisite specificity which defendants are alleged to have committed which torts, and that this portion of the pleading should therefore be dismissed for failure to state a claim. (Defs.' Mem. of Law at 128-29). Third, they argue that summary judgment should be granted "on the merits" with respect to claims for intentional infliction of emotional distress, assault and battery, trespass on the person, false imprisonment, all negligence theories, conspiracy, and violations of the New York Constitution. (Defs.' Mem. of Law at 129-36). Finally, they argue that the individual defendants are protected from liability based on a theory of "good faith immunity" and that the City is protected by municipal immunity. (Defs.' Mem. of Law at 136-37).

In response, plaintiffs have withdrawn their claims for intentional infliction of emotional distress, trespass on the person and conspiracy, and do not dispute that plaintiffs Lamb and Cavanna did not file administrative notices of claim, thus precluding their assertion of state-law tort claims. (Pls.' Mem. in Opp'n at 126). Otherwise they oppose defendants' application. (Id.).

1. Reserved General Municipal Law § 50-e

The General Municipal Law requires, as a predicate to suit against the City for tortious conduct, that the putative plaintiff first file a notice of claim with the agency, specifying the time, place and manner in which the claimed injury occurred. N.Y. Gen. Mun. Law § 50-e. Plaintiffs (except for Lamb and Cavanna) filed such notices of claim, asserting in substance the wrongful conduct on which they have also predicated their current lawsuit, that is, allegations of false arrest, false imprisonment, malicious prosecution, excessive force and interference with protected First Amendment activity, all of which was said to have occurred on a specified date and time and at a specified location. They also described their injuries in terms of loss of their rights under the federal and state constitutions and other applicable laws, and

206

referred to having incurred physical and emotional pain and suffering. (Defs.' Ex. TT).

To the extent that the defendants may be arguing that the notices of claim did not bear the appropriate legal label for plaintiffs' claims of violation of the State constitution, we disagree, since they refer explicitly to the New York State Constitution. (Defs.' Ex. TT). Moreover, the General Municipal Law requirement of administrative-remedy exhaustion does not turn on the specific legal label appended to the claim form, but rather requires sufficient disclosure of the facts and the nature of the wrongful conduct and injury to permit the City to investigate and assess the claim and decide whether to seek to compromise it before suit is filed. See, e.g., Bick v. City of New York, 1997 WL 639236, at *2 (S.D.N.Y. Oct. 14, 1997) (citing, inter alia, DeLeonibus v. Scognamillo, 183 A.D.2d 697, 698, 583 N.Y.S.2d 285, 286 (2d Dep't 1992)); Frazier v. City of New York, 1997 WL 214919, at *3 (S.D.N.Y. April 24, 1997); cf. Zhao v. City of New York, 656 F. Supp.2d 375, 402-03 & n.24 (S.D.N.Y. 2009).

Defendants stand on a stronger footing in challenging the invocation of the negligence theories. As they point out, the administrative claim forms all articulated facts and legal theories

207

pointing to claims for intentional torts. (Defs.' Mem. of Law at 128; Defs. Reply Mem. of Law at 84 (citing Weiss Decl., Defs.' Ex. TT)). As such, they are unlikely to suggest to the reviewing agency that one aspect of the plaintiffs' claims involved how the Police Department hired, trained or supervised their personnel. Furthermore, to the extent that plaintiffs are now asserting claims that some of the individual defendants acted negligently in their dealings with the plaintiffs, the notices of claim do not suggest that this was a contention of the claimants. In short, we view the notices of claim as inadequate to preserve the negligence claims that plaintiffs now seek to advance. See Mahase v. Manhattan and Bronx Surface Transit Operating Auth., 3 A.D.3d 410, 411, 771 N.Y.S.2d 99, 100-01 (1st Dep't 2004) (theory of liability precluded where original notice of claim did not assert it and period to file amended or late notice of claim had lapsed).[76]

---

[76] We note that plaintiffs do not argue that, by waiting until the summary-judgment stage to raise the adequacy of administrative exhaustion, the defendants have waived the defense or should be estopped from asserting it. See, e.g., Zhao, 656 F. Supp.2d at 400-01 & n.21. Plaintiffs have also not argued that their claims against the individual defendants should survive even if their claims against the City may be dismissed for failure to properly exhaust the administrative process, so we do not address such an argument. See, e.g., id. at 398 n.19.

2. Adequacy of the Complaint

Defendants next seem to target all of the state-law claims, arguing that the complaint fails to allege with the requisite specificity which defendants committed which tortious acts. (Defs.' Mem. of Law at 129). In effect, they invite us to grant Rule 12(b)(6) relief on these claims at the summary-judgment stage.

We decline defendants' invitation. Even if the Second Amended Complaint were deemed too vague in the respect cited by defendants, that purported lack of clarity has been fully cured by the gargantuan discovery undertaken by the parties and further distilled in the plaintiffs' various summary-judgment motion papers. Hence, the only relief available to the defendants on this aspect of their motion would be a dismissal with leave for plaintiffs to amend to recapitulate in still more detail the various events to which the individual parties and other witnesses have already exhaustively testified. Such a step would be a complete waste of time and expense, particularly in the absence of any hint of prejudice to defendants, who have obviously been able to create a very detailed factual record on all claims and to determine in exquisite detail who among the defendants are said to have done what in purported violation of the rights of each

209

plaintiff. If further fleshing out is to be done concerning the specific alleged responsibility of each defendant for any of the common-law torts, it should be done as part of the process of creating a joint pre-trial order in the wake of disposition of the current motions.

### 3. The Merits of the State-Law Claims

Defendants next pursue a variety of arguments as to the lack of evidentiary or legal merit of some of the state-law claims and, in one case -- involving claims of assault -- the plaintiffs' purported failure to give proper notice in the administrative claims. We address these in roughly the order pursued by the parties.

### a. Assault and Battery

In challenging plaintiffs' assault and battery claims, defendants first argue that they failed (except for plaintiff Spitzer) to specify it adequately in their administrative claim forms. (Defs.' Mem. of Law at 132). To the extent that this argument is premised on the notion that the claimant must provide a legal label in the claim form corresponding to the cause of

action asserted in court, defendants are, for reasons already noted, simply wrong. (See pp. 206, supra). If they are also contending that the plaintiffs failed to offer proper notice because their references to false arrest and excessive force do not adequately convey the notion of an assault -- that is, intentionally placing the plaintiff in fear of imminent harmful or offensive bodily contact, e.g., Green v. City of New York, 465 F.3d 65, 86 (2d Cir. 2006) (quoting Charkhy v. Altman, 252 A.D.2d 413, 414, 678 N.Y.S.2d 40, 41 (1st Dep't 1998)) -- or a battery, which is "an intentional wrongful physical contact with another person without consent," id. (quoting Charkhy, 252 A.D.2d at 414, 678 N.Y.S.2d at 41), they are equally incorrect. The combined allegations of false arrest and excessive force adequately convey elements of claims of common-law assault and battery, that is, the notion that in the moments leading up to the arrest the claimant was in apprehension of harmful or offensive bodily contact and the approach was not privileged, and that the force used in the course of the arrest was a wrongful physical contact without the plaintiff's consent. See Posr v. Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991) ("essential elements of" claims for "§ 1983 use of excessive force and state law assault and battery" are "substantially identical.") (citing Raysor v. Port Auth. of New York and New Jersey, 768 F.2d 34, 40 (2d Cir. 1985)). In short, the

211

claim notices were adequate.

As for the merits of the assault and battery claims, defendants' challenge is premised on the notion that the parallel federal claims for false arrest and excessive force have no basis. (Defs.' Mem. of Law at 133). For reasons that we have already addressed, however, that assumption is incorrect, and hence the predicate for defendants' argument is misguided. In short, these are triable claims.

### b. False Imprisonment

Defendants argue that false imprisonment is simply a repeat of the tort of false arrest. (Defs.' Mem. of Law at 133-34 (citing Jenkins v. City of New York, 478 F.3d 76, 88 n.10 (2d Cir. 2007); Weyant, 101 F.3d at 853)). Plaintiffs do not respond to this argument, which appears to accurately reflect the state of the law, and hence we recommend that this aspect of defendants' motion for judgment be granted.

### c. Negligence

If it were determined that the notices of claim adequately

preserved plaintiffs' negligence claims, those claims would survive
summary judgment. Citing the prospect of a favorable outcome on the
battery claims, defendants argue that plaintiffs cannot prevail at
the same time on a claim for negligence growing out of the same
event. (Defs.' Mem. of Law at 134). While this is true, the
evidence in the record would permit a trier of fact to find either
that various instances of excessive force amounted to a battery
because the force was exerted with intent, or alternatively that
the impact was unintended and attributable to negligence by the
officer.

In short, the record would not justify summary judgment on the
negligence claims. Plaintiffs may present alternative claims to the
jury, e.g., Heinemann v. Howe & Rusling, 260 F. Supp.2d 592, 599
(W.D.N.Y. 2003) (quoting Bridges v. Eastman Kodak Co., 800 F. Supp.
1172, 1179 (S.D.N.Y. 1992)), and the trial court will instruct the
jurors to make findings about intent that will dictate which
theory, if either, will be found to have been proven.

   d. Negligent Hiring, Screening, Retention, Supervision and
      Training

In addition to a general negligence claim, plaintiffs have
invoked a litany of specific claims against the City for what they

213

claim was negligence in hiring, screening, retaining, supervising and training police personnel. (2d Am. Compl. at ¶¶ 80(d), (f)). Defendants seek dismissal of these claims because they are precluded by plaintiffs' respondeat superior claims against the City. (Defs.' Mem. of Law at 134-35). We agree.

The New York courts recognize the principle that if an employer is sued on the basis of respondeat superior for the negligent conduct of his employee who was acting within the scope of his employment, then claims for negligent hiring, training, supervision and the like will not be entertained. As one oft-quoted Appellate Division decision explained, "if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay for the judgment regardless of the reasonableness of the hiring or retention or the adequacy of the training." Karoon v. New York City Transit Auth., 241 A.D.2d 323, 324, 659 N.Y.S.2d 27, 29 (1st Dep't 1997). This remains the law in New York. See, e.g., Sugarman v. Equinox Holding, Inc., 73 A.D.3d 654, 655, 901 N.Y.S.2d 615 (1st Dep't 2010); Rosetti v Board of Educ. of Shalmont Cent. School Dist., 277 A.D.2d 668, 670, 716 N.Y.S.2d 460, 461-62 (3d Dep't 2000); Hendrix v. Jinx-Proof LLC, 27 Misc.3d 1223(A), 2010 WL

214

1945805, *2 (Sup. Ct. N.Y. Cty. Apr. 30, 2010).[77]


    e. New York State Constitution


    Plaintiffs have asserted claims arising directly under provisions of the New York State Constitution and paralleling their section 1983 claims. (2d Am. Compl. at ¶¶ 80(h)-81). Defendants seek dismissal premised on the contention that the state courts do not recognize such claims unless there is a demonstrated showing of a need for such an implied Bivens-like claim, and that the availability of the comparable section 1983 claims demonstrates the absence of such a need. (Defs.' Mem. of Law at 136; Defs.' Reply Mem. of Law at 88-89). In response plaintiffs suggest that dismissal would be premature because it will not be apparent until final adjudication of their federal claims whether they are viable

---

    [77] We note that plaintiffs cite one decision from a Kings County Supreme Court justice that appears to be to the contrary. (Pls.' Mem. in Opp'n at 131-32) (citing Barton v. City of New York, 15 Misc.2d 504, 512, 831 N.Y.S.2d 882, 890 (Sup.Ct. Kings Cty. 2007)). The court there noted that it was unsettled in that case whether the employee had been acting within the scope of his duties, Barton, 15 Misc. 2d at 509-10, 831 N.Y.S.2d at 888-89, a circumstance not encountered here. In any event, it is apparent that the various Appellate Division departments have spoken with some consistency in the opposite direction, and we are bound by their determination of state law absent some compelling reason to conclude otherwise, see, e.g., New York v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 210-11 (2d Cir. 2006) (citing, inter alia, Comm'r of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 465 (1967)), which we do not have.

and thus available. (Pls.' Mem. in Opp'n at 132).

In <u>Brown v. State</u>, 89 N.Y.2d 172, 652 N.Y.S.2d 223 (1996), the New York Court of Appeals recognized civil claims under the New York State Constitution, Art. I, §§ 11-12, for violation of equal protection based on large-scale allegedly racially motivated police interrogations. In doing so, it observed that recognition of such a constitutional claim was "consistent with the purposes underlying the duties implied by these [State constitutional] provisions and [wa]s necessary and appropriate to ensure the full realization of the rights they state." <u>Id.</u> at 189, 652 N.Y.S.2d at 233.

Subsequently the same court took a narrow view of <u>Brown</u> when confronted with a comparable claim in <u>Martinez v. City of Schenectady</u>, 97 N.Y.2d 78, 735 N.Y.S.2d 868 (2001). In that case the plaintiff had been arrested and convicted based on a search that he claimed had been undertaken without probable cause. On appeal from the conviction, the New York Court of Appeals agreed with Martinez and reversed the conviction because the search had been invalid. <u>Id.</u> at 82, 735 N.Y.S.2d at 870. Martinez then filed a federal lawsuit under section 1983, asserting claims for malicious prosecution and other federal constitutional torts. That suit was ultimately dismissed on summary judgment, except with

216

regard to the section 1983 claims against the individual officers,
as to which the district court found an issue of fact regarding the
officers' qualified-immunity defense. The Second Circuit affirmed
the dismissal of the remainder of the suit, and reversed the
district court's decision on qualified immunity, finding that
Martinez's claims against the officers were barred by the
qualified-immunity defense. Id. at 82, 735 N.Y.S.2d at 870-71.

Martinez then filed a state-court suit on the same basis, but
asserted claims under state law, including provisions of the New
York State Constitution. The trial court dismissed the
constitutional claims, a ruling affirmed by the Appellate Division
and then by the New York Court of Appeals. In its ruling the Court
of Appeals characterized the Brown decision as providing a "narrow
remedy," Martinez, 97 N.Y.2d at 83, 735 N.Y.S.2d at 871, and as
resting on the need "to ensure the full realization of the rights"
embodied in the equal-protection and search-and-seizure clauses of
the New York Constitution. Id. at 83, 735 N.Y.S.2d at 871. As the
Court noted, in Brown the plaintiffs had no remedy other than a
damages suit; according to the Court, neither injunctive nor
declaratory relief was available in that earlier case, and since
the plaintiffs had not been arrested and charged, suppression was
also not available. As the court put it, "For those plaintiffs it

217

was damages or nothing."[78] Id. at 83, 735 N.Y.S.2d at 871. It further observed that, in Brown, the Court had made clear that to obtain a damages award based on a constitutional violation, the plaintiffs must establish not only the violation but "grounds that entitle them to a damages remedy." Id. at 83, 735 N.Y.S.2d at 871.

In rejecting Martinez's justification, the Court said that she had failed to demonstrate that the "recognition of a constitutional tort claim . . . is . . . necessary to effectuate the purposes of the State constitutional protections plaintiff invokes []or appropriate to ensure full realization of her rights." Id. at 83, 735 N.Y.S.2d at 871. It observed that in her case the suppression of evidence and reversal of her conviction despite proof of guilt beyond a reasonable doubt "will serve the public interest of promoting greater care in seeking search warrants." Hence the

_____

[78] The Martinez court did not explain why injunctive and declaratory relief was not available. 97 N.Y.2d at 83, 735 N.Y.S.2d at 871. We infer that the panel was referring to the fact that the New York Court of Claims -- in which the Brown plaintiffs had filed their suit -- has subject matter jurisdiction only if the primary claim is for money damages, and may only grant equitable relief if such relief is incidental to the monetary relief sought, see, e.g., Sarbro IX v. State Office of Gen'l Servs., 229 A.D.2d 910, 911, 645 N.Y.S.2d 212, 213-14 (4th Dep't 1996) (citing cases), although the Brown court at one point suggested that neither injunctive nor declaratory relief would be an effective remedy for the wrong suffered by the plaintiffs in that case. Brown, 89 N.Y.2d at 192, 652 N.Y.S.2d at 235.

deterrence goal of <u>Brown</u> was already satisfied. <u>Id.</u> at 83-84, 735 N.Y.S.2d at 871-72. The Court further held that money damages are not "appropriate to ensure full realization" of the rights plaintiff invoked. <u>Id.</u> at 84, 735 N.Y.S.2d at 872. In this regard the Court observed that Martinez had already gotten the benefit of suppression and vacatur of her conviction, and had cited no circumstances suggesting that it was appropriate to give her a damages remedy as well. <u>Id.</u> at 84, 735 N.Y.S.2d at 872.

Since <u>Brown</u> and <u>Martinez</u> were decided, a number of lower state courts have declined to entertain State constitutional claims on the basis that the plaintiff had other remedies under state law for the same alleged misconduct. <u>See</u>, <u>e.g.</u>, <u>Bullard v. State</u>, 307 A.D.2d 676, 678-79, 763 N.Y.S.2d 371, 374 (3d Dep't 2003) (invoking availability of Article 78 proceeding); <u>Lyles v. State</u>, 194 Misc.2d 32, 752 N.Y.S.2d 523, 526-27 (Ct. Cl. 2002) (invoking state common-law tort theories); <u>Remley v. State of New York</u>, 174 Misc.2d 523, 665 N.Y.S.2d 1005, 1009 (Ct. Cl. 1997) (same). In a somewhat different (albeit parallel) vein, a number of courts in this circuit have held that a State constitutional claim is barred if the plaintiff has available to him a federal constitutional claim under section 1983. <u>See</u>, <u>e.g.</u>, <u>Washpon v. Parr</u>, 561 F. Supp.2d 394, 409-10 (S.D.N.Y. 2008); <u>Vilkhu v. City of New York</u>, 2008 WL

219

1991099, at *8-9 (E.D.N.Y. May 5, 2008); Coakley v. Jaffe, 49 F. Supp.2d 615, 628-29 (S.D.N.Y. 1999), aff'd mem. on other gds., 234 F.3d 1261 (2d Cir. 2000). It is this line of cases that defendants in effect invoke, to argue that the New York courts would not recognize plaintiffs' constitutional claims, since they have colorable section 1983 claims for the same misconduct. (Defs.' Mem. of Law at 136).

The federal cases are consistent in assuming that the availability of a federal-law claim is sufficient to distinguish Brown. We are less certain that this assumption is correct. It bears emphasis that we are addressing a set of claims grounded in New York law, and not dependent, on their face, on federal legal theories. It is certainly possible, then, in the absence of New York case law treating federal legal claims as decisive in determining whether State constitutional claims may be asserted, that the New York courts would not choose this means of avoiding creation of a state-law damages claim. Moreover, this uncertainty is magnified by a closer look at Brown and Martinez.

In Brown, the plaintiffs were claiming that the police were engaging in racially targeted stops and interrogations, and the Court of Appeals chose to recognize a set of claims under the New

220

York Constitution premised on the contention that these stops violated the equal-protection clause and the unreasonable-search-and-seizure provisions of the State constitution. If, however, the availability of a section 1983 claim were a basis for declining to make a State constitutional claim available, then <u>Brown</u> should have come out the other way, since the plaintiffs in that case had, at least in theory, a viable set of section 1983 claims for violation of the United States Constitution's Fourteenth Amendment Equal Protection Clause and its provision barring unreasonable searches and seizures.

The problem with defendants' theory is further underscored by <u>Martinez</u>. As noted, the plaintiff there not only had an available federal constitutional theory by which to seek civil relief, but had actually employed it before repairing to state court. Moreover, although she ultimately lost her federal suit on the basis of a qualified-immunity defense, defendants argue that it is the mere availability of a legal remedy -- even if it proves unavailing -- that triggers a bar on a State constitutional damages claim. Yet, contrary to what we might expect, the Court in <u>Martinez</u>, when explaining its rejection of her claims, did not invoke the very theory that defendants here espouse -- that is, the availability of a section 1983 suit. Rather, the Court undertook a quasi-<u>Bivens</u>

221

analysis, see Martinez, 97 N.Y.2d at 83-84, 735 N.Y.S.2d at 871-72,
and held that Martinez's success at suppression and vacatur in her
criminal case justified the conclusion that recognizing a civil
damages remedy under the State constitution was unnecessary. The
Court's silence on the more obvious, and easier-to-justify, theory
that defendants here invoke raises a strong question whether the
New York courts, if confronted with defendants' current theory,
would adopt it.

Finally, we note that the federal cases that have treated a
section 1983 remedy as preclusive of a damages claim predicated on
the State constitution have not confronted either the lack of state
precedent for this theory or the seeming inconsistency of both
Brown and Martinez with their own holding. Rather, they have simply
assumed that the state cases support their own somewhat different
conclusions.

Under the circumstances -- and without the benefit of the
certification procedure that is available to our circuit court, see
N.Y.C.R.R. tit. 22, § 500.27; 2d Cir. Local R. 27.2 -- we view it
as the more prudent course at this stage to deny defendants'
application to dismiss the State constitutional claims. If
plaintiffs prevail on their parallel federal claims, there will be

222

no occasion to address the issue definitively since the state-law claims will be duplicative and thus not trigger any additional relief. If the plaintiffs fail in their burden of proof on the federal claims, the state-law claims will also presumably fail since they embody comparable legal standards. Finally, if -- for reasons not apparent at present -- it turns out that the state-law claims succeed at trial despite the failure of the federal claims, the Second Circuit will have the opportunity, if it wishes, to seek clarification from the New York Court of Appeals by way of the certification procedure.[79]

### f. "Good Faith and Government Immunities"

Defendants seek in fairly conclusory terms to invoke an immunity from tort liability for both the individual defendants and the City. (Defs.' Mem. of Law at 136-37). Their argument is unpersuasive.

---

[79] We note that an argument might be made that plaintiffs have common-law claims that parallel some of their state constitutional claims, and on that basis the constitutional claims should be precluded. Defendants have not advanced this argument, however -- which seems inconsistent with Brown -- much less identified which common-law tort claims should preclude which constitutional claims and why. Hence we do not address such an hypothesized analysis.

223

The scant authority that defendants cite for the immunity of the individual defendants relies on precedent for government immunity and looks to whether the government employees exercised discretion in policy matters. (Id. (citing Estate of Rosenbaum v. City of New York, 982 F. Supp. 894, 895-96 (E.D.N.Y. 1997)).[80] The New York Court of Appeals has focused more specifically on the immunity of state officers and has adhered to the notion that these individuals will be deemed immune if they exercised discretion rather performed ministerial acts. See Tango v. Tulevich, 61 N.Y.2d 34, 40-42, 471 N.Y.S.2d 73, 76-77 (1983). Defendants, however, in arguing for immunity, fail to identify which defendants purportedly exercised discretion, whether in policy matters or otherwise, so as to claim such immunity, and which tort claims are defeated by such immunity. This omission is significant since, as the Court of Appeals recognized in Tango, the distinction between discretionary and ministerial acts for this purpose is far from straightforward, id. at 40-41, 471 N.Y.S.2d at 76, and involves an assessment of the functions and duties of the individual as well as whether he

---

[80] The one case that defendants cite, Estate of Rosenbaum, appears to conflate the immunity of the government (in that case the City) with immunity of government employees. See 982 F. Supp. at 895-96 (citing Mon v. City of New York, 78 N.Y.2d 309, 574 N.Y.S.2d 529 (1991), and Haddock v. City of New York, 75 N.Y.2d 478, 554 N.Y.S.2d 439 (1990), to justify immunity of employees; both cited cases, however, addressed only immunity of the government).

"exercise[d] reasoned judgment which could typically produce different acceptable results . . . ." Id. at 40, 41, 471 N.Y.S.2d at 76, 77; see also Barnes v. County of Nassau, 108 A.D.2d 50, 53-54, 487 N.Y.S.2d 827, 830-31 (2d Dep't 1985). As the New York courts have observed, "each case must be decided on the circumstances involved, the nature of the duty, the degree of responsibility resting on the officer, and his position in the municipality's table of organization." Tango, 61 N.Y.2d at 40, 471 N.Y.S.2d at 76 (quoting Rottkamp v. Young, 21 A.D.2d 373, 249 N.Y.S.2d 330 (2d Dep't 1964), aff'd, 15 N.Y.2d 831, 257 N.Y.S.2d 944 (1965); see also, e.g., Lewis v. City of New York, 19 Misc.3d 1109(A), 859 N.Y.S.2d 904 (Table, Text in WESTLAW), 2008 WL 787243, at *9-11 (Sup. Ct. N.Y. Cty. Mar. 26, 2008). The decision to arrest a member of the public without a legal basis, as plaintiffs contend, may not come within such a principle, particularly if a policy component is required to trigger immunity, nor does the use of excessive force in making arrests or otherwise interacting with the public. See, e.g., Della Pietra v. State, 125 A.D.2d 936, 938, 510 N.Y.S.2d 334, 336 (4th Dep't 1986) (unlawful search does not involve discretion).[81] As for the balance of plaintiffs' common-law

---

[81] In the wake of Tango, the New York courts continue to look to whether the officer's actions involve a component of policy. See, e.g., Smelts v. Meloni, 5 Misc.3d 773, 778, 784 N.Y.S.2d 834, 838 (Sup. Ct. N.Y. Cty. 2004).

claims, defendants are equally silent, and accordingly we see no basis for awarding them relief on this theory at the summary-judgment stage. Whether the proof at trial will yield a more specific ground for invoking this defense must await the trial.

As for defendants' argument about municipal immunity, the short answer is that "[m]unicipalities surrendered their common-law immunity for the misfeasance of their officers and employees long ago." Tango, 61 N.Y.2d at 40, 471 N.Y.S.2d at 76. Thus, if plaintiffs prove that some of the individual defendants committed torts while engaging in actions within the scope of their employment, then the City may be held vicariously liable. See, e.g., Green, 465 F.3d at 80; Elmore v. City of New York, 15 A.D.3d 334, 335, 790 N.Y.S.2d 462, 463 (2d Dep't 2005) (citing Riviello v. Waldron, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302 (1979)); see also Carnegie v. J.P. Phillips, Inc., 28 A.D.3d 599, 815 N.Y.S.2d 107, 108-09 (2d Dep't 2006). In contrast, the municipal-immunity defense to which defendants allude applies only in limited circumstances to defeat a claim directly against the City, such as for negligent hiring. See, e.g., Mon, 78 N.Y.2d at 313-16, 574 N.Y.S.2d at 531-34. Moreover, it applies only to the exercise of discretion in policy matters. See, e.g., Haddock, 75 N.Y.2d at 483-86, 554 N.Y.S.2d at 442-44. Since plaintiffs now clarify that they

226

seek a finding of municipal tort liability on the basis of respondeat superior (Pls.' Mem. in Opp'n at 132), the defendants' immunity argument does not avoid this form of municipal liability.

Finally, insofar as plaintiffs also assert tort claims directly against the City for such failings as negligent hiring and training, we have already noted that these claims are precluded for a separate reason -- that plaintiffs assert tort claims against the individual police defendants for actions within the scope of their official duties, and hence the City is subject to respondeat superior liability on those claims. (See pp. 213-14, supra). Had we not done so, however, we do not believe that defendants' immunity arguments would prevail.[82] As illustrated by the contrast between the outcomes of Mon and Haddock, the determination of whether the conduct targeted by a tort claim is discretionary in the sense meant by the immunity doctrine requires a fairly detailed assessment of the precise scope of the discretion and the manner in which the alleged conduct either came within the confines of that discretion or did not. See Mon, 78 N.Y.2d at 313-16, 574 N.Y.S.2d

---

[82] Oddly, defendants never make the perhaps more straightforward argument that some of the negligence claims asserted against the City, notably for negligent hiring and perhaps for negligent training, are not sufficiently supported by evidence to survive summary judgment. Since defendants have not presented such an argument, we do not address it here.

227

at 531-34; Haddock, 75 N.Y.2d 483-86, 554 N.Y.S.2d 442-44.
Defendants' brief and conclusory municipal-immunity argument, which
does not address any of these details, is manifestly inadequate to
justify a conclusion that the claims would be barred by the
asserted defense.

### H. Injunctive and Declaratory Relief

Defendants' last target is plaintiffs' request for injunctive
and declaratory relief. We first address the injunction question.

Insofar as the complaint requests entry of an injunction to
prohibit policies allegedly maintained by the Police Department in
derogation of plaintiffs' First Amendment right to demonstrate and
other rights -- including interference with access to
demonstrations, false arrests, use of excessive force and exposure
of arrestees to adverse detention conditions -- defendants argue
(1) that plaintiffs lack standing because they have not shown that
they are likely to be harmed in the future, (2) that the underlying
claims on which the injunction request is predicated are meritless
under summary-judgment standards, and (3) that plaintiffs cannot
demonstrate irreparable harm since any future violations of their
rights may be remedied by the award of damages. (Defs.' Mem. of Law

at 137-43). Plaintiffs respond that at least some of them intend to participate, or have participated, in other demonstrations or are being chilled from doing so by virtue of the City's challenged policies, that the evidence of record and the course of later lawsuits suffices to demonstrate that the Police Department has continued to engage in practices intended to deter members of the public from participating in political demonstrations, and that the violation of their First Amendment rights constitutes irreparable harm. (Pls.' Mem. in Opp'n at 134-35). They also assert that they seek, in substance, the entry of a permanent injunction that mirrors the preliminary injunction entered in the parallel case of Stauber v. City of New York, 03 Civ. 9162 (RWS). (Pls.' Mem. in Opp'n at 133).

Although we disagree with the grounds advanced by defendants for precluding injunctive relief, we conclude that at least a portion of such relief should be denied at this stage as moot. Moreover, to the extent that we recommend granting summary judgment for defendants on some of the claims against the City, injunctive relief for those claims must also be denied.

We first address defendants' arguments, beginning by noting that at least some of the plaintiffs have put their standing in

229

issue by testifying that they either have participated in demonstrations in New York since the February 15, 2003 protest or have been discouraged from doing so by virtue of their experience with the police conduct of which they complain in this lawsuit. (E.g., Bryant Dep. at 60-62; Blair Dep. at 100-01; Parkel Dep. at 51-52, Stevens Dep. at 51-52; Haus Dep. at 92-95; Spitzer Dep. at 33-34). The substantial potential for exposure to the use of police crowd-control tactics in mass demonstrations that are said to violate First and Fourth Amendment rights in itself would be sufficient to provide standing to plaintiffs who still attend such demonstrations, subject of course to satisfactory proof at trial, see Stauber, 2004 WL 1593870, at *17-19, but in any event, to the extent that some of the plaintiffs testified to an objective chill -- that is, to being deterred from participating in subsequent demonstrations by their exposure to the challenged practices on February 15 (Connor Dep. at 138-42; Dellal Dep. at 100-01; Dodde Dep. at 102-03) -- they surely have standing to seek injunctive relief. See, e.g., Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008); see also Hsu v. Roslyn Union Free School Dist., 85 F.3d 839, 861 (2d Cir. 1996).

As for the purported lack of merit to plaintiffs' underlying claims predicated on alleged illegal City policies or practices, we

have addressed those merits in preceding sections of this Report
and Recommendation, and, among other matters, recommended that
plaintiffs' claim regarding the Police Department's alleged failure
to provide notice of means of access to the demonstration site be
reserved for trial. If all the First Amendment claim are ultimately
dismissed, then injunctive relief, to the extent predicated on
those claims, would necessarily have to be denied, but that is a
matter yet to be resolved. The same is true of plaintiffs' false-
arrest, excessive-force and malicious-prosecution claims, as to
which there are triable issues of material fact. If some of those
claims survive, as we recommend, then the injunction request must
be addressed at trial.

    As for defendants' remaining argument -- that the availability
of damages precludes equitable relief -- that is surely not the
case. As the Supreme Court and other courts have long held, the
violation of First Amendment and other constitutional rights in
itself constitutes irreparable harm. E.g., Elrod v. Burns, 427 U.S.
347, 373 (1976); Doninger, 527 F.3d at 47; cf. Salinger v. Colting,
607 F.3d 68, 82 (2d Cir. 2010). Indeed that was the premise for the
entry of the preliminary injunction in the Stauber case. 2004 WL
1593870, at *23-25, *26-29. If plaintiffs prove such violations at
trial and proffer adequate evidence of likely future injury, they

231

will have satisfied their burden, subject of course to the trial court's balancing of pertinent equitable considerations.

Notwithstanding the foregoing analysis, we conclude that some of the injunctive parts of plaintiffs' case should be dispensed with for an entirely separate reason. Following the entry of a preliminary injunction in Stauber, the defendants there filed a notice of appeal. Some time later, however, the appeal was withdrawn and the parties entered into a stipulation of settlement that was so ordered by Judge Sweet and filed on April 7, 2008. (Stipulation of Settlement and Order, Stauber v. City of New York, 03-cv-9162 (S.D.N.Y. Apr. 7, 2008), ECF No. 67). That settlement provided, in pertinent part, that the Police Department would include in the Patrol Guide a set of provisions that squarely address a number of issues raised in Stauber and in this case about police practices in handling the February 15 demonstration, and, by extension, other such large-scale demonstrations. (Id. at 3-4).

Specifically, the stipulation and order requires that, when demonstrations are conducted, the Department is to disseminate to the media and to the event organizers and is to post on the Department's web site, if possible, "information on expected street and sidewalk closings and information on how the public may access

232

[the] demonstration." (<u>Id.</u> at 3). Moreover, it requires that detailed information on street closings and access points, as well as unanticipated changes in access, must be given to the officers and supervisors assigned to the event, and those personnel are to provide that information to the public. (<u>Id.</u> at 3-4). This provision deals directly and comprehensively with the one First Amendment claim that, as discussed above, should survive against the City rather than merely against one or a few individual defendants.

To the extent that plaintiffs are pursuing other challenges to the Department's plan for crowd control on February 15, the <u>Stauber</u> stipulation and order addresses a number of the main issues. Thus, it requires inclusion in the Patrol Guide of a provision that "barrier configurations for demonstrations" may not "unreasonably restrict access to and participation in the event." (<u>Id.</u> at 4). As an example, it targets the current plaintiffs' principal complaints about the use of pens on First Avenue by requiring that demonstrators be permitted to leave the pens at any time and that, if possible, they should be permitted to leave and then return to the same area if they wish. (<u>Id.</u>). In addition, it specifies that the police must maintain appropriate openings in the pens to permit egress and return by the demonstrators. (<u>Id.</u>).

233

The Stipulation and Order also addresses claims aired in this lawsuit about the use of the Mounted Patrol to control large crowds. Thus it specifies an additional Patrol Guide provision that if such mounted units are needed for crowd control, the incident commanders must "ensure that a crowd or group to be dispersed has sufficient avenues of escape and/or retreat available to them and has had a reasonable chance to disperse." (Id.).

Upon learning of the entry of the Stauber order, we invited the parties to address its impact on any issues raised by the parties' pending summary-judgment motions and the plaintiffs' class-certification motion. In response, neither side referred to the potential mooting effect of this order on some or all of the plaintiffs' injunction requests, which, as noted, have been targeted by defendants. (See April 18, 2009 Letter to the Court from Ass't Corp. Counsel Elizabeth Dollin, Esq.; May 1, 2008 Letter to the Court from Jonathan C. Moore, Esq. and Vera M. Scanlon, Esq.). Notwithstanding the parties' silence on this point, we conclude that, to the extent that the cited provisions overlap with portions of the plaintiffs' claims that should or will survive summary judgment, the Stauber order should moot those aspects of

234

plaintiffs' injunctive requests.[83]

Insofar as defendants attack plaintiffs' request for a declaratory judgment -- arguing that it was never pled and that it is unnecessary (Defs.' Mem. of Law at 143-45) -- we note that plaintiffs offer no substantive response. Under the circumstances, however, since plaintiffs articulate such a request in their class-certification motion, it is necessary to consider defendants' point. They cite cases that address the propriety of a declaratory-judgment action divorced from any other request for relief (see Defs.' Mem. of Law at 144 (citing, inter alia, Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734 (2d Cir. 1992))), but that is not the situation here. Whether the facts as laid out at trial will justify declaratory relief is entirely unclear on the presently contested record, and defendants point to no evidence as such that would necessarily preclude granting a declaration. Accordingly, rejection of such a request for relief at this stage would be premature.

---

[83] That said, plaintiffs will be free to argue at trial for other forms of equitable relief if they can demonstrate that the Stauber provisions are inadequate or do not cover claimed misconduct that needs future correction.

II. Plaintiffs' Summary-Judgment Motion


Plaintiffs have moved for summary judgment on three sets of claims. They seek such relief on their First Amendment attack on the Police Department plan for policing the February 15 demonstration, as well as on their claims for false arrest and excessive force. The motion is meritless.


A. The First Amendment Claims


In seeking summary judgment on their First Amendment claims, plaintiffs offer an extended, if general, critique of the competence of the Police Department in designing its plan for crowd control. They then assert that the arrangements at issue should be assessed using strict scrutiny because, they say, the plan was not viewpoint-neutral, and they argue that, so judged, the plan constituted an unconstitutional prior restraint. (Pls.' R.56 Mem. of Law at 10-21). Within this argument, they appear to take issue with the decisions of the district court and circuit court in UPJ, insofar as they indicated that the proposed plan for a stationary demonstration was content-neutral and adequate as an alternative to the requested march. (Id. at 15-18, 20-21). Alternatively, they assert, the plan embodied unreasonable time, place and manner

236

restrictions because it involved (1) the use of pens, (2) the closure of side streets and (3) a refusal to provide access information to would-be demonstrator. (Id. at 21-25).

Plaintiffs' argument that, as a matter of law, the policing plan was not content-neutral appears to rest principally on the notion that because the demonstration was political in nature and the Police Department adopted a plan for its policing, the plan is ipso facto not content-neutral. (Id. at 15-16). This reasoning is strange, to say the least. The Police Department obviously had to develop a plan unique to the demonstration because the anticipated appearance of 100,000 people, and possibly many more, all seeking to congregate in the neighborhood of the United Nations, plainly required the preparation of a plan that addressed the logistics of that particular event. Plaintiffs also make a general reference to the notion that if the local authorities have broad discretion in handling crowds, that may be indicative of a lack of content-neutrality. (Id. at 17-18). The context here for discretion does not reflect that the plan was not content-neutral. The authorities (and the event sponsors) did not know how many people would show up for the demonstration or the routes that they would take to reach the site of the event, and hence it is obvious that broad discretion would appropriately have to be retained by the police to

237

manage matters on the ground in accordance with how events evolved. That is not tantamount to content bias and most assuredly does not demonstrate as a matter of law that the plans and their implementation were anything other than time, place and manner restrictions rather than prior restraints.

In any case, discretion aside, the specifics of the plan do not demonstrate that the police imposed restrictions that were so far removed from prior tactics and so stringent as to suggest First Amendment bias. As for the use of pens and side-street closures, neither was unprecedented and, in any event for reasons noted, each had an evident justification, and was well within the discretion of the local authorities in handling massed crowd events. Finally, as we have also discussed, the evidence indicates that the plan did not reflect any intention to keep access routes secret, although there appear to have been problems in communicating those details to some of the people who took part in the demonstration. That alone is not evidence of a lack of content-neutrality, and the record offers no evidence to support plaintiffs' contention in this respect, much less proof beyond triable dispute.

As for whether the plan and its implementation involved time, place and manner restrictions that were not reasonable, we have

238

addressed those issues in assessing defendants' Rule 56 motion and

have found triable issues regarding the access-information claim.[84]

We have also found triable issues regarding whether some defendants

violated the First Amendment rights of the arrested plaintiffs. The

---

[84] Plaintiffs cite some cases in which courts have found that police rules excluding any demonstrators from certain locations involved unreasonable restrictions. (Pls.' R.56 Mem. of Law at 24-25). These cases are unhelpful to plaintiffs (and certainly do not support granting them summary judgment) since the plan at issue here did not bar all demonstrators from a given location -- in this case First Avenue -- but rather sought to control the density of the crowds on that Avenue. The fact that some of the plaintiffs were unable to gather on First Avenue in the Fifties does not demonstrate that the plan was unreasonable either in concept or in application, since there is no evidence that the pens on First Avenue were not filled or that it was unreasonable for the police to seek to limit the size of the crowds on each block to avoid potentially dangerous overcrowding and to ensure adequate lanes for emergency personnel and vehicles.

To the extent that plaintiffs also complain that some of them could not hear the speakers located on First Avenue at 51st Street because they "were several blocks north of the intended audience" (Pls.' R.56 Mem. of Law at 25), their argument verges on the frivolous. If upwards of 100,000 people show up for a demonstration, plainly not all of them will be able to fit within the few blocks from which a speaker on a pre-designated platform is likely to be heard. Furthermore, how far north a speaker can be heard is in major part a function of the loudspeaker system, if any, that the sponsors choose to use. Moreover, the appearance by members of the public at such a huge demonstration -- even if not within vocal range of the speaker -- does not necessarily constitute denial of participation. Plainly the demonstration was intended to serve as an expression of public discontent with the Bush administration's war plans, and the number of people who showed up gave obvious voice to that message regardless of whether the people who demonstrated could hear the speaker. In any event, as we have previously discussed, local authorities are not required to compress as many people as will fit into a given area if it may threaten public safety. See, e.g., Million Youth March, Inc., 155 F.3d at 127.

record, however, demonstrates that the facts pertinent to assessing those questions are very much in genuine dispute, thus precluding any basis for granting plaintiffs summary judgment on any version of their First Amendment claims.[85]

B. The Excessive-Force Claims

Plaintiffs have moved for summary judgment on some of their excessive-force claims. In their initial papers, they did not identify on which plaintiffs' behalf they were seeking Rule 56 relief and against which defendants. (See generally Pls.' R.56 Mem. of Law at 47-53). They subsequently clarified that they were seeking judgment for plaintiffs Haus, Connor, Dodde, Silva and Stevens, and that their motion was targeting the City as well as defendants Kelly, Joseph Esposito, Michael Esposito, Smolka, Acerbo, Flynn, Willoughby, Brady, Carney, Secreto, Scali and

---

[85] Plaintiffs also separately invoke the provisions of the New York State Constitution assuring freedom of speech, and they seem to argue that this guarantee is more stringent than the First Amendment as interpreted by the federal courts. (Pls.' R.56 Mem. of Law at 26-28). The implication seems to be that even if summary judgment may not be awarded on the federal version of the claims, it is appropriate with respect to the state-law variant. Plaintiffs fail, however, to demonstrate in any respect why the state-law standard clarifies and eliminates the disputed factual issues that are material to the federal claims and further fail to explain why, as they imply, the invocation of state law eliminates the materiality of the disputed fact issues that are plainly dispositive of the federal claims.

Reilly. (Pls.' R.56 Reply Mem. of Law at 44-51). The premise for this aspect of their motion is the contention that these defendants were responsible for the aggressive use of horses as a means of crowd control.

For reasons already noted, none of the plaintiffs in question were able to identify the officers whose horses came in contact with them. Hence, there is no evidentiary basis to hold any of the mounted officers liable on these claims. Similarly, for reasons already noted, the record does not reflect that any of the supervisory defendants except for Capt. Acerbo, Joseph Esposito ad Bruce Smolka potentially bore responsibility for the alleged misuse of the police mounts, that is, their use in penetrating massed crowds rather than limiting them only to controlling the perimeter of such gatherings. It necessarily follows that summary judgment cannot be granted against any of these defendants.

As for Acerbo, Esposito and Smolka, we have noted that their self-described roles at the demonstration, including their presence at the specific locations at which several of the plaintiffs claimed to have been injured, may lend itself to a finding that they were responsible for the on-the-spot decisions as to how to use the horses and hence for the asserted excessive use of force

241

complained of by these individuals. That said, the testimony of
Acerbo about what the police under his command did is inconsistent
with the tactics that -- if deliberate and directed or acquiesced
in by him -- would expose him and the other two supervisors to
liability. Since the plaintiffs' testimony suggests a deliberate
intrusion by the mounted police directly into several massed crowds
and since Acerbo denied seeing or ordering that, the claims against
him and against Esposito and Smolka are triable and not susceptible
to resolution by summary judgment.

As for possible liability by the City, we have already
addressed that question in assessing defendants' motion, and have
concluded that plaintiffs have not created a triable issue with
respect to the facts material to any recognized theory for
municipal liability. (See pp. 158-70, supra). It necessarily
follows that plaintiffs' application for Rule 56 relief against the
City on these claims must be denied.

Finally, even if the cited plaintiffs could identify the
mounted officers in question or the supervisors responsible for the
acts of which they complain, they could not achieve summary
judgment. As we have noted, plaintiffs Haus and Connor apparently
suffered some injury -- Haus's being particularly serious -- and

242

Silva reported being so forcefully struck in the head by a horse that he was "stunned." (Silva Dep. at 80-81; see also Connor Dep. at 79; Haus Dep. at 55-59, 72-86, 88-91). Their accounts, however, do not compel a trier of fact to find that the police engaged in deliberate use of force that led to their injuries. As we have discussed, the circumstances to which they testified certainly lend themselves to such an inference, but they do not compel that conclusion, and the testimony of defendant Acerbo is to the contrary. In short, there are triable issues of fact pertinent to the circumstances in which the plaintiffs suffered their injuries and particularly relevant to whether the contact from the horses resulted from a deliberate decision by the police to penetrate the crowd (representing a potentially excessive use of force) or whether the contacts resulted from the mounted officers inadvertently losing control of their mounts, as one plaintiff in fact speculated (Connor Dep. at 78-79), thus potentially reflecting an accident and not a liability-creating use of force. (See pp. 131-69, supra).[86]

In sum, plaintiffs' application for summary judgment on their equine excessive-force claims should be denied.

---

[86] Dodde did not report any contact by a horse. (See Dodde Dep. at 55-56). He has not proffered evidence sufficient to take to trial on a claim of excessive force by a horse.

C. The False-Arrest Claims

Plaintiffs seek summary-judgment on some of their false-arrest claims. In substance they argue that the disorderly-conduct charges pressed against plaintiffs Blair, Cavanna, Connor, Delal, Dodde, Douglas, Parkel, Sanchez, Silva, Stevens and Venizelos -- as reflected in the charging instruments filed against them -- were not supported by probable cause or arguable probable cause. (Pls.' R.56 Mem. of Law at 53-55). They also argue that such a charge cannot be sustained if the arrestee has not violated a prior police warning to disperse, and that this element is constitutionally required. (Id. at 58).

Defendants respond that asserted defects in the charging instrument are irrelevant to a probable-cause analysis for a false-arrest claim, and they note that plaintiffs have not proffered evidence that there was no probable cause as measured by what the police observed at the time of the arrests. (Defs.' R.56 Mem. in Opp'n at 49-53). As for the constitutional challenge to arrests for disorderly conduct in the absence of an order to disperse, defendants complain that plaintiffs did not plead this theory. (Defs.' R.56 Mem. in Opp'n at 53-55). They further offer to provide still more briefing on that theory if ordered by the court. (Defs.'

244

R.56 Mem. in Opp'n  at 55).

As to the charging instruments, defendants' initial argument is well taken. Plaintiffs' focus on the purported defects in some of the charging instruments is misguided. The existence or non-existence of probable cause is measured by the events occurring at the time of the arrest, and while a defect in the charging document may lead to the dismissal of the charge, that does not demonstrate that the arrest was invalid. See, e.g., Carthew v. County of Suffolk, 709 F. Supp.2d 188, 197-201 & n.9 (E.D.N.Y. 2010) (finding that probable cause existed for plaintiff's arrest and granting summary judgment on false-arrest claim, despite the fact that state-court prosecution had been dismissed due to defective charging instrument).[87] Moreover, even if there is no probable cause for the crime or violation listed in the charging instrument, the arrest may be deemed valid and not subject to constitutional challenge if the facts apparent to the officers at the time of the arrest would have supported a different charge. See, e.g.,

---

[87] Indeed, the Criminal Court may choose to give the State leave to file an amended complaint if it can correct the pleading error in the initial document. See, e.g., People v. Thompson, 28 Misc.3d 483, 498, 905 N.Y.S.2d 449, 461-62 (N.Y. City Crim. Ct. 2010) (dismissing misdemeanor information as facially insufficient but permitting motion to amend to cure defects in charging instrument); see also N.Y. C.P.L. § 200.70 (permitting amendment of criminal pleadings).

Devenpeck v. Alford, 543 U.S. 146, 152-56 (2004).

For purposes of plaintiffs' motion, the question then must be whether the individual plaintiff or the arresting officer or some other eyewitness has testified to facts that, if accepted for purposes of this motion, would give rise to probable cause or arguable probable cause for a criminal charge. Since on this motion plaintiffs bear the initial burden of making the contrary showing, we look to their proffer, which is inadequate.

First, plaintiff's initial argument addresses only the adequacy of the accusatory instruments that named plaintiffs Blair, Connor, Dodde, Sanchez, Silva, Stevens, Parkel and Venizelos. (Pls.' R.56 Mem. of Law at 54-55).[88] Of these charging instruments, they observe that all but the documents naming Parkel and Venizelos accuse the cited plaintiff of having, with others, blocked a roadway, and thereby obstructed vehicular traffic despite having been directed by the police to disperse. (Id.). Even if the test of their false-arrest claims were, as plaintiffs assume, the facial adequacy of the charging instrument, they do not demonstrate that these charging instruments were legally inadequate. Indeed, they cite only a New York Court of Appeals decision in People v. Jones,

_____

[88] Plaintiffs make no reference to Mr. Cavanna.

9 N.Y.3d 259, 848 N.Y.S.2d 600 (2007), in which the Court
determined that a criminal complaint that alleged that Jones had
been standing on a sidewalk -- behavior that the Court in Jones
characterized as "'apparently innocent' conduct", id. at 262, 848
N.Y.S.2d at 602 (quoting People v. Carcel, 3 N.Y.2d, 327, 331, 165
N.Y.S.2d 113, 116  -- was facially inadequate because it did not
suggest the requisite intent or recklessness. Id. at 262, 848
N.Y.S.2d at 602. The difference between standing on a sidewalk,
thereby allegedly obstructing pedestrian traffic, and standing in
a roadway, thereby obstructing vehicular traffic, is sufficient to
distinguish Jones on this pleading point. In short, the sworn
allegations in the criminal instruments for these plaintiffs
suffices to create a triable issue on probable cause.[89]


    Second, as noted, the adequacy of the criminal pleading does
not control the probable-cause determination. Since plaintiffs have
failed to address the evidentiary record pertinent to the existence
or non-existence of probable cause or arguable probable cause in
their first round of motion papers, they have not met their initial

---

[89] The instruments that named Parkel and Venizelos refer to
their blocking a sidewalk (Pls.' Exs. 27 (Parkel), 36
(Venizelos)), and hence those instruments may have been
inadequate under Jones. As we have noted, however, the pleading
defects are not dispositive of the probable-cause issue on a
false-arrest claim.

247

Rule 56 burden, and hence their motion must be denied.[90]

Finally, we address plaintiffs' argument that New York's disorderly-conduct statute is unconstitutional because it permits the police to make arrests without first giving an order to disperse. Defendants contend that we should not consider this argument, since the complaint did not explicitly challenge the constitutionality of the disorderly-conduct statute and we should not address a legal argument raised for the first time on summary judgment. (Defs.' R.56 Mem. in Opp'n at 53-55). Plaintiffs respond that they pled the unconstitutionality of various individual plaintiffs' arrests, and that this should have been sufficient to place defendants on notice of a challenge to the statute under which plaintiffs were arrested. (Pls.' Reply R.56 Mem. of Law at 53). Regardless of whether that is so, we believe summary judgment on this argument is inappropriate for several reasons.

First, it is not immediately clear whether the plaintiffs who were arrested under the disorderly-conduct statute were arrested under Penal Law § 240.20(5), which refers only to "obstruct[ing]

---

[90] We note in any event that for a number of the plaintiffs, the testimony of the arresting police officers, if credited as we must, suggests a potential basis for finding probable cause or arguable probable cause for the arrests. (See, e.g., Ryan Dep. at 84-91, Hannon Dep. at 33-39; Otero Dep. at 74, 79-83, 87-93).

vehicular or pedestrian traffic," or Penal Law § 240.20(6), which prohibits "congregat[ing] with other persons in a public place <u>and refus[ing] to comply with a lawful order of the police to disperse</u>" (emphasis added). Clearly, the latter subsection cannot be unconstitutional due to its failure to require a dispersal order, since by its plain text it requires not only a dispersal order, but a "lawful" one -- presumably, one that complies with the First Amendment. See <u>Jones v. Parmley</u>, 465 F.3d at 60-61 (citing, <u>inter alia</u>, N.Y. Penal Law § 240.20(6)). The disorderly conduct statute also requires that the arrestee have obstructed traffic "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." N.Y. Penal Law § 240.20. "New York courts have interpreted this statute to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." <u>Jones</u>, 465 F.3d at 59 (citing, <u>inter alia</u>, <u>People v. Nixon</u>, 248 N.Y. 182, 185, 187 161 N.E. 463, 465, 466 (1928)). Plaintiffs have not addressed the effects of either the intent requirement or the New York courts' limiting construction on the constitutionality of the statute, instead simply asserting that the statute is unconstitutional without the requirement of a dispersal order. Without further explanation or more clearly established facts, we cannot say as a matter of law that plaintiffs are correct in that assertion. <u>Cf.</u> <u>Jones</u>, 465 F.3d

at 58 ("[T]he First Amendment does not insulate individuals from criminal sanction merely because they are simultaneously engaged in expressive activity.") (citing Cox, 379 U.S. at 554).

Second, we address plaintiffs' citation to Jones's ruling that several disorderly-conduct arrests without a dispersal order violated the First Amendment. (Pls.' R.56 Mem. of Law at 57 (citing Jones, 465 F.3d at 60-61)). In Jones, the plaintiffs were on private property, and the police defendants conceded that they could not identify those who had previously obstructed traffic by walking on the highway. 465 F.3d at 60. "Defendants could not, then, have reasonably thought that indiscriminate mass arrests without probable cause were lawful under these circumstances." Id. Moreover, -- as the court in Jones appears to have recognized -- without the capability to identify those who had previously violated § 240.20(5), the plaintiffs in that case must have been arrested under Penal Law § 240.20(6), which requires that the police first give a lawful dispersal order. Such an order could not have been given in the context of those plaintiffs' First Amendment activities "absent imminent harm[.]" Jones, 465 F.3d at 60. We contrast that with the situation encountered here, where there are disputes of fact regarding the circumstances of plaintiffs' arrests, including whether probable cause existed for those

250

arrests, whether dispersal orders were in fact given prior to the arrests, whether certain plaintiffs were actually engaged in First Amendment activity when they were arrested, and whether there was a threat of the type of "imminent harm" that the Court in <u>Jones</u> suggested might warrant arrests that might otherwise tread on First Amendment rights. Given these disputes, plaintiffs cannot be granted summary judgment on their challenge to the constitutionality of the disorderly-conduct statute.

### III. <u>The Class-Certification Motion</u>

Plaintiffs have moved to certify four classes under Rules 23(b)(2) and (b)(3). They refer to these classes as "a First Amendment access class, an excessive force class, a false arrest class, and an unlawful conditions of confinement class." (Pls.' Class Mem. at 1). In further elucidation, plaintiffs described the proposed First Amendment class as consisting of two sub-classes, one involving all people denied access to First Avenue and the other involving "those who reached First Avenue but whose lawful unencumbered exercise of their First Amendment rights was denied by defendants." (Pls.' Class Mem. at 6; <u>see also</u> Pls.' Reply Class Mem. of Law at 1).

251

Defendants oppose the motion. In substance they argue that the motion, filed after the completion of all discovery, is untimely (<u>see</u> Defs.' Class Mem. in Opp'n at 1-4), and that in any event plaintiffs are unable to satisfy any of the pertinent Rule 23 requirements for certification. (<u>See</u> <u>generally</u> <u>id.</u>).

A. <u>The Basic Requirements</u>

The plaintiffs' application is governed by the terms of Rule 23, including the requirements imposed on all class actions by Rule 23(a) and the further prerequisites of Rules 23(b)(2), which concerns suits for injunctive relief, and of Rule 23(b)(3), which addresses claims for damages. Rule 23(a) requires the movant to demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Pro. 23(a). These four factors are referred to, respectively, as "numerosity, commonality, typicality, and adequacy." <u>Brown v. Kelly</u>, 609 F.3d 467, 475 (2d Cir. 2010).

252

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." As for Rule 23(b)(3), it authorizes maintenance of a class if "questions of law or fact common to class members predominate over any questions affecting only individual members" and class treatment would be "superior to other available methods for fairly and efficiently adjudicating the controversy." See, e.g., Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2548-49 & n.2 (2011); Brown, 609 F.3d at 476.

Satisfaction of these requirements depends, not on the adequacy of the party's pleading, but on a proffer of evidence sufficient to demonstrate that the case meets these criteria. As the Supreme Court recently noted:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact etc. We recognized in *Falcon* that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, 457 U.S. at 160, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied, *id.*, at 161; see *id.* at 160 . . . . Frequently that "rigorous analysis" will entail some overlap with the merits of the

> plaintiff's underlying claim. That cannot be helped.
> "'[T]he class determination generally involves
> considerations that are enmeshed in the factual and legal
> issues comprising the plaintiff's cause of action.'"
> *Falcon*, *supra*, at 160 (quoting *Coopers & Lybrand v.*
> *Livesay*, 437 U.S. 463, 469 (1978) . . . .

Wal-Mart, 131 S.Ct. at 2551-52 (emphasis and brackets in original)

(quoting and citing, <u>inter alia</u>, <u>Gen'l Tel. Co. of Southwest v.</u>

<u>Falcon</u>, 457 U.S. 147, 160 (1982)); <u>see also</u> <u>In re Initial Public</u>

<u>Offering</u>, 471 F.3d 24, 40 (2d Cir. 2006) (discussing the

requirement that a district judge certify a class "only after

making determinations that each of the Rule 23 requirements has

been met" based on the resolution of any relevant factual disputes,

including those factual disputes that go to the merits of the

case). In short, "[e]ach of the Rule 23 requirements must be

satisfied by a preponderance of the evidence . . . and the burden

to prove each element is on the party seeking certification."

<u>MacNamara v. City of New York</u>, __ F.R.D. __, 2011 WL 1991144, at *7

(S.D.N.Y. May 19, 2011) (citing, <u>inter alia</u>, <u>Teamsters Local 445</u>

<u>Freight Div. Pensino Fund v. Bombardier Inc.</u>, 546 F.3d 196, 202 (2d

Cir. 2008)) (internal citation omitted).


Judged by these standards, and in light of our determinations

regarding the nature and viability of plaintiffs' claims, we

conclude that certification cannot be justified.[91] We address each proposed class separately.


B. <u>The First Amendment Class</u>


The proposed First Amendment class consists, as noted, of all individuals who either were "denied access" to First Avenue or were able to reach First Avenue "but whose lawful unencumbered exercise of their First Amendment rights was denied by defendants." (Pls.' Class Mem. of Law at 8). The premise for the class application is that the City undertook a broad-based plan or set of practices that violated the First Amendment rights of any demonstrator who did not get to First Avenue or who, despite arriving on that avenue, was restricted in some fashion in his or her enjoyment of First Amendment rights.


It appears that the first sub-class is designed to capture an allegedly illegal set of time, place and manner restrictions -- including side-street closures, the use of pens on First Avenue to limit the number of people who could stand on any given block of

---

[91] For present purposes, we assume without deciding that the class motion was not untimely under Rule 23(c)(1)(A). <u>See</u> Fed. R. Civ. Pro. 23(c)(1)(A), 2003 Advisory Committee Notes, Federal Judicial Procedure and Rules at 131-32 (West 2011).

First Avenue, lack of information on the location of access points for First Avenue, and the use of false arrests and excessive force (notably aggressive Mounted Police activity) -- that assertedly prevented large numbers of people from reaching "the NYPD-designated stationary demonstration site on First Avenue." (Id.). The second sub-class is vaguely defined, but is presumably intended to encompass, at a minimum, all individuals who were either required to stand in the pens on First Avenue and were not allowed to leave their pen for some period of time or were prevented from returning to their original pen. Given some of the plaintiffs' explanation of their First Amendment theories, it may also include anyone who was prevented from moving further down First Avenue from their initial pens and possibly anyone who was not permitted to gather within sight and hearing of the stage at 51st Street. (See Pls.' R.56 Mem. of Law at 24-25).

In addressing the viability of this class, we briefly review in somewhat greater detail the substance of the Rule 23 requirements. Plaintiffs fail to satisfy a number of them.

### 1. Numerosity

The first requirement under Rule 23(a) is that the proposed

256

class is "so numerous that joinder of each member is impracticable." As a general matter, if the potential class exceeds forty members, the numerosity requirement will be viewed as satisfied, whereas a class of less than twenty is likely to be viewed as too small. See, e.g., MacNamara, 2011 WL 1991144, at *8 (citing Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)). Other pertinent factors that the court should consider -- especially when assessing proposed classes the size of which is in a grey area -- include such matters as "(1) the judicial economy of avoiding multiple suits; (2) the geographic dispersion of the proposed class members; (3) the financial resources of the proposed class members, (4) the ability of the proposed class members to file individual suits; and (5) requests for prospective injunctive relief which would involve future class members." Id. (citing Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)).

For present purposes, given plaintiffs' definition of the first proposed sub-class, we view it as sufficiently large to meet this requirement. The evidence reflects that far more than forty people remained on Second and Third Avenues, and we may fairly infer that a sizeable portion of them would have chosen to go to First Avenue if the side streets had been opened to them. That

said, for reasons noted in connection with defendants' summary-judgment motion, the numerosity of the class is placed into severe question because the plaintiffs' First Amendment claims, insofar as based on the contention that the City adhered to a plan that itself violated the participants' First Amendment rights, cannot be sustained. As we have observed, the use of street closures and pens does not constitute a set of unreasonable time, place and manner restrictions; the alleged use of arrests and excessive force has not been shown to be part of any City plan or practice that prevented access to First Avenue; and the alleged inadequacy of information regarding access points may or may not have itself prevented significant numbers of people from reaching First Avenue, but the record on this point is entirely opaque.

As for the second sub-class, it is so vaguely defined that it is difficult, if not impossible, to arrive at any realistic assessment of how many people would be included, and there is little or no evidence as to the number of people who were not allowed to leave their pens for the purpose of departing from the demonstration,[92] or were allowed to leave but not permitted to

---

[92] We so phrase this category because plaintiffs rely for their pertinent constitutional theory on the notion that individuals have the right to not participate in a First Amendment event or to withdraw from it. (Pls.' R.56 Mem. of Law at 38). One of the plaintiffs, Ms. Delaine Douglas, testified

return, or were prevented from moving southward when a more
southern pen was not filled.[93]


## 2. Commonality & Typicality


The second Rule 23(a) requirement is that "there are questions
of fact or law common to the class." Fed. R. Civ. Pro. 23(a)(2).
Commonality is not satisfied merely because there are some common
issues; rather, the Rule requires "that plaintiffs identify some
unifying thread among the class members' claims that warrant[s]
class treatment." Damassia v. Duane Reade, Inc., 250 F.R.D. 152,
156 (S.D.N.Y. 2008) (quoting Bolanos v. Norwegian Cruise Lines
Ltd., 212 F.R.D. 144, 153 (S.D.N.Y. 2002)); see also Friedman-Katz
v. Lindt & Sprungli (USA), Inc., 270 F.R.D. 150, 155 (S.D.N.Y.
2010). In this regard, the recent observations of the Supreme Court
in the Wal-Mart case are instructive. The Court there noted that
the wording of Rule 23(a)(2) -- that "there are questions of law

_____

that she was prevented from leaving her pen, although her reason
for seeking to do so was to arrive at Bloomingdale's in time for
a pre-scheduled facial. (Douglas Mar. Dep. at 71-72; Douglas Apr.
Dep. at 25, 32-33).

[93] We note that the only instances of such problems in the
record -- apart from the experience of Ms. Douglas -- were
recounted during the Stauber hearing by several non-parties to
the current lawsuit. (Stauber Tr. at 51-52, 119-21, 125-26, 212-
13, 368-70).

and fact common to the class" -- are "easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" 131 S.Ct. at 2551 (quoting Nagareda, "Class Certification in the Age of Aggregate Proof," 84 N.Y.U. L. Rev. 97, 131-32 (2009)). The Court went on to observe:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," *Falcon*, *supra*, at 157. This does not mean merely that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention, . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> "What matters to class certification . . . is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Nagareda, *supra*, at 132.

Id. (emphasis in Nagarenda).


The requirement of typicality is closely linked to that of commonality. See, e.g., Brown, 609 F.3d at 475. To demonstrate typicality, the plaintiff must show that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." In re Flag Telecom Holdings, Ltd., 574 F.3d 29, 35 (2d Cir. 2009)

(quoting Robidoux, 987 F.2d at 936). "A plaintiff's claims are typical of the class claims 'where the plaintiff's and the class members' 'injuries derive from a unitary course of conduct by a single system.'" MacNamara, 2011 WL 1991144 at *8 (quoting Marisol A. v. Giuliani 126 F.3d 372, 377 (2d Cir. 1997)).

Given the limitations that we have recognized with regard to the viability of plaintiffs' First Amendment theories, they cannot satisfy these linked tests. Plaintiffs' assertion that the City applied a uniform set of policies and practices -- imbedded in a their crowd control plan -- to preclude access to First Avenue, in violation of the First Amendment rights of numerous would-be demonstrators, cannot, for reasons already stated, survive summary judgment. Necessarily, then, the question of whether any single demonstrator was denied his or her First Amendment rights by being prevented from reaching First Avenue[94] cannot be answered by a

---

[94] For purposes of this analysis, we assume arguendo that if a putative protester was prevented by the police from reaching First Avenue somewhere north of 51st Street, that would be tantamount to a violation of that protester's First Amendment rights. This premise is based on the assumption built into the City's plan that all people who wished to appear on First Avenue, however far north that would be (depending on the size of the crowd that appeared), could be accommodated. As indicated by the Second Circuit decision in Million Youth March, Inc., 155 F.3d at 127, however, that is an overly generous view of the defendants' constitutional obligations, since they may choose to limit the size of the crowd actually present for a demonstration on a given street and require that any overflow remain on adjacent streets.

single finding that the City crowd-control plan blocked side streets, and used pens on First Avenue, thus limiting the number of participants on any single block to perhaps 3,000 to 4,000. It also cannot be answered based on the notion that the City systematically used baseless arrests or applied excessive force to prevent people seeking to reach First Avenue from accomplishing that end. Furthermore, based on our prior analysis, which rejected the notion that the City deliberately or systematically chose to deny access information to the public, it cannot be said that a determination that some officers failed to provide such information could determine the violation of a large number of class members' First Amendment claims insofar as predicated on the denial of access to First Avenue. (See pp. 45-56, supra).

As a result, the determination of whether any one class member was denied his or her First Amendment rights cannot be decided based on the resolution of any still-open common question. Though many individuals did not reach First Avenue, the reasons for that involve a host of apparently varied answers, most of which do not implicate First Amendment violations by the City and others of which involve varied circumstances that members of the public encountered that day.

We assume, with plaintiffs, that many sought to arrive directly at First Avenue in the Fifties, but were caught in large crowds of people on Second and Third Avenues, most or all of whom were also seeking to go directly to First Avenue in the lower Fifties. This congestion was presumably largely attributable to the facts that the pens on the adjoining portions of First Avenue had already filled and that the police had (legitimately) closed the side streets leading into that area of First Avenue. For reasons discussed, this would not itself implicate a constitutional violation. Moreover, if individuals then chose not to go further north to get to the demonstration -- deciding instead either to depart or to remain on the more westerly avenues as part of a large crowd that constituted a satellite demonstration -- that would not trigger First Amendment liability by defendants.

Some of the would-be demonstrators may have been prevented from getting to First Avenue because they initially sought direct access in the Fifties and for some period of time police officers blocked the route going north on Second or Third Avenues. Such blockage might well implicate First Amendment rights, but there is no showing that this was part of the City plan rather than an order issued by some unidentified mid-level supervisor that lasted for some unspecified period of time and prevented some from reaching

263

their intended destination (a category limited to those who, in the crowded condition of the lower Fifties, would have been prepared, but for the police blockage, to walk up to the Seventies or Eighties to get to First Avenue).

Others were perhaps frustrated in reaching their goal because they asked a police officer for directions and were either given inaccurate information or denied any guidance. The ignorance of some officers as to how the public was to reach First Avenue does not create a basis for a class in view of the undisputed record that (1) upwards of 100,000 people did reach the appointed site, (2) the plan anticipated that the police would direct people northward if they sought to enter already filled portions of First Avenue, (3) some police officers were providing accurate information, (4) if any member of the public could not learn from one police officer where to go, he or she was free to ask other officers or supervisors on the scene, and (5) only if a would-be demonstrator was unable, after making reasonable efforts, to learn how to access First Avenue and would have been willing to walk north for a significant distance had the correct information been furnished, might he establish a claim. Given these parameters, it is evident that proof of a constitutional violation on the basis of a class member's failure to access First Avenue turns on a

264

multitude of factual determinations that are not common to the proposed class or subclass.

Insofar as plaintiffs press an alternative form of First Amendment claim, premised on the alleged use of excessive force or false arrests, for reasons already noted they cannot sustain a claim based on the contention that the City pursued a systematic practice of using such force or arrests to prevent people from attending the rally. (See pp. 56-66, supra). Under these circumstances, the determination of whether any class member -- that is, someone who could not get to First Avenue -- was thereby denied his First Amendment rights would turn on the unique circumstances of his encounter with the police, including an assessment of whether the force that he was met with was justified or excessive under the circumstances and whether, in the event of an arrest, the arrest was or was not supported by probable cause. In short, these determinations are also not common to the class and require individual assessments wholly incompatible with a class action.

Finally, the second subclass also fails for lack of commonality as well as for lack of an articulable legal basis for a First Amendment claim. The evidence reflects that people were

permissibly required to stay in pens on First Avenue. As for the alleged refusal to allow people to head south through the pens or to depart from First Avenue or to return to the pens after departure, there is no evidence that these restrictions were part of a plan or practice of the City or were systematically imposed. Indeed, the plaintiffs' own testimony and other evidence that has been proffered demonstrates the contrary. (See, e.g., Douglas Apr. Dep. at 36-39, 39-40, 40-42, 43-44 (detailing police officers' contradictory instructions regarding leaving a pen at First Avenue between 59th and 60th Streets)). In short, any failures by the police in these respects would inevitably reflect on-the-spot decisions either by patrol officers or by low-level supervisors on the street at the time, and hence do not implicate an across-the-board Police Department decision that may appropriately be assessed for an entire class or sub-class.

The foregoing analysis adequately demonstrates that the proposed class and subclasses for plaintiffs' First Amendment claims also fail to satisfy the typicality requirement of Rule 23(a). The named plaintiffs' circumstances cannot be said to have been shown as typical of those encountered by the members of the purported class and sub-classes because the range of circumstances that led to their purported inability to reach First Avenue or to

266

leave it have not been shown to mirror those of the other members of the class and subclasses.


### 3. Adequacy


We assume that the class representatives would "fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a). The record does not reflect any inherent conflicts, and class counsel is experienced and qualified. Cf. MacNamara, 2011 WL 1991144, at *9 (quoting, inter alia, Brown, 609 F.3d at 479; Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000) (stating requirements for adequacy)); id. at *15-16 (applying requirements to class of demonstrator-plaintiffs).


### 4. Rule 23(b)(2) Criteria


Rule 23(b)(2) certification is intended for cases in which "broad class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." Robinson v. Metro-North, 267 F.3d 147, 162 (2d Cir. 2001). According to the Advisory Committee Notes, it does not apply to "cases in which the appropriate final relief relates exclusively or predominantly to money damages." See MacNamara, 2011 WL 1991144, at *9 (quoting Fed. R. Civ. Pro.

267

23(b)(2), 1966 Advisory Committee Note (West 2011)). In applying this test, the court is to look to whether reasonable plaintiffs would bring the lawsuit to seek injunctive or declaratory relief even if monetary relief were unavailable and whether injunctive or declaratory relief would be "reasonably necessary and appropriate if plaintiff were to succeed on the merits." Id. (citing Robinson, 267 F.3d at 164); see generally Wal-Mart, 131 S.Ct. at 2557-61 (discussing rationale and standards for Rule 23(b)(2) class).

For reasons already noted, the one failing in the implementation of the crowd-control plan that appears to have been fairly widespread was the inadequacy of circulation of up-to-date and specific information about access points, both for police officers at the scene and for intended demonstrators. While in theory that failing might form the basis for injunctive relief, the settlement in the Stauber case led to the inclusion in the Police Department Patrol Guide of specific provisions requiring advance planning with documented specifics as to access routes for demonstrations and assurances that the police on the scene will be fully informed of those details in advance, and that the Department, through public media, including its own web site, as well as through the officers on the scene, will communicate those details to the public. That is the type of relief that plaintiffs

would presumably have sought here; indeed, they claim to want a
permanent injunction that tracks the preliminary injunction imposed
in Stauber case. (Pls.' Mem. in Opp'n at 133; see also Pls.' Class
Reply Mem. at 41-42).

Given that alteration in Department procedures, the case for
even the limited injunctive relief that plaintiffs originally
sought is significantly undercut. Moreover, that development
underscores the further fact that plaintiffs cannot satisfy the
requirements of Rule 23(b)(2). Injunctive relief of this nature
would presumably not be necessary -- indeed the plaintiffs' request
in this case seems to have been mooted by the consent order in the
other case -- and under these circumstances it necessarily follows
that a reasonable plaintiff would not bring a lawsuit now for this
form of injunctive relief.

### 5. Rule 23(b)(3) Criteria

To satisfy the requirements of Rule 23(b)(3), the plaintiff
must show that common questions "predominate over any questions
affecting only individual members" of the class and that class
resolution "is superior to other available methods for fairly and
efficiently adjudicating the controversy." Fed. R. Civ. Pro.

269

23(b)(3). Again, plaintiffs fail to satisfy these criteria.

Predominance is shown if the plaintiff "establish[es] that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." Cordes & Co. Fin. Servs. Inc, v. A.G. Edwards & Sons, 502 F.3d 91, 107-08 (2d Cir. 2007) (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001) (superseded by statute on other grounds)) (internal quotation marks and ellipsis omitted). Notably, predominance "is a more demanding criterion than the commonality inquiry under Rule 23(a)." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002) (citing AmChem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)). We have already concluded that plaintiffs fail to satisfy the commonality requirement. Necessarily, then, they cannot demonstrate predominance.[95]

---

[95] Given this conclusion, we need not offer a prolonged exegesis on superiority. We note only that the absence of predominant common issues means that a class proceeding would be dominated by the necessity of individual proof of most key issues on the First Amendment claims. We also note that many people who were present at the February 15 demonstration and had adverse experiences have long ago brought separate lawsuits and sought individual relief, and all of those suits have either settled or been resolved at trial. (Stipulation of Settlement and Order, McEnery v. City of New York, 03-cv-6307 (S.D.N.Y. Sept. 28, 2007), ECF No. 70; Stipulation & Order of Settlement and Dismissal, Fountain v. City of New York, 03-cv-4526 (S.D.N.Y. July 13, 2007), ECF No. 70; see also, e.g. Scherer v. City of New

C. The Excessive-Force Class

The plaintiffs' second requested class would consist of all people who were subjected to excessive force on February 15 and all "those who are likely to be so subjected in the future." (Pls.' Class Mem. of Law at 8). We understand the latter portion of the formulation to be intended to encompass even people who were not at the demonstration, apparently on the theory that they might participate in future demonstrations, and we assume that this formulation is intended to match up with the requirements for a Rule 23(b)(2) class.

The apparent premise for plaintiffs' application for the excessive-force class is that the City pursued either a policy or a consistent practice of utilizing excessive force against the people seeking to participate in the February 15 demonstration. Indeed, otherwise the excessive-force claims would be self-evidently inappropriate for class treatment since each alleged victim's claim would turn on the particulars of his or her encounter with the police officer who used the force that the class member is contending was excessive. We assess the pertinent Rule 23 factors and conclude that plaintiffs have not justified

---

York, 2007 WL 2710100 (Sept. 7, 2007)).

certification of the requested class.

1. <u>Numerosity</u>

The number of people subjected to what plaintiffs refer to as excessive force is not readily discernible. We infer from the plaintiffs' testimony that a fairly large number of people in the vicinity of the demonstration -- that is, on or near Second, Third and Lexington Avenues -- and some even further away, including near Sixth and Seventh Avenues, were subjected to some degree of force by the police. That said, the circumstances of these encounters vary considerably from person to person. For example, some were apparently pressed against or pushed by police officers seeking to move crowds of people from roadbeds onto sidewalks; at least one was struck in the back, seemingly without provocation; some were pushed by police horses and at least a few were stepped on by the mounts; some were physically seized and thrown to the ground as part of an arrest; some were also kneed as part of an arrest and/or had their arms twisted in preparation for handcuffing; and some were handcuffed in positions that caused discomfort or pain.[96]

_____

[96] In plaintiffs' briefing they also refer to demonstrators being pepper-sprayed by the police and assert that the police "used pepper spray as a means of crowd control." (Pls.' Class Mem. of Law at 15). None of the named plaintiffs, however, reported being subjected to pepper spray.

Whether any, some or all of these encounters involved excessive force is subject to triable dispute, the resolution of which would require an exploration of the particular circumstances in which force was used, including the extent of the force and the reasons for its use.

For purposes of the present motion it is reasonable to assume, based on the testimony of plaintiffs, that more than forty individuals were subjected to force that may give rise to a colorable, that is, a triable, claim of excessiveness.[97] The other pertinent factors, however, demonstrate that class certification would be inappropriate.

2. Commonality & Typicality

We have already concluded that the evidence of record cannot

---

[97] As we note below, in briefing the excessive-force class application, plaintiffs focus on the Department's allegedly aggressive use of the Mounted Patrol. We infer that this focus was chosen because, as we have seen above, the use of horses at the demonstration is the one aspect of the Department's use of force that is susceptible to at least a triable claim of lack of supervision by the Mounted Patrol commander and two other senior supervisors, and hence it suggests the possibility of some uniformity of the facts underlying liability. That said, this focus would narrow considerably the number of people who were said to have been injured or otherwise adversely affected as a result of the alleged use by the Police Department of excessive force.

sustain plaintiffs' contention that the City engaged in a policy or practice of exerting excessive force against members of the public who sought to participate in the February 15 demonstration. (See pp. 159-70, supra). This does not mean that there were not instances of excessive force or that such instances were not numerous, but it does require that claims for excessive force turn on a case-by-case evaluation of each encounter. This fact readily demonstrates that plaintiffs cannot satisfy the commonality and typicality requirements of Rule 23(a).

This problem is comparable to that faced by the plaintiffs in the recent Wal-Mart decision. In that case the plaintiffs sought a nationwide class to pursue claims of gender discrimination premised on the contention that Wal-Mart had engaged in a pattern or practice of such discrimination. In rejecting the class application, the Supreme Court noted that an individual's Title VII claim turned on "the reason for the particular employment decision." 131 S.Ct. at 2552 (quoting Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 (1984)). Since the proposed class encompassed a challenge to a vast number of individual employment decisions, commonality in that context depended on whether there was "some glue holding the alleged reasons for all those decisions together." Id. at 2552 (emphasis in original). To provide that

274

"glue," the plaintiffs were required to demonstrate some across-the-board practice (whether by use of objectively biased criteria or a policy or practice of discrimination), id. at 2553 (discussing Falcon, 457 U.S. at 157-58), and in fact the Wal-Mart plaintiffs contended that Wal-Mart followed a widespread -- indeed, national -- pattern or practice of discriminating against female employees. Since the Supreme Court found that the record on the class motion demonstrated an absence of such an affirmative policy or practice, id.,[98] it held that the plaintiffs had failed to establish commonality. Because of the absence of an across-the-board policy or practice, the proof of discrimination would necessarily require, at the very least, individualized proof as to the circumstances surrounding each store manager's decisions. Hence there was no meaningful commonality between the particular experiences of the named plaintiffs and those of the class. Id. at 2554-55.

By parity of reasoning, plaintiffs' excessive-force claims in this case cannot satisfy the commonality and typicality standards. Absent a City policy or practice of undertaking, encouraging or

---

[98] According to the Court, the only national policy or practice in evidence was to allow individual store managers broad discretion in hiring and promotion. Id. at 2554. It further found no evidence that this discretion was uniformly exercised by the managers in the direction of discriminating against women. Id. at 2554-55.

uniformly acquiescing in the use of excessive force against would-be demonstrators, there is no "glue" to hold together the disparate claims of excessive force by members of the class. Each instance of force would have to be examined to determine whether it was excessive, and hence the class format would be unworkable.

Moreover, although plaintiffs' papers have emphasized, as the principal targeted use of force, the Department's utilization of the Mounted Patrol, and although we have recommended preserving several plaintiffs' horse-related claims against defendants Acerbo, Smolka and Joseph Esposito, that does not save the class. First, as noted, the various encounters that a few plaintiffs had with police horses varied considerably one from another, with one reporting horses coming close to her or pushing others in a crowd (Venizelos Dep. at 49-51), another reporting being pushed or struck in the head by the chest of a horse, although with no lasting injury (Silva Dep. at 80-81), another being knocked down and having his foot stepped on (Connor Dep. at 79), and one whose leg was seriously injured when a horse apparently inadvertently stepped on her. (Haus Dep. at 55-59, 72-86, 88-91). There is also no evidence that the allegedly over-aggressive use of the horses injured a sufficient number of other people in such comparable circumstances as to permit a single adjudication against Acerbo, Esposito and

276

Smolka of both excessiveness of force and lack of adequate supervision. Indeed, the horses were used in a number of different locales at different times and in somewhat varying circumstances, and hence inevitably the specifics of each individual encounter would have to be examined to determine the viability of a class member's claim.

In sum, plaintiffs fail to establish such uniformity of conduct by the police as would justify a finding of commonality. For the same reasons, they also fail to demonstrate that their claims in this respect are typical of the purported class members.

### 3. Adequacy

As was the case with plaintiffs' requested First Amendment class, we see no basis to question the adequacy of the named plaintiffs to represent the proposed excessive-force class.

### 4. Rule 23(b)(2) Criteria

Even if the plaintiffs had satisfied the Rule 23(a) standards for the class as they define it, we would find that they have not shown that the obtaining of an injunction against excessive force

277

was sufficiently central to the current case for to justify Rule 23(b)(2) certification. As noted, the evidence reflects that the Police Department has adequate standards that it utilizes in training its Mounted Police, and the record does not reflect Department-wide failings in supervising its personnel in the utilization of force. Ultimately, then, this case appears to be, in this respect, one predominantly for individualized damages for provable use of excessive force, and hence it does not meet the Rule 23(b)(2) criteria.

If the class were limited to people injured or likely to be injured by the failure of the Department to apply its recognized standards to the use of its Mounted Patrol, the argument for an injunction might, in theory, be somewhat stronger, and we do not reject out of hand the potential propriety of such relief. Nonetheless, as noted, such relief would likely be mooted -- in whole or in part -- by the Stauber stipulation and order. Moreover, since plaintiffs fail to demonstrate satisfaction of the principal other requirements for such a horse-limited class -- notably commonality, typicality and (as we shall see) predominance, as well as possibly numerosity -- we need not definitively assess this particular question here.

5. Rule 23(b)(3) Standards

Finally, we note that plaintiffs cannot meet the predominance requirement of Rule 23(b)(3). As we have observed, that criterion is still more stringent than the commonality and typicality prerequisites of Rule 23(a), and since plaintiffs have failed to satisfy those, perforce they cannot meet this test either.

D. The False-Arrest Class

The proposed false-arrest class is defined in a manner parallel to that of the excessive-force class. Our analysis of this application also parallels that applied to the preceding class-certification request.

Briefly, although the total number of people arrested at the February 15 demonstration vastly exceeds forty, how many were arrested without justification is entirely unknown, and there is no basis for assuming that all or even a substantial number of those arrests were without probable cause. This absence of proof is related to the fact that, as noted before, plaintiffs fail to demonstrate a basis for concluding that the City undertook a policy

279

or practice of engaging in illegal arrests at the demonstration.[99] (See supra pp. 56-63).

The absence of any such proof also readily establishes that plaintiffs cannot satisfy the commonality, typicality and predominance requirements of Rules 23(a) and 23(b)(3). The lawfulness of each arrest requires an assessment of the circumstances surrounding it. Necessarily, then, there is not a common issue or set of issues that would be subject to triable dispute and would be dispositive of, or significant for, the resolution of the arrest claims that may be advanced by or on behalf of the members of the proposed class.

As for the Rule 23(b)(2) criteria, absent some basis for inferring a policy or widespread practice of false arrests, there would seem to be little or no rationale for a suit designed to enjoin false arrests at demonstrations. In short, plaintiffs cannot meet this test either.

---

[99] This failing distinguishes this case from MacNamara, in which the plaintiffs proffered evidence of geographically distinct mass arrests by the police in the days before or during the Republican National Convention in 2004. 2011 WL 1991144, at *2-5. It was on that basis that the court in MacNamara certified a class and a series of sub-classes of all those arrested in those specifically defined locations. Id. at *16-17.

E. The Unlawful-Conditions-of-Detention Class

Plaintiffs' remaining class-certification request seeks recognition of a class consisting of everyone who was arrested at the February 15 demonstration and subjected to "cruel and inhumane conditions of confinement, including excessive detention," as well as all who are likely to be so detained in the future. (Pls.' Class Mem. of Law at 8-9). According to plaintiffs' briefing, this category is intended to encompass arrestees who were held for an extended period of time, which plaintiffs do not define but seem to assume involves detention for at least eight, ten or twelve hours; who were exposed to cold weather during some portion of their detention; who were denied food or water during their detention; who were denied access to toilets during their detention; who were handcuffed for extended periods of time in cuffs that caused pain or other discomfort; and who were subjected to interrogations about their political affiliations. (Pls.' Class Mem. at 8-9, 19-20).

For reasons that we have noted, all but three of the plaintiffs were released within twelve to fourteen hours and cannot show an undue delay in their processing, and the remaining plaintiffs have not been able to show a link between their extensive detentions and any of the defendants, including the City.

(See pp. 187-93, supra). Accordingly, the claim for delayed processing cannot form the basis for a class action in any event. We have also concluded that exposure of some of the plaintiffs to the cold for limited periods of time does not trigger any constitutional liability, and hence that circumstance does not provide a basis for certification of a class. Similarly, the failure of the police to provide food or water to the arrested plaintiffs released within twelve hours did not trigger constitutional exposure by the City or by any named individual defendants and hence no class can be certified for arrestees so affected.[100] (See pp. 193-203, supra).

As for the balance of the complained-of conditions, the denial of toilets to some of the plaintiffs and the maintaining of tight handcuffs for extended periods despite requests that they be loosened were the product of individual decisions by police officers who have not been identified as including any of the individual defendants here. Since there is no evidence that the City itself followed a plan or practice of denying toilet access to

---

[100] It appears that those arrestees held for longer periods -- that is, overnight -- were offered some food. (Parkel Dep. at 39; Venizelos Dep. at 115-16). It is also the case that those arrestees who had brought food or water with them to the demonstration were permitted to eat or drink what they had brought. (Dodde Dep. at 96, 114-16; Defs.' Ex. DDD at 338).

arrestees or that it pursued a systematic policy of not loosening tight handcuffs -- indeed, some of the arrestees reported that their cuffs had been loosened and that at various points they were removed -- plaintiffs cannot demonstrate a uniform decision the invalidity of which would establish the claims or an essential part of the claims of class members for exposure to unconstitutional conditions of detention.

Based on the lack of a City policy or practice to which plaintiffs can point that would have required, encouraged or acquiesced in denial of essential necessities for arrestees being processed, plaintiffs cannot demonstrate commonality or typicality under Rule 23(a) or predominance under Rule 23(b)(3). Given the varied experiences of the plaintiffs when in custody and particularly the absence of any defendant against whom such a claim of unreasonable conditions of detention may be pressed, their application for a class corresponding to these various versions of such a claim must be denied.

A slightly different analysis applies to certain plaintiffs' claims with respect to their political interrogation, which we have found raise issues of material fact as to whether the City had in place a policy or practice regarding political interrogation and

what justification, if any, the police had for it, as well as questions as to whether that type of interrogation violates the First Amendment. Four of the fifteen remaining plaintiffs testified that they had been questioned in this manner (Parkel Dep. at 43-45, Venizelos Dep. at 31, Cavanna Dep. at 217, Dellal Dep. at 73, 83), and three of those plaintiffs actually included a claim for such interrogation in the complaint. (2d Am. Compl. at ¶¶ 62, 71, 73). As we noted above, such claims have been brought in other cases arising out of the February 15 demonstration. (See pp. 66-72, supra; Fountain Report & Recommendation at 15 & n.8). As plaintiffs reference political interrogation in their class certification motion (Pls.' Class Mem. of Law at 19), we address whether certification would be appropriate for a class limited to the political-interrogation issues.

Other than the four named plaintiffs's allegations of political interrogation (and the fact that some other arrestees were apparently treated in the same manner), we are presented with only one piece of evidence as to what proportion of arrestees were questioned in this manner: a report by the New York Civil Liberties Union, recounting that, out of "over 300 witness accounts received by the NYCLU about police actions on February 15" (Pls.' Ex. 5 at 338), "eight accounts tell of detainees being questioned about

284

their organizational affiliations." (Id. at 358). This evidence seems to suggest that political interrogation was in fact limited to a small subset of the arrestees. Hence, while plaintiffs have raised an issue of material fact as to the existence of a policy or practice of political interrogation, albeit one that clearly was not followed in the case of every arrestee, we do not believe that they have carried their burden to show, by a preponderance of the evidence, that the potential class of arrestees subjected to political interrogation on February 15 is sufficiently numerous to warrant class certification.[101] In the interest of completeness, we will briefly address the remaining Rule 23 criteria as applied to this subclass.

If we were to assume that a narrowly-defined class consisting of only those who were arrested and subjected to political interrogation on February 15 could satisfy the numerosity requirements of Rule 23(a), we would likewise assume that they would adequately represent the interests of the class. (See pp. 267, supra). Furthermore, it appears that three questions of fact

---

[101] We note as well that at least two potential members of this class have long since brought and settled their own individual lawsuits. (See Fountain Report & Recommendation at 15 & n.8; Stipulation & Order of Settlement and Dismissal, Fountain v. City of New York, 03-cv-4526 (S.D.N.Y. July 13, 2007), ECF No. 70; Stipulation & Order of Settlement and Dismissal, Schneider v. City of New York, 04-cv-5978 (S.D.N.Y. Mar. 8, 2006), ECF No. 7).

and law central to this claim -- whether the City in fact had a policy or practice of political interrogation, whether there was a legitimate law-enforcement purpose to that interrogation, and whether the policy of political interrogation violates the First Amendment -- are indeed common to the class, and that the three individual plaintiffs' claims are typical of the claims of the class as a whole. Hence it appears that this limited subclass, were it sufficiently numerous, might satisfy the requirements of Rule 23(a).

It also appears that, with respect to this narrow subclass, "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof," Cordes & Co. Fin. Servs., Inc., 502 F.3d at 107-08 (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d at 136), and thus satisfy the requirements of Rule 23(b)(3). The primary factual question relating to the City's liability with respect to plaintiffs' political-interrogation claims is whether there was in fact a policy or practice of asking certain arrestees questions that invaded their First Amendment association rights. The proof on this issue will necessarily be the same for each class member. Similarly, any potential justification for the City's alleged

interrogation policy would presumably be part of the policy itself and thus subject to generalized proof, as would the question of whether that justification may pass First Amendment scrutiny. Although the question of whether any individual plaintiff's interrogation was justified would necessarily be individualized, this does not preclude certification.

If we ignored the numerosity requirement, we would then ask whether a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "[T]he factors relevant to this analysis include: the interest of class members in controlling separate actions; the extent and nature of existing litigation concerning the controversy; the desirability or undesirability of concentrating litigation of the class claims in the particular forum; and the likely difficulties in managing a class action." MacNamara, 2011 WL 1991144, at *19 (citing Fed. R. Civ. P. 23(b)(3)). We believe that the latter two of these factors weigh in favor of class adjudication, since political-interrogation claims against the City must necessarily be in this District regardless of whether they are class actions or individualized claims, and managing the litigation of this claim would be no more difficult if three of the seventeen plaintiffs represented a class on this

287

issue. While there has been litigation by other putative class members regarding this issue in the past (see supra pp. 66-72), it appears that those cases have settled, and hence "the remaining putative class members have not expressed a similar interest [in controlling their own claims] by filing separate actions." MacNamara, 2011 WL 1991144, at *19. It thus appears that, numerosity aside, a class action would be superior to individual adjudication of the political-interrogation claims.

We believe that the subclass would satisfy the requirements of Rule 23(b)(2), as it would challenge an alleged Police Department police or practice that could be the subject of injunctive or declaratory relief that would apply to the class as a whole. But, as stated above, without evidence showing that a sufficiently numerous class of plaintiffs was in fact subjected to political interrogation, neither a Rule 23(b)(2) class nor a Rule 23(b)(3) class limited to this issue not be certified. Hence plaintiffs Cavanna, Parkel, and Venizelos may proceed with their political-interrogation claims against the City, but they may not do so as representatives of a class.

CONCLUSION

For the reasons stated, we recommend that defendants' motion for partial summary judgment be granted in part and denied in part, that plaintiffs' motion for partial summary judgment be denied, and that plaintiffs' motion for class certification be denied. Specifically, we recommend that the following claims be permitted to proceed to trial under section 1983:

- Plaintiffs Bryant, Connor, Dodde, Lamb, Silva, Spitzer, and Stevens' First Amendment claims against defendants Joseph and Michael Esposito with respect to the implementation of the plan, specifically, the lack of communication of access information to the public;

- Plaintiffs Cavanna, Parkel, and Venizelos' First Amendment claim against the City for an alleged policy or practice of unconstitutional interrogation about their political affiliations;

- Amy Haus's excessive-force claim against Christopher Acerbo, Bruce Smolka, and Joseph Esposito;

- John Connor's excessive-force claim against Acerbo, Smolka,

289

and Joseph Esposito, and his false-arrest and malicious-prosecution claims against Smolka;

- Carlos Sanchez's false-arrest and malicious-prosecution claims against Smolka;

- Delaine Douglas's claims against Wesley Otero of excessive force, false arrest, and malicious prosecution;

- Sara Parkel's false-arrest claim against Jeff Millenbach;

- Abraham Blair's claims against Daniel Ryan of excessive force, false arrest, and malicious prosecution;

- William Silva's false-arrest and malicious-prosecution claims against Smolka and "Officer Kelly", his excessive-force claim against "Officer Kelly", and his excessive-force claim against defendants Acerbo, Smolka, and Joseph Esposito;

- Melvyn Stevens' false-arrest and malicious-prosecution claims against Neil Spadaro;

- Don Bryant's false-arrest and malicious-prosecution claims

290

against Smolka;

- Robert Dodde's false-arrest and malicious-prosecution claims against Smolka;

- Jasmine Dellal's false-arrest and excessive-force claims against Dennis Hannon;

- Emily Venizelos' claims against Rocco Loccisanno for excessive force, false arrest, and malicious prosecution; and

- Matthew Cavanna's claims against John Beale for excessive force and false arrest, including the claim that the arrest and use of force were in retaliation for Cavanna's exercise of his First Amendment rights.

Furthermore, as stated above, each of the plaintiffs (except Cavanna) who retains a section 1983 claim for excessive force may also assert the parallel state common-law claim for assault and battery against the arresting officer defendant and the City. Similarly, each of the plaintiffs (except Cavanna) who retains a section 1983 claim for false arrest and/or malicious prosecution may also assert the parallel state common-law claims against the

291

arresting officer defendant and the City. In addition, Adele Spitzer may assert a state common-law claim for assault and battery against the City on the basis of respondeat superior. Finally, each of the plaintiffs (except Cavanna and Lamb) may assert parallel claims for civil damages as a remedy for the alleged violation of their rights under the New York State Constitution. We note, as stated above, that the City may be held liable on these claims on the basis of respondeat superior. (See pp. 203-226, supra).

We further recommend that all other claims against all other defendants be dismissed.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Robert W. Sweet, Room 1940, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. Pro. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d.

292

Cir. 2000) (citing <u>Small v. Sec'y. of Health & Human Servs.</u>, 892

F.2d 15, 16 (2d Cir. 1989)).


Dated: New York, New York
       August 31, 2011



_____
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE




Copies of this Report & Recommendation are being mailed today to:

Jonathan C. Moore, Esq.
Vera M. Scanlon, Esq.
Beldock Levine & Hoffmann LLC
99 Park Avenue
Suite 1600
New York, New York 10016

Susan Halatyn, Esq.
Dara L. Weiss, Esq.
Mark Zuckerman, Esq.
Elizabeth Dollin, Esq.
Michael Gertzer, Esq.
Elizabeth M. Daitz, Esq.
Corporation Counsel
  of the City of New York
100 Church Street
New York, New York 10007